IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) Case No. 12-cv-01087-JSM-TGW |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BRIDGEWATER COMMUNITY | ) |
| ASSOCIATION, INC. | ) |
| | ) |
| Defendant. | ) |
| | ) |

## AFFIDAVIT OF STEVEN M. DAVIS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| STATE OF FLORIDA | ) |
| | )SS: |
| COUNTY OF MIAMI-DADE | ) |

BEFORE ME, the undersigned authority, this day personally appeared STEVEN M. DAVIS, ("Affiant") who was sworn and states the following:

1.  I, Steven Davis, am over the age of 21, and competent to testify in Court, and make this Affidavit based upon personal knowledge.

2.  I currently serve as counsel of record for the Plaintiff in this action

3.  I personally performed a title search to determine that the Wells Fargo mortgage which was foreclosed was in fact a first mortgage when it was foreclosed by Wells Fargo.

4.  A true and correct copy of the Pasco County Circuit Court docket from the Wells Fargo foreclosure case is attached hereto as Exhibit "A". I marked the portion where Bridgewater Community Association, Inc. was served with the Wells Fargo foreclosure

complaint

5.     A true and correct copy of the Wells Fargo foreclosure judgment is attached hereto as Exhibit "B".

6.     Attached to my Affidavit as Exhibit "C" is a true and correct copy of the Bridgewater Declaration of Restrictions as referenced in Plaintiff's opposition.

7.     I make the above assertions based on my own personal knowledge and belief.


FURTHER AFFIANT SAYETH NAUGHT.

STEVEN M. DAVIS


STATE OF FLORIDA          :
                                            SS:
COUNTY OF MIAMI-DADE  :

Sworn to (or affirmed) and subscribed before me this _____ day of_____ 2013, by STEVEN DAVIS, who is personally known to me or who has provided_____

_____ as identification.


My commission expires:                    Notary Public

                                                      Printed Name:_____

ACTIVE: U06092/332521:4669468_1

CARLOS A. GARCIA
MY COMMISSION # EE 204240
EXPIRES: July 7, 2016
Bonded Thru Notary Public Underwriters

LAW OFFICES
BECKER & POLIAKOFF, P.A.
121 ALHAMBRA PLAZA, 10TH FLOOR • • CORAL GABLES, FL 33134
TELEPHONE (305) 262-4433



*Paula S. O'Neil, Ph.D.*
Clerk & Comptroller Pasco County, Florida

## Search by Case Number

PRINTABLE VERSION

**Basic Case Information**

| | |
|---|---|
| Case Name | WELLS FARGO VS M P GAYDA |
| Case # | 51-2008-CA-001844-CAAX-ES |
| Current Judge | SECTION J4 |
| Filing Type | Foreclosure On Real Property |
| Case Status | Closed |
| Filing Date | 3/6/2008 |
| Status Date | 2/16/2010 |

**Parties to this Case**

| Party Type | Party Name | Party Details |
|---|---|---|
| Defendant | ANY AND ALL UNKNOWN PARTIES | addr-atty-alias |
| Defendant | BRIDGEWATER COMMUNITY ASSOCIATION INCORPORATED | addr-atty-alias |
| Defendant | GAYDA KARIN A | addr-atty-alias |
| Defendant | GAYDA MICHAEL P | addr-atty-alias |
| Defendant | TENANT 1 | addr-atty-alias |
| Defendant | TENANT 2 | addr-atty-alias |
| Defendant | TENANT 3 | addr-atty-alias |
| Defendant | TENANT 4 | addr-atty-alias |
| Defendant | WELLS FARGO BANK NA | addr-atty-alias |
| Plaintiff | WELLS FARGO BANK NA | addr-atty-alias |
| Defendant | WELLS FARGO BANK NATIONAL ASSOCIATION | addr-atty-alias |

**Register of Actions**

| Event Date | Seq | Event |
|---|---|---|
| 5/26/2010 | 1 | CERTIF OF TITLE ISSUED TO: PLTF REC 052610 1 PG MLD 6; WELLS FARGO BANK NA |
| 5/26/2010 | 1 | CERTIFICATE OF DISBURSEMENTS 0.00 MLD 6; WELLS FARGO BANK NA |
| 5/10/2010 | 5007 | PMT:CA FR ONLINE SALES FEE; B121716; $27.00; WELLS FARGO BANK NA |
| 5/10/2010 | 5006 | PMT:DOCUMENTARY STAMPS; B121716; $490.70; WELLS FARGO BANK NA |
| 5/10/2010 | 2 | ASM:CA FR ONLINE SALES FEE; B121716; $27.00; WELLS FARGO BANK NA |
| 5/10/2010 | 1 | ASM:DOCUMENTARY STAMPS; B121716; $490.70; WELLS FARGO BANK NA |
| 4/13/2010 | 5005 | PMT:CA FORECLOSURE SALES; B119546; $70.00; WELLS FARGO BANK NA |
| 4/13/2010 | 2 | ASM:CA FORECLOSURE SALES; B119546; $70.00; WELLS FARGO BANK NA |
| 4/13/2010 | 1 | CERTIF SALE W/ATTACH PROOF PUB SOLD TO PL1 70100.00 MLD 6 |
| 3/29/2010 | 1 | PROOF OF PUBLICATION 120.00 |
| 3/25/2010 | 2 | NTC OF FILING BANKRUPTCY COURT ORDER GRANTING STAY |
| 3/25/2010 | 1 | NTC OF FILING COPY OF ASSIGNMENT OF MORTGAGE; WELLS FARGO BANK NA |
| 3/15/2010 | 1 | ONLINE AUCTION SCHEDULED 041310 |
| 3/11/2010 | 1 | NTC OF HEARING 032510 AT 1030AM |
| 3/10/2010 | 2 | LETTER TO PRESS NTC OF SALE GULF COAST BUSINESS REVIEW BEG 031910 |
| 3/10/2010 | 1 | NTC OF SALE 041310 |
| 2/16/2010 | 6 | FILING CLOSED FOR SRS |
| 2/16/2010 | 5 | UNIFORM FINAL JDMT FORECLOSURE 164,213.41 TEPPER 021210 REC 031110 7 PGS MLD 6; WELLS FARGO BANK NA |
| 2/16/2010 | 4 | FINAL DISPOSITION FORM |
| 2/16/2010 | 3 | MEMORANDUM OF LAW IN SUPPORT OF PLFS MOTION FOR FINAL SUMMARY JUDGMENT OF MORTGAGE FORECLOSURE; WELLS FARGO BANK NA |
| 2/16/2010 | 2 | MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL SUMMARY JUDGMENT; WELLS FARGO BANK NA |
| 2/16/2010 | 1 | NTC OF FILING ATTACHED MOTION FOR RELIEF FROM STAY; WELLS FARGO BANK NA |
| 1/8/2010 | 1 | NTC OF HEARING 012710 AT 315PM |
| 12/2/2009 | 2 | AFF AS TO AMTS DUE AND OWING |
| 12/2/2009 | 1 | NTC OF FILING; WELLS FARGO BANK NA |
| 10/8/2009 | 1 | CASE REASSIGNED BY COURT REASSIGNED PER JUDGE BRAY MEMO 09/14/09 |
| 9/21/2009 | 1 | CERTIFICATE OF COMPLIANCE WITH FORECLOSURE PROCEDURES AMENDED |
| 8/24/2009 | 1 | ORDER GRANTING: LEAVE TO SUBSTITUTE PARTY DEF GARDNER 082409 SUBST DF 10 FOR DF 4 SENT TO REC 082609 2 PGS; WELLS FARGO BANK N |
| 8/17/2009 | 1 | MTN TO SUBSTITUTE PLF/DEF; WELLS FARGO BANK NA |
| 2/13/2009 | 4 | NTC OF FILING ORIGINAL NOTE AND MORTGAGE; WELLS FARGO BANK NA |
| 2/13/2009 | 3 | AFF TO REASONABLE ATTY FEE; WELLS FARGO BANK NA |
| 2/13/2009 | 2 | AFF AS TO AMTS DUE AND OWING; WELLS FARGO BANK NA |
| 2/13/2009 | 1 | NTC OF FILING; WELLS FARGO BANK NA |
| 8/4/2008 | 4 | NTC OF VOLUNTARY DISMISSAL OF DEFS 3 AND 6 THRU 9 SENT TO REC 080808 2 PGS; WELLS FARGO BANK NA |
| 8/4/2008 | 3 | NTC OF VOLUNTARY DISMISSAL AS TO COUNT II RE-ESTABLISHMENT OF LOST NOTE SENT TO REC 080808 2 PGS; WELLS FARGO BANK NA |
| 8/4/2008 | 2 | AFF AS TO COSTS AND ATTYS FEES |
| 8/4/2008 | 1 | MTN FOR SUMMARY JDMT INCLUDING A HEARING TO TAX ATTYS FEES AND COSTS; WELLS FARGO BANK NA |
| 6/26/2008 | 1 | DEFAULT ENTERED DF1 DF2 AND DF5 |
| 6/24/2008 | 2 | MTN FOR DEFAULT ON: DF1 DF2 AND DF5; WELLS FARGO BANK NA |
| 6/24/2008 | 1 | AFF OF NON MILITARY SVC; WELLS FARGO BANK NA |
| 5/12/2008 | 2 | ANSWER - CIVIL AND REQUEST FOR NOTICE; WELLS FARBO BANK NA |
| 5/12/2008 | 1 | REQUEST FOR PRODUCTION; WELLS FARGO BANK NA |
| 5/6/2008 | 6 | SUMMONS RETURN UNSRVD:; TENANT 2 |
| 5/6/2008 | 5 | SUMMONS RETURN UNSRVD:; TENANT 1 |
| --------->>>> 5/6/2008 | 4 | SUMMONS RETURN SRVD: 031008; BRIDGEWATER COMMUNITY ASSOCIATION INCORPORATED |

## EXHIBIT "A"

PASCOCLERK.COM - Courts-Results-nc-Case-Search          http://www.pascoclerk.com/public-courts-results-nc-case-search.asp?mdqs=c

| Date | No. | Description |
|------|-----|-------------|
| 5/6/2008 | 3 | SUMMONS RETURN SRVD: 031008; WELLS FARBO BANK NA |
| 5/6/2008 | 2 | SUMMONS RETURN SRVD: 031008; GAYDA KARIN A |
| 5/6/2008 | 1 | SUMMONS RETURN SRVD: 031008; GAYDA MICHAEL P |
| 3/13/2008 | 2 | SUMMONS ISSUED AND RETURNED TO; GAYDA KARIN A |
| 3/13/2008 | 1 | SUMMONS ISSUED AND RETURNED TO ELISOR; GAYDA MICHAEL P |
| 3/11/2008 | 2 | ORDER APPT PROCESS SERVER BRAY 3/10/08 |
| 3/11/2008 | 1 | MTN TO APPT PROCESS SERVER; WELLS FARGO BANK NA |
| 3/7/2008 | 6 | SUMMONS ISSUED AND RETURNED TO PROCESS SERVER; TENANT 2 |
| 3/7/2008 | 5 | SUMMONS ISSUED AND RETURNED TO PROCESS SERVER; TENANT 1 |
| 3/7/2008 | 4 | SUMMONS ISSUED AND RETURNED TO PROCESS SERVER; BRIDGEWATER COMMUNITY ASSOCIATION INCORPORATED |
| 3/7/2008 | 3 | SUMMONS ISSUED AND RETURNED TO PROCESS SERVER; WELLS FARBO BANK NA |
| 3/7/2008 | 2 | SUMMONS ISSUED AND RETURNED TO PROCESS SERVER; GAYDA KARIN A |
| 3/7/2008 | 1 | SUMMONS ISSUED AND RETURNED TO PROCESS SERVER; GAYDA MICHAEL P |
| 3/6/2008 | 5004 | PMT:CA RECORDING DOC/ADDL NAME; N111125; $7.00; WELLS FARGO BANK NA |
| 3/6/2008 | 5003 | PMT:CA ADDITIONAL DEF OVER 5; N111125; $8.00; WELLS FARGO BANK NA |
| 3/6/2008 | 5002 | PMT:CA RECORD LIS PENDENS; N111125; $5.00; WELLS FARGO BANK NA |
| 3/6/2008 | 5001 | PMT:CA FF GENERAL; N111125; $255.00; WELLS FARGO BANK NA |
| 3/6/2008 | 8 | COMPLAINT; WELLS FARGO BANK NA |
| 3/6/2008 | 7 | CIVIL COVER SHEET; WELLS FARGO BANK NA |
| 3/6/2008 | 6 | FILING OPENED FOR SRS |
| 3/6/2008 | 5 | NTC OF LIS PENDENS SENT TO RECORDING (1) PAGES ON 03/11/2008; WELLS FARGO BANK NA |
| 3/6/2008 | 4 | ASM:CA RECORDING DOC/ADDL NAME; N111125; $7.00; WELLS FARGO BANK NA |
| 3/6/2008 | 3 | ASM:CA ADDITIONAL DEF OVER 5; N111125; $8.00; WELLS FARGO BANK NA |
| 3/6/2008 | 2 | ASM:CA RECORD LIS PENDENS; N111125; $5.00; WELLS FARGO BANK NA |
| 3/6/2008 | 1 | ASM:CA FF GENERAL; N111125; $255.00; WELLS FARGO BANK NA |

Excellence...Always
Pasco County Clerk & Comptroller © 2013

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL
CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA
CIVIL ACTION

WELLS FARGO BANK, NA,

    Plaintiff,

vs.

    CASE NO.   51-2008-CA-1844-ES
    DIVISION   J4



PAULA S. O'NEIL, PASCO CLERK & COMPTROLLER
03/11/10 01:41pm   1  of 7
OR BK **8286** PG **1082**

SPACE FOR
RECORDING ONLY
F.S.§695.26

MICHAEL P. GAYDA; KARIN A. GAYDA;
WELLS FARGO BANK, N.A.;
BRIDGEWATER COMMUNITY
ASSOCIATION, INC.

    Defendant(s).

## UNIFORM FINAL JUDGMENT OF FORECLOSURE

THIS MATTER was heard before the Court on Plaintiff's Motion for Summary Final Judgment of

Foreclosure on January 27, 2010. After consideration of all evidence presented, this Court rules as follows:

IT IS ADJUDGED that:

    1.    Plaintiff has submitted a Certification of Compliance with Foreclosure Procedures in

compliance with Administrative Order No. 2009-065 PA/PI-CIR or any subsequent Administrative Order.

    2.    VALUE OF CLAIM: At the initiation of this action, in accordance with section

28.241(1)(a)2.b., Florida Statutes (effective for actions file on and after June 1, 2009), Plaintiff estimated

the amount in controversy of claim to be $137,556.77. In accordance with section 28.241 (1)(a)2.c.,

Florida Statutes, the Court identifies the actual value of the claim to be $164,837.31. For any difference

between the estimated amount in controversy and the actual value of the claim that requires the filing fee

to be adjusted, the Clerk shall adjust the filing fee. In determining whether the filing fee needs to be

adjusted, the following graduated filing fee scale in section 28.241 (1)(a)2.d., Florida Statutes, controls:

| | |
|---|---|
| $400 | Value of claim less than or equal to $50,000 with 5 defendants or less |
| $905 | Value of claim greater than $50,000 but less than $250,000 with 5 defendants or less |
| $1,905 | Value of claim $250,000 or greater with 5 defendants or less |



EXHIBIT "B"

If an excess filing fee was paid, the Clerk shall provide a refund of the excess fee. If an additional filing

fee is owed, the Plaintiff shall pay the additional fee prior to the judicial sale. If any additional filing fee

owed is not paid prior to the judicial sale, the Clerk shall cancel the judicial sale without further order of

the Court.

   3.   The following amounts are due and owed to the Plaintiff:

| | |
|---|---|
| PRINCIPAL DUE ON THE NOTE SECURED BY THE MORTGAGE FORECLOSURED: | $129,383.66 |
| INTEREST ON THE NOTE AND MORTGAGE FROM 10/1/2007 TO 12/13/2009 | 18,525.27 |
| PER DIEM INTEREST AT 6.5% FROM 12/13/2009 TO 1/27/2010 | 1,051.20 |
| PRE-ACCELERATED LATE CHARGES THROUGH February 27, 2008 | 330.46 |
| TAXES | 8,837.26 |
| INSURANCE | 1,210.56 |
| TITLE SEARCH EXPENSES | 175.00 |
| TITLE EXAMINATION FEE | 150.00 |
| MIP/PMI ADVANCES | 0.00 |
| PROPERTY PRESERVATION | 1,675.00 |

| | | |
|---|---|---|
| 11/03/09 | 15.00 | Inspection |
| 10/29/09 | 80.00 | Lawn Care |
| 10/14/09 | 80.00 | Lawn Care |
| 09/29/09 | 80.00 | Lawn Care |
| 09/29/09 | 15.00 | Inspection |
| 09/14/09 | 80.00 | Lawn Care |
| 09/02/09 | 15.00 | Inspection |
| 08/26/09 | 80.00 | Lawn Care |
| 08/13/09 | 35.00 | Trip Charge |
| 08/12/09 | 80.00 | Lawn Care |
| 07/29/09 | 15.00 | Inspection |
| 07/10/09 | 15.00 | Inspection |
| 06/03/09 | 15.00 | Inspection |
| 05/05/09 | 15.00 | Inspection |
| 03/27/09 | 15.00 | Inspection |
| 02/27/09 | 15.00 | Inspection |
| 01/28/09 | 100.00 | Lawn Care |
| 01/26/09 | 15.00 | Inspection |
| 01/06/09 | 100.00 | Lawn Care |
| 12/29/08 | 15.00 | Inspection |
| 11/26/08 | 100.00 | Lawn Care |
| 10/06/08 | 100.00 | Lawn Care |
| 10/03/08 | 15.00 | Inspection |
| 09/17/08 | 100.00 | Lawn Care |
| 09/17/08 | 15.00 | Inspection |
| 09/10/08 | 100.00 | Lawn Care |
| 08/20/08 | 100.00 | Lawn Care |
| 08/04/08 | 15.00 | Inspection |

OR BK **8286** PG **1083**
2   of   7

| | | |
|---|---|---|
| 07/25/08 | 100.00 | Lawn Care |
| 07/16/08 | 15.00 | Inspection |
| 07/15/08 | 35.00 | Trip Charge |
| 07/14/08 | 30.00 | Photos |
| 07/14/08 | 40.00 | Lock Rekey |
| 07/14/08 | 15.00 | Inspection |
| 06/11/08 | 15.00 | Inspection |

OR BK **8286** PG **1084**
3 of 7

| | |
|---|---|
| BANKRUPTCY BALANCE | 1,000.00 |
| 10/17/2008  1000.00  Bankruptcy Fee | |
| | |
| Court Costs: | |
| FILING FEE | 265.00 |
| INVESTIGATION/SERVICE OF PROCESS | 350.00 |
| | |
| | |
| RECORDING FEE | 10.00 |
| | |
| SUBTOTAL | 162,963.41 |
| | |
| ATTORNEY'S FEE | 1,250.00 |
| | |
| **TOTAL SUM** | $164,213.41 |

4.      The total sum amount referenced in paragraph 3 shall bear interest from this date forward at

the prevailing statutory interest rate of 6%percent.

5.      Plaintiff, whose address is 3476 Stateview Boulevard MAC #X7801-013, Fort Mill, SC

29715, holds a lien for the total sum specified in paragraph 3 herein. The lien of the Plaintiff is superior

in dignity to any right, title, interest, or claim of the Defendants and all persons, corporations, and other

entities claiming by, though, or under the defendants or any of them and the property will be sold free

and clear of all claims of the defendants, with the exception of any assessments that are superior pursuant

to Sections 718.116 and 720.3085, Florida Statutes. The plaintiff's lien encumbers the subject property

located in PASCO County, Florida and described as:

LOT 11, BLOCK 10 BRIDGEWATER PHASE 1 AND 2, ACCORDING TO THE
PLAT THEREOF, RECORDED IN PLAT BOOK 48, PAGE 110, OF THE PUBLIC
RECORDS OF PASCO COUNTY, FLORIDA.

Property Address: 31132 MASENA DRIVE, ZEPHYRHILLS, FL  33544

6.      If the total sum with interest at the rate described in paragraph 4 and all costs accrued

subsequent to this judgment are not paid, the Clerk of this Court shall sell the property at public sale on

April 13_____, 2010, at 11:00AM to the highest bidder for cash, except as prescribed in paragraph

OR BK **8286** PG **1085**
4   of   7

7, in the following location:

WWW.PASCO.REALFORECLOSE.COM IN ACCORDANCE WITH CHAPTER 45 FLORIDA

STATUTES. in PASCO COUNTY, Florida. after having first given notice as required by Section 45.031,

Florida Statutes. Plaintiff must pay the costs associated with the Notice of Publication at least three (3) days

prior to the sale, or have arranged for the publication of the notice, or have arranged for publication of the

Notice.

The Clerk shall not hold a sale in the absence of the Plaintiff's Attorney or other representative, except

for an online sale. Plaintiff or its attorney may also cancel or postpone the sale by notifying the Clerk of the

Court of such cancellation or postponement via a fax sent to the Clerk prior to the sale being conducted.

7.      Plaintiff shall advance all subsequent required costs of this action and shall be reimbursed

for them by the Clerk if Plaintiff is not the purchaser of the property for sale.  If Plaintiff is the purchaser,

the Clerk shall credit Plaintiff's bid with the total sum with interest and costs accruing subsequent to this

Judgment, or such part of it, as is necessary to pay the bid in full.  If a third party bidder is the purchaser,

the third party bidder must pay the documentary stamps attached to the certificate of title in addition to

the bid.

8.      If Plaintiff incurs additional expenses subsequent to the entry of this Final Judgment but

prior to the sale date specified above, Plaintiff may, by written motion served on all parties, seek to

amend this final judgment to include said additional expenses.

9.      On filing of the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far

as they are sufficient, by paying: first, all of the Plaintiff's costs; second, documentary stamps affixed to the

Certificate, unless the property is purchased by a third party bidder; third, Plaintiff's attorneys' fees; fourth,

the total sum due to the Plaintiff, less the items paid, plus interest at the rate prescribed in paragraph 4 from

this date to the date of the sale; and by retaining any remaining amount pending the further Order of this

Court.

10.     On filing of the Certificate of Title, Defendant(s) and all persons claiming under or against

Defendant(s) since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the

property and the purchaser at the sale shall be let into possession of the property, except as provided in the

Protecting Tenants at Foreclosure Act of 2009 Pub. L. No. 11-22, 123 Stat. 1660. On filing of the Certificate

OR BK **8286** PG **1086**
5   of   7

of Sale, Defendant(s) right of redemption as provided by Section 45.0315, Florida Statutes shall be terminated.

11.     The Court finds, based upon the affidavits presented and upon inquiry of counsel for the Plaintiff, that the flat fee of $1,250.00 is reasonable and appropriate for the Plaintiff's counsel's attorney's fees.  The Court finds that there are no reasons for either reduction or enhancement pursuant to Florida Patient's Compensation Funds v. Rowe 472 So.2d 1145 (Fla. 1985), and the Court therefore has awarded reasonable attorney's fees in the amount indicated in Paragraph 3 of this Judgment.

12.     IMPORTANT INFORMATION PROVIDED pursuant to Section, 45.031, Florida Statutes:

IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT.

IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE.  IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.

IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED.  PLEASE CHECK WITH THE CLERK OF THE COURT, PASCO COUNTY, 38053 Live Oak Ave., Room 205, Dade City, FL 33523-3894, PHONE: 352-1,  WITHIN TEN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT Bay Area Legal Services, Inc - Pasco / Dade City Office (352)567-9044, Bay Area Legal Services, Inc - Pasco / New Port Richey Office (727)847-5494, Bay Area Legal Services, Inc. - Tampa Office (813)232-1343, TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT Bay Area Legal Services, Inc - Pasco / Dade City Office (352)567-9044, Bay Area Legal Services, Inc - Pasco / New Port Richey Office (727)847-5494, Bay Area Legal Services, Inc. - Tampa Office (813)232-1343, FOR ASSISTANCE, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.

13.     The Plaintiff may assign the judgment and credit bid by the filing of an assignment without further Order of the Court.

14.    The Court retains jurisdiction of this action to enter further Orders that are proper including, without limitation, orders authorizing writs of possession and an award of attorney's fees, and to enter deficiency judgments if the borrower has not been discharged in bankruptcy.

DONE AND ORDERED at PASCO County, Florida, on this _12_ day of _____, 2010.

Circuit Judge    LYNN TEPPIN

Copies furnished to all parties:
Robert Schneider, Esquire
Florida Default Law Group, P.L.
P.O. Box 25018
Tampa, Florida 33622-5018
All parties on the attached Service List

F08015913, Case No. 51-2008-CA-1844-ES, NMNC-FHA—

OR BK **8286** PG **1087**
**6** of **7**

USA/2-148

**Service List**

MICHAEL P. GAYDA
3892 Beaumont Loop
Spring Hill, FL 34609

Michael P. Gayda
c/o BK Attorney
Sheila D Norman
Norman and Bullington, P.A.
1905 West Kennedy Blvd
Tampa, FL 33606

KARIN A. GAYDA
3892 Beaumont Loop
Spring Hill, FL 34609

Karin A. Gayda
c/o BK Attorney
Sheila D Norman
Norman and Bullington, P.A.
1905 West Kennedy Blvd
Tampa, FL 33606

WELLS FARBO BANK, N.A.
c/o Edward b. Pritchard, Esq.
Foyle & Singer P.A
P.O Box 800
Tampa, FL  33601

OR BK **8286** PG **1088**
7    of    7

BRIDGEWATER COMMUNITY ASSOCIATION, INC.
C/o Smith, Brian K 9887 Fourth Street Northsuite 301
St. Petersburg, FL  33702

THIS INSTRUMENT PREPARED BY:

PATRICIA KIMBALL FLETCHER, ESQ.
PATRICIA KIMBALL FLETCHER, P.A.
DUANE MORRIS LLP
200 SOUTH BISCAYNE BLVD., SUITE 3400
MIAMI, FLORIDA 33131



2003188544

Rcpt: 722653     Rec: 460.50
DS: 0.00         IT: 0.00
10/07/03              Dpty Clerk

JED PITTMAN, PASCO COUNTY CLERK
10/07/03 04:34pm  1   of  102
OR BK 5574     PG 934

# DECLARATION
# FOR
# BRIDGEWATER

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 1. | Recitals | 2 |
| 2. | Definitions | 2 |
| 3. | Plan of Development | 6 |
| 4. | Amendment | 6 |
| | 4.1 General Restrictions on Amendments | 6 |
| | 4.2 No Vested Rights | 7 |
| | 4.3 Amendments Prior to and Including the Turnover Date | 7 |
| | 4.4 Amendments After the Turnover Date | 7 |
| 5. | Annexation and Withdrawal | 7 |
| | 5.1 Annexation by Developer | 7 |
| | 5.2 Annexation by Association | 7 |
| | 5.3 Withdrawal | 7 |
| 6. | Dissolution | 8 |
| | 6.1 Generally | 8 |
| | 6.2 Applicability of Declaration after Dissolution | 8 |
| 7. | Binding Effect and Membership | 8 |
| | 7.1 Term | 8 |
| | 7.2 Transfer | 8 |
| | 7.3 Membership and Voting Rights | 9 |
| | 7.4 Ownership by Entity | 9 |
| | 7.5 Voting Interests | 9 |
| | 7.6 Document Recordation by Owners Prohibited | 9 |

**EXHIBIT "C"**

7.7     Conflicts ...................................................................................................... 9
8.      Paramount Right of Developer ........................................................................ 9

9.      Operation of Common Areas ........................................................................... 9

        9.1     Prior to Conveyance ......................................................................... 9
        9.2     Construction of Common Areas Facilities ...................................... 9
        9.3     Use of Common Areas by Developer ............................................... 10
        9.4     Conveyance ...................................................................................... 10
                9.4.1   Generally ............................................................................. 10
                9.4.2   Form of Deed ...................................................................... 10
        9.5     Operation After Conveyance ........................................................... 11
        9.6     Paved Common Areas ...................................................................... 11
        9.7     Delegation and Managers ................................................................ 11
        9.8     Use ................................................................................................... 11
                9.8.1   Nonexclusive Use ............................................................... 12
                9.8.2   Right to Allow Use .............................................................. 12
                9.8.3   Obstruction of Common Areas ........................................... 12
                9.8.4   Assumption of Risk ............................................................. 12
                9.8.5   Owner's Obligation to Indemnify ...................................... 12
        9.9     Rules and Regulations ..................................................................... 12
                9.9.1   Generally ............................................................................. 12
                9.9.2   Developer Not Subject to Rules and Regulations .............. 13
        9.10    Public Facilities ............................................................................... 13
        9.11    Default by Another Owner ............................................................... 13
        9.12    Special Taxing Districts ................................................................... 13
        9.13    Water Mains ..................................................................................... 13
        9.14    Association's Obligation to Indemnify ............................................ 13
        9.15    Site Plans and Plats ......................................................................... 14
10.     Bridgewater Community Development District ................................................ 14

        10.1    Generally ........................................................................................... 14
        10.2    Creation of the District ..................................................................... 14
        10.3    District Assessments ........................................................................ 14
        10.4    Common Areas and Facilities Part of District ................................. 15
        10.5    Facilities Owned by District ............................................................. 15
11.     Maintenance by Association ............................................................................ 15

        11.1    Common Areas .................................................................................. 15
        11.2    District Facilities .............................................................................. 15
        11.3    Adjoining Areas ................................................................................ 15
        11.4    Negligence ........................................................................................ 15
        11.5    Right of Entry ................................................................................... 15
        11.6    Maintenance of Property Owned by Others ..................................... 16
12.     Use Restrictions .............................................................................................. 16

        12.1    Alterations and Additions ................................................................. 16
        12.2    Animals ............................................................................................. 16
        12.3    Artificial Vegetation ........................................................................ 16
        12.4    Cars and Trucks ................................................................................ 16
                12.4.1  Parking ................................................................................ 16
                12.4.2  Repairs and Maintenance of Vehicles ............................... 17
                12.4.3  Prohibited Vehicles ............................................................ 17
        12.5    Casualty Destruction to Improvements ............................................ 17
        12.6    Commercial Activity ........................................................................ 17

12.7     Completion and Sale of Units................................................................. 17
12.8     Control of Contractors ........................................................................... 17
12.9     Cooking.................................................................................................... 17
12.10    Decorations ............................................................................................. 18
12.11    Disputes as to Use.................................................................................. 18
12.12    Drainage System ..................................................................................... 18
12.13    Driveway Easement ................................................................................ 18
12.14    Extended Vacation and Absences .......................................................... 18
12.15    Fences and Walls; Screens ..................................................................... 18
12.16    Fuel Storage............................................................................................ 19
12.17    Garages ................................................................................................... 19
12.18    Garbage Cans .......................................................................................... 19
12.19    General Use Restrictions ........................................................................ 19
12.20    Hurricane Shutters ................................................................................. 19
12.21    Irrigation ................................................................................................. 19
12.22    Lake and Canal Slopes ............................................................................ 19
12.23    Laundry ................................................................................................... 19
12.24    Lawful Use .............................................................................................. 19
12.25    Lawn Maintenance Standards ............................................................... 20
         12.25.1  Trees........................................................................................ 20
         12.25.2  Shrubs ..................................................................................... 20
         12.25.3  Grass........................................................................................ 20
                  12.25.3.1  Cutting Schedule ................................................. 20
                  12.25.3.2  Edging .................................................................. 20
         12.25.4  Mulch ...................................................................................... 20
         12.25.5  Insect Control and Disease ..................................................... 20
         12.25.6  Fertilization............................................................................. 20
         12.25.7  Irrigation................................................................................. 20
         12.25.8  Weeding .................................................................................. 20
         12.25.9  Trash Removal ........................................................................ 20
         12.25.10 Right of Association to Enforce ............................................. 20
12.26    Landscaping and Irrigation of Lots; Removal of Sod and Shrubbery; Additional Planting ......... 20
12.27    Leases...................................................................................................... 21
12.28    Maintenance by Owners ........................................................................ 21
         12.28.1  Standard of Maintenance ....................................................... 21
         12.28.2  Enclosed Common Area .......................................................... 21
         12.28.3  Weeds and Refuse .................................................................. 22
12.29    Minor's Use of Facilities ......................................................................... 22
12.30    Nuisances ................................................................................................ 22
12.31    Oil and Mining Operations ..................................................................... 22
12.32    Personal Property.................................................................................... 22
12.33    Pools ....................................................................................................... 22
12.34    Roofs, Driveways and Pressure Treatment............................................ 22
12.35    Satellite Dishes and Antennae ............................................................... 22
12.36    Servants ................................................................................................... 22
12.37    Signs and Flags........................................................................................ 23
12.38    Sports Equipment ................................................................................... 23
12.39    Storage .................................................................................................... 23
12.40    Subdivision and Regulation of Land....................................................... 23
12.41    Substances .............................................................................................. 23
12.42    Swimming, Boating and Docks ............................................................... 23
12.43    Use of Homes .......................................................................................... 23
12.44    Visibility on Corners................................................................................ 23
12.45    Wetlands and Mitigation Areas .............................................................. 23
12.46    Windows or Wall Units............................................................................ 24

| | | |
|---|---|---|
| 12.47 | Window Treatments | 24 |
| 12.48 | Easement for Unintentional and Non-Negligent Encroachments | 24 |
| 13. | Requirement to Maintain Insurance | 24 |
| 13.1 | Association | 24 |
| 13.1.1 | Flood Insurance | 24 |
| 13.1.2 | Liability Insurance | 24 |
| 13.1.3 | Directors and Officers Liability Insurance | 24 |
| 13.1.4 | Other Insurance | 24 |
| 13.1.5 | Developer | 24 |
| 13.2 | Homes. | 24 |
| 13.2.1 | Requirement to Maintain Insurance | 24 |
| 13.2.2 | Requirement to Reconstruct or Demolish | 25 |
| 13.2.3 | Standard of Work | 25 |
| 13.2.4 | Additional Rights of Association | 25 |
| 13.2.5 | Association Has No Liability | 25 |
| 13.3 | Fidelity Bonds | 25 |
| 13.4 | Association as Agent | 26 |
| 13.5 | Casualty to Common Areas | 26 |
| 13.6 | Nature of Reconstruction | 26 |
| 13.7 | Additional Insured | 26 |
| 13.8 | Cost of Payment of Premiums | 26 |
| 14. | Property Rights | 26 |
| 14.1 | Owners' Easement of Enjoyment | 26 |
| 14.2 | Ingress and Egress | 27 |
| 14.3 | Development Easement | 27 |
| 14.4 | Public Easements | 27 |
| 14.5 | Delegation of Use | 27 |
| 14.6 | Easement for Encroachments | 27 |
| 14.7 | Permits, Licenses and Easements | 28 |
| 14.8 | Blanket Easement in Favor of District | 28 |
| 14.9 | Support Easement and Maintenance Easement | 28 |
| 14.10 | Drainage | 28 |
| 14.11 | Easement in favor of Association | 28 |
| 14.12 | Duration | 28 |
| 15. | Assessments | 28 |
| 15.1 | Types of Assessments | 28 |
| 15.2 | Purpose of Assessments | 28 |
| 15.3 | Designation | 29 |
| 15.4 | Allocation of Operating Costs | 29 |
| 15.5 | General Assessments Allocation | 30 |
| 15.6 | Use Fees and Individual Assessment | 30 |
| 15.7 | Commencement of First Assessment | 30 |
| 15.8 | Shortfalls and Surpluses | 30 |
| 15.9 | Budget | 30 |
| 15.10 | Establishment of Assessments | 31 |
| 15.11 | Initial Capital Contribution | 31 |
| 15.12 | Resale Capital Contribution | 31 |
| 15.13 | Assessment Estoppel Certificates | 31 |
| 15.14 | Payment of Home Real Estate Taxes | 31 |
| 15.15 | Creation of the Lien and Personal Obligation | 32 |
| 15.16 | Subordination of the Lien to Mortgages | 32 |
| 15.17 | Acceleration | 32 |

15.18   Non-Payment of Assessments ........................................................................ 32
15.19   Exemption .................................................................................................. 32
15.20   Collection by Developer .............................................................................. 33
15.21   Rights to Pay Assessments and Receive Reimbursement ............................... 33
15.22   Mortgagee Right ......................................................................................... 33
16.   Information to Lenders and Owners ......................................................................... 33

16.1   Availability .................................................................................................. 33
16.2   Copying ...................................................................................................... 33
16.3   Notice ......................................................................................................... 33
17.   Architectural Control .............................................................................................. 34

17.1   Architectural Control Committee .................................................................. 34
17.2   Membership ................................................................................................. 34
17.3   General Plan ................................................................................................ 34
17.4   Community Plan ........................................................................................... 34
17.5   Community Standards ................................................................................... 34
17.6   Quorum ....................................................................................................... 34
17.7   Power and Duties of the ACC ....................................................................... 35
17.8   Procedure .................................................................................................... 35
17.9   Alterations ................................................................................................... 36
17.10   Variances .................................................................................................... 36
17.11   Permits ....................................................................................................... 36
17.12   Construction by Owners ............................................................................... 36
17.13   Inspection ................................................................................................... 37
17.14   Violation ..................................................................................................... 37
17.15   Court Costs ................................................................................................. 37
17.16   Certificate ................................................................................................... 37
17.17   Certificate of Compliance ............................................................................ 37
17.18   Exemption .................................................................................................. 37
17.19   Exculpation ................................................................................................. 37
18.   Association ............................................................................................................ 38

18.1   Surface Water Management System ............................................................... 38
18.2   Association Easements ................................................................................. 38
19.   Owners Liability ..................................................................................................... 38

19.1   Loop System Irrigation ................................................................................ 38
19.2   Right to Cure .............................................................................................. 39
19.3   Non-Monetary Defaults ............................................................................... 39
19.4   No Waiver ................................................................................................... 39
19.5   Rights Cumulative ....................................................................................... 40
19.6   Enforcement By or Against Other Persons ..................................................... 40
19.7   Fines .......................................................................................................... 40
20.   Additional Rights of Developer ............................................................................... 40

20.1   Sales Office and Administrative Offices ........................................................ 40
20.2   Modification ................................................................................................ 41
20.3   Promotional Events ...................................................................................... 41
20.4   Use by Prospective Purchasers ..................................................................... 41
20.5   Franchises ................................................................................................... 41
20.6   Easements ................................................................................................... 41
20.7   Right to Enforce .......................................................................................... 41
20.8   Additional Development ............................................................................... 42
20.9   Representations ............................................................................................ 42

OR BK **5574** PG **939**
6   of **102**

| | | |
|---|---|---|
| 20.10 | Non-Liability | 42 |
| 20.11 | Resolution of Disputes | 43 |
| 20.12 | Venue | 43 |
| 20.13 | Reliance | 43 |
| 20.14 | Duration of Rights | 43 |
| 20.15 | Monitoring System | 43 |
| | 20.15.1 Right to Install | 43 |
| | 20.15.2 Components | 44 |
| | 20.15.3 Part of Operating Costs | 44 |
| | 20.15.4 Owners' Responsibility | 44 |
| 21. | Telecommunications Services | 44 |
| 21.1 | Right to Contract for Telecommunications Services | 44 |
| 21.2 | Easements | 44 |
| 21.3 | Restoration | 45 |
| 21.4 | Operating Costs | 45 |
| 22. | Refund of Taxes and Other Charges | 45 |
| 23. | Assignment of Powers | 45 |
| 24. | General Provisions | 45 |
| 24.1 | Authority of Board | 45 |
| 24.2 | Severability | 45 |
| 24.3 | Construction Activities | 46 |
| 24.4 | Affirmative Obligation of Association | 46 |
| 24.5 | Execution of Documents | 46 |
| 24.6 | Notices | 46 |
| 24.7 | Florida Statutes | 47 |
| 24.8 | Title Documents | 47 |

MIA\98109.7

DECLARATION
FOR
BRIDGEWATER

OR BK **5574** PG **940**
**7** of **102**

THIS DECLARATION FOR BRIDGEWATER (this "**Declaration**") is made by Lennar Homes, Inc., a Florida corporation ("**Lennar**") and joined in by Bridgewater Community Association, Inc., a Florida not-for-profit corporation ("**Association**").

R E C I T A L S

A.      Lennar is the owner of the real property in Pasco County, Florida more particularly described in Exhibit 1 attached hereto and made a part hereof ("**Bridgewater**").

B.      Lennar desires to subject Bridgewater to the covenants, conditions and restrictions contained in this Declaration.

C.      This Declaration is a covenant running with all of the land comprising Bridgewater, and each present and future owner of interests therein and their heirs, successors and assigns are hereby subject to this Declaration;

NOW THEREFORE, in consideration of the premises and mutual covenants contained in this Declaration, Lennar hereby declares that every portion of Bridgewater is to be held, transferred, sold, conveyed, used and occupied subject to the covenants, conditions, restrictions, easements, reservations, regulations, charges and liens hereinafter set forth.

1.      Recitals. The foregoing Recitals are true and correct and are incorporated into and form a part of this Declaration.

2.      Definitions. In addition to the terms defined elsewhere in this Declaration, all initially capitalized terms herein shall have the following meanings:

"**ACC**" shall mean the Architectural Control Committee for Bridgewater established pursuant to Section 17.1 hereof.

"**Access Control System**" shall mean any system intended to control access and/or enhance the welfare of exclusively Bridgewater.

"**Articles**" shall mean the Articles of Incorporation of Association filed with the Florida Secretary of State in the form attached hereto as **Exhibit 2** and made a part hereof, as amended from time to time.

"**Assessments**" shall mean any assessments made in accordance with this Declaration and as further defined in Section 15 hereof.

"**Association**" shall mean the Bridgewater Community Association, Inc., its successors and assigns.

"**Association Documents**" shall mean this Declaration, the Articles, the By-Laws, the Rules and Regulations, and the Community Standards, as amended from time to time.

"**Board**" shall mean the Board of Directors of Association.

"**Bonds**" shall have the meaning set forth in Section 10.1 hereof.

Bridgewater
Declaration
2
10/6/03

OR BK **5574** PG **941**
8   of 102

"**Bridgewater**" shall mean all of the real property described on **Exhibit 1** and shall include the Common Areas, each Home, each Parcel, Lot, tract, unit or other subdivision of real property, subject to additions and deletions thereto as permitted pursuant to the terms of this Declaration. Developer may, when amending or modifying the description of real property which is subject to the operation of this Declaration, also amend or modify the definition of Bridgewater.

"**Builder**" shall mean any person or entity that purchases a Parcel or Lot from Developer for the purpose of constructing one or more Homes.

"**By-Laws**" shall mean the By-Laws of Association in the form attached hereto as **Exhibit 3** and made a part hereof, as amended from time to time.

"**Cable Services**" shall mean "basic service tier" as described in Section 623(b)(7)(A) of the Cable Television Consumer Protection Act of 1992, video programming services offered on a per-channel or per-program basis, video programming services offered in addition to basic service tier, any method of delivering video programming to Homes including, without limitation, interactive video programming, and any channel recognized in the industry as premium including, without limitation, HBO, Showtime, Disney, Cinemax and the Movie Channel. By way of example, and not of limitation, the term Cable Services may include cable television, satellite master antenna television, multipoint distribution systems, video dialtone, open video system or any combination thereof.

"**Common Areas**" shall mean all real property interests and personalty within Bridgewater designated as Common Areas from time to time by Plat or recorded amendment to this Declaration and provided for, owned, leased by, or dedicated to the common use and enjoyment of the Owners within Bridgewater. The Common Areas may include, without limitation, open space areas, internal buffers, perimeter buffers or landscape easement areas, entrance features, monuments, improvements, easement areas owned by others, additions, irrigation pumps, wetlands, lakes, canals, irrigation areas, irrigation lines, sidewalks, streets, parking areas, lights, walls, fences, pools, cabanas, basketball court, tot lot, dog park,. lakes, fields, commonly used utility facilities, signage, other lighting, and landscaping within property owned by Association. The Common Areas do not include any portion of a Home. NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THE DEFINITION OF "COMMON AREAS" AS SET FORTH IN THIS DECLARATION IS FOR DESCRIPTIVE PURPOSES ONLY AND SHALL IN NO WAY BIND OR OBLIGATE DEVELOPER TO CONSTRUCT OR SUPPLY ANY SUCH ITEM AS SET FORTH IN SUCH DESCRIPTION. FURTHER, NO PARTY SHALL BE ENTITLED TO RELY UPON SUCH DESCRIPTION AS A REPRESENTATION OR WARRANTY AS TO THE EXTENT OF THE COMMON AREAS TO BE OWNED, LEASED BY OR DEDICATED TO ASSOCIATION, EXCEPT AFTER CONSTRUCTION AND DEDICATION OR CONVEYANCE OF ANY SUCH ITEM. Further, and without limiting the foregoing, it is possible that certain areas that would otherwise be Common Areas shall be conveyed to the District and comprise part of the Facilities.

"**Community Completion Date**" shall mean the date upon which all Homes in Bridgewater, as ultimately planned and as fully developed, have been conveyed by Developer and/or Builder to Owners.

"**Community Plan**" shall mean collectively any full or partial concept plan for the development of Bridgewater, as it exists as of the date of recording this Declaration, regardless of whether such plan is currently on file with one or more governmental agencies. The Community Plan is subject to change as set forth herein. The Community Plan is not a representation by Developer as to the development of Bridgewater or its amenities, as Developer reserves the right to amend all or part of the Community Plan from time to time.

"**Community Standards**" shall mean such standards of conduct, maintenance or other activity, if any, established by the ACC pursuant to Section 17.5 hereof and this Declaration.

"**Contractors**" shall have the meaning set forth in Section 17.12.2 hereof.

"**County**" shall mean Pasco County, Florida.

"**Data Transmission Services**" shall mean (i) internet access services and (ii) enhanced services as defined in Section 64.702 of Title 47 of the Code of Federal Regulations, as amended from time to time, and without regard to whether the transmission facilities are used in interstate commerce.

"**Declaration**" shall mean this Declaration together with all amendments and modifications thereof.

"**Developer**" shall mean Lennar and any of its designees, successors and assigns who receive a written assignment of all or some of the rights of Developer hereunder. Such assignment need not be recorded in the Public Records in order to be effective. In the event of such a partial assignment, the assignee shall not be deemed Developer, but may exercise such rights of Developer specifically assigned to it. Any such assignment may be made on a non-exclusive basis.

"**District**" shall have the meaning set forth in Section 10.1 hereof

"**District Debt Service Assessments**" shall have the meaning set forth in Section 10.2 hereof.

"**District Maintenance Special Assessments**" shall have the meaning set forth in Section 10.1 hereof.

"**District Revenue Bonds**" shall have the meaning set forth in Section 10.2 hereof.

"**Facilities**" shall have the meaning set forth in Section 10.1 hereof.

"**Home**" shall mean each single family residential home and appurtenances thereto constructed within Bridgewater. The term Home may not reflect the same division of property as reflected on a Plat. A Home shall be deemed created and have perpetual existence upon the issuance of a final or temporary Certificate of Occupancy for such residence; provided, however, the subsequent loss of such Certificate of Occupancy (e.g., by casualty or remodeling) shall not affect the status of a Home, or the obligation of Owner to pay Assessments with respect to such Home. The term "Home" includes any interest in land, improvements, or other property appurtenant to the Home.

"**Individual Assessments**" shall have the meaning set forth in Section 15.2.5 hereof.

"**Initial Capital Contribution**" shall have the meaning set forth in Section 15.11 herein.

"**Installment Assessments**" shall have the meaning set forth in Section 15.2.1 hereof.

"**Lawn Maintenance Standards**" shall have the meaning set forth in Section 12.25 hereof.

"**Lender**" shall mean (i) the institutional and licensed holder of a first mortgage encumbering a Lot or Home or (ii) Developer and its affiliates, to the extent Developer or its affiliates finances the purchase of a Home or Lot initially or by assignment of an existing mortgage.

"**Lennar**" shall mean Lennar Homes, Inc., a Florida corporation, its successors and/or assigns.

"**Lot**" shall mean any platted residential lot shown on a Plat.

"**Monitoring System**" shall mean any electronic surveillance and/or monitoring system intended to control access, provide alarm service, and/or enhance the welfare of Bridgewater. By way of example, and not of limitation, the term Monitoring System may include a central alarm system, electronic entrance gates, gatehouses, roving attendants, wireless communication to Homes, or any combination thereof. THE PROVISION OF A MONITORING SYSTEM SHALL IN NO MANNER CONSTITUTE A WARRANTY OR REPRESENTATION AS TO THE PROVISION OF OR LEVEL OF SECURITY WITHIN BRIDGEWATER. DEVELOPER AND

ASSOCIATION DO NOT GUARANTEE OR WARRANT, EXPRESSLY OR BY IMPLICATION, THE MERCHANTABILITY OF FITNESS FOR USE OF ANY MONITORING SYSTEM, OR THAT ANY SUCH SYSTEM (OR ANY OF ITS COMPONENTS OR RELATED SERVICES) WILL PREVENT INTRUSIONS, FIRES, OR OTHER OCCURRENCES, REGARDLESS OF WHETHER OR NOT THE MONITORING SERVICE IS DESIGNED TO MONITOR THE SAME. EACH AND EVERY OWNER AND THE OCCUPANT OF EACH HOME ACKNOWLEDGES THAT DEVELOPER AND ASSOCIATION, THEIR EMPLOYEES, AGENTS, MANAGERS, DIRECTORS, AND OFFICERS, ARE NOT INSURERS OF OWNERS OR HOMES, OR THE PERSONAL PROPERTY LOCATED WITHIN HOMES. DEVELOPER AND ASSOCIATION, WILL NOT BE RESPONSIBLE OR LIABLE FOR LOSSES, INJURIES, OR DEATHS RESULTING FROM ANY SUCH EVENTS.

"**Operating Costs**" shall mean all costs and expenses of Association and the Common Areas including, without limitation, all costs of ownership; operation; administration; all amounts payable by Association; all amounts payable in connection with any private street lighting agreement between Association and Withlacoochee River Electric Co Op, Inc.; amounts payable to a Telecommunications Provider for Telecommunications Services furnished to all Owners; utilities; taxes; insurance; bonds; Monitoring System costs (if any); any amounts due to Association for the maintenance of lakes within Bridgewater; salaries; management fees; professional fees; service costs; supplies; maintenance; repairs; replacements; refurbishments; and any and all costs relating to the discharge of the obligations hereunder, or as determined to be part of the Operating Costs by Association. By way of example, and not of limitation, Operating Costs shall include all of Association's legal expenses and costs relating to or arising from the enforcement and/or interpretation of this Declaration.

"**Owner**" shall mean the record owner (whether one or more persons or entities) of fee simple title to any Home. The term "Owner" shall not include Developer or Builder until the Turnover Date, or a Lender.

"**Parcel**" shall mean any portion of Bridgewater upon which one or more Homes may be constructed.

"**Permit**" shall mean the permit attached as **Exhibit 4** issued by SWFWMD (as defined below).

"**Plat**" shall mean any plat of any portion of Bridgewater filed in the Public Records, as the same may be amended by Developer, from time to time.

"**Premium Channel**" shall mean any channel recognized in the industry as premium including, without limitation, HBO, Showtime, Disney, Cinemax and the Movie Channel.

"**Public Infrastructure**" shall have the meaning set forth in Section 10.2 hereof.

"**Public Records**" shall mean the Public Records of Pasco County, Florida.

"**Reserves**" shall have the meaning set forth in Section 15.2.4 hereof.

"**Rules and Regulations**" shall mean collectively the Rules and Regulations governing Bridgewater as adopted by the Board from time to time.

"**Special Assessments**" shall mean those Assessments more particularly described as Special Assessments in Section 15.2.2 hereof.

"**Surface Water Management System**" shall mean the collection of devices, improvements, or natural systems whereby surface waters are controlled, impounded or obstructed. This term includes exfiltration trenches, wetland conservation areas, mitigation areas, lakes, retention areas, water management areas, ditches, culverts, structures, dams, impoundments, reservoirs, drainage maintenance easements and those works defined in Section 373.403(1)-(5) of the Florida Statutes. The Surface Water Management System includes those works authorized by SWFWMD pursuant to the Permit.

"**SWFWMD**" shall mean the Southwest Florida Water Management District.

"**Telecommunications Provider**" shall mean any party contracting with Association to provide Owners with one or more Telecommunications Services. Developer may be a Telecommunications Provider. With respect to any particular Telecommunications Services, there may be one or more Telecommunications Providers. By way of example, with respect to Data Transmission Services, one Telecommunications Provider may provide Association such service while another may own, maintain and service the Telecommunications Systems which allow delivery of such Data Transmission Services.

"**Telecommunications Services**" shall mean delivered entertainment services; all services that are typically and in the future identified as telecommunication services; Telephony Services; Cable Services; and Data Transmission Services. Without limiting the foregoing, such Telecommunications Services include the development, promotion, marketing, advertisement, provision, distribution, maintenance, transmission, and servicing of any of the foregoing services. The term Telecommunications Services is to be construed as broadly as possible.

"**Telecommunications Systems**" shall mean all facilities, items and methods required and/or used in order to provide Telecommunications Services to Bridgewater. Without limiting the foregoing, Telecommunications Systems may include wires (fiber optic or other material), conduits, passive and active electronic equipment, pipes, pedestals, wireless cell sites, computers, modems, satellite antennae sites, transmission facilities, amplifiers, junction boxes, trunk distribution, feeder cables, lock boxes, taps, drop cables, related apparatus, converters, connections, head-end antennae, earth stations, appurtenant devices, network facilities necessary and appropriate to support provision of local exchange services and/or any other item appropriate or necessary to support provision of Telecommunications Services. Ownership and/or control of all or a portion of any part of the Telecommunications Services may be bifurcated among network distribution architecture, system head-end equipment, and appurtenant devices (e.g., individual adjustable digital units).

"**Telephony Services**" shall mean local exchange services provided by a certified local exchange carrier or alternative local exchange company, intraLATA and interLATA voice telephony and data transmission.

"**Title Documents**" shall have the meaning set forth in Section 24.8 hereof.

"**Toll Calls**" shall have meaning given to such term by the Florida Public Service Commission and\or the Federal Communications Commission.

"**Turnover Date**" shall mean the date on which transition of control of Association from Developer to Owners occurs.

"**Use Fees**" shall have the meaning set forth in Section 15.2.3 hereof.

"**Violations Committee**" shall have the meaning set forth in Section 19.7 hereof.

3.    Plan of Development. The planning process for Bridgewater is an ever-evolving one and must remain flexible in order to be responsible to and accommodate the needs of Developer's buyers. Subject to the Title Documents, Developer may wish and has the right to develop Bridgewater and adjacent property owned by Developer into residences, comprised of homes, villas, coach homes, townhomes, zero lot line homes, patio homes, condominiums, and other forms of residential dwellings. The existence at any point in time of walls, landscape screens, or berms is not a guaranty or promise that such items will remain or form part of Bridgewater as finally developed.

4.    Amendment.

    4.1    General Restrictions on Amendments. Notwithstanding any other provision herein to the contrary, no amendment to this Declaration shall affect the rights of Developer unless such amendment receives the prior

written consent of Developer, which consent may be withheld for any reason whatsoever. No amendment shall alter the provisions of this Declaration benefiting Lenders without the prior approval of the Lender(s) enjoying the benefit of such provisions. If the prior written approval of any governmental entity or agency having jurisdiction is required by applicable law or governmental regulation for any amendment to this Declaration, then the prior written consent of such entity or agency must also be obtained. All amendments must comply with the Declaration provisions which benefit the SWFWMD. No amendment shall be effective until it is recorded in the Public Records.

4.2    No Vested Rights. Each Owner by acceptance of a deed to a Home irrevocably waives any claim that such Owner has any vested rights pursuant to case law or statute with respect to this Declaration or any of the other Association Documents. It is expressly intended that Developer and Association have the unfettered right to amend this Declaration and the other Association Documents except as expressly set forth herein.

4.3    Amendments Prior to and Including the Turnover Date. Prior to and including the Turnover Date, Developer shall have the right to amend this Declaration as it deems appropriate, without the joinder or consent of any person or entity whatsoever. Such amendments may include, without limitation, the creation of easements for Telecommunications Systems, utility, drainage, ingress and egress and roof overhangs over any portion of Bridgewater; additions or deletions from the properties comprising the Common Areas; changes in the Rules and Regulations, and modifications of restrictions on the Homes, and maintenance standards for landscaping. Developer's right to amend under this provision is to be construed as broadly as possible. By way of example, and not as a limitation, Developer may create easements over Homes conveyed to Owners provided that such easements do not prohibit the use of such Homes as residential homes. In the event that Association shall desire to amend this Declaration prior to and including the Turnover Date, Association must first obtain Developer's prior written consent to any proposed amendment. Thereafter, an amendment identical to that approved by Developer may be adopted by Association pursuant to the requirements for amendments after the Turnover Date. Thereafter, Developer shall join in such identical amendment so that its consent to the same will be reflected in the Public Records.

4.4    Amendments After the Turnover Date. After the Turnover Date, but subject to the general restrictions on amendments set forth above, this Declaration may be amended with the approval of (i) sixty six and two-thirds percent (66⅔%) of the Board; and (ii) seventy-five percent (75%) of all of the votes present (in person or by proxy) at a duly noticed meeting of the members in which there is a quorum.

5.    Annexation and Withdrawal.

5.1    Annexation by Developer. Prior to the Turnover Date, additional lands may be made part of Bridgewater by Developer, at Developer's sole discretion. Such additional lands to be annexed may or may not be adjacent to Bridgewater. Except for applicable governmental approvals (if any), no consent to such annexation shall be required from any other party (including, but not limited to, Association, Owners or any Lenders of any portion of Bridgewater, including a Home). Such annexed lands shall be brought within the provisions and applicability of this Declaration by the recording an amendment to this Declaration in the Public Records. The amendment shall subject the annexed lands to the covenants, conditions, and restrictions contained in this Declaration as fully as though the annexed lands were described herein as a portion of Bridgewater. Such amendment may contain additions to, modifications of, or omissions from, the covenants, conditions, and restrictions contained in this Declaration as deemed appropriate by Developer and as may be necessary to reflect the different character, if any, of the annexed lands. Prior to the Turnover Date, only Developer may add additional lands to Bridgewater.

5.2    Annexation by Association. After the Turnover Date, and subject to applicable governmental approvals (if any), additional lands may be annexed with the approval of (i) sixty-six and two-thirds percent (66⅔%) of the Board; and (ii) seventy-five percent (75%) of all of the votes present (in person or by proxy) at a duly noticed meeting of the members in which there is a quorum.

5.3    Withdrawal. Prior to the Turnover Date, any portions of Bridgewater (or any additions thereto) may be withdrawn by Developer from the provisions and applicability of this Declaration by the recording of an amendment to this Declaration in the Public Records. The right of Developer to withdraw portions of Bridgewater

Bridgewater
Declaration
7
10/6/03

shall not apply to any Home which has been conveyed to an Owner unless that right is specifically reserved in the instrument of conveyance or the prior written consent of the Owner is obtained. The withdrawal of any portion of Bridgewater shall not require the consent or joinder of any other party (including, but not limited to, Association, Owners, or any Lenders of any portion of Bridgewater). Association shall have no right to withdraw land from Bridgewater.

6.   Dissolution.

6.1   Generally. In the event of the dissolution of Association without reinstatement within thirty (30) days, other than incident to a merger or consolidation, any Owner may petition the Circuit Court of the appropriate Judicial Circuit of the State of Florida for the appointment of a receiver to manage the affairs of the dissolved Association and to manage the Common Areas in the place and stead of Association, and to make of such provisions as may be necessary for the continued management of the affairs of the dissolved Association. In the event Association is dissolved, and any portion of the Surface Water Management System is part of the Common Areas, the Surface Water Management System shall be conveyed to the District or an appropriate agency of local government, and that if not accepted, then the Surface Water Management System shall be dedicated to a similar non-profit corporation.

6.2   Applicability of Declaration after Dissolution. In the event of dissolution of Association, Bridgewater and each Home therein shall continue to be subject to the provisions of this Declaration, including, without limitation, the provisions respecting Assessments specified in this Declaration. Each Owner shall continue to be personally obligated to the successors or assigns of Association for Assessments to the extent that Assessments are required to enable the successors or assigns of Association to properly maintain, operate and preserve the Common Areas. The provisions of this Section shall only apply with regard to the maintenance, operation, and preservation of those portions of Bridgewater which had been Common Areas and continue to be so used for the common use and enjoyment of the Owners.

7.   Binding Effect and Membership.

7.1   Term. This Declaration and all covenants, conditions and restrictions contained in this Declaration are equitable servitudes, perpetual and run with the land. Each Owner, by acceptance of title to a Home or Parcel, and any person claiming by, through or under such Owner (i)agrees to be subject to the provisions of this Declaration and (ii)irrevocably waives any right to deny, and any claim, that this Declaration and all covenants, conditions and restrictions contained in this Declaration are not enforceable under the Marketable Record Title Act, Chapter 712 of the Florida Statutes. It is expressly intended that the Marketable Record Title Act will not operate to extinguish any encumbrance placed on Bridgewater by this Declaration. It is further expressly intended that no re-filing or notice of preservation is necessary to continue the applicability of this Declaration and the applicability of all covenants, conditions, and restrictions contained in this Declaration. This provision is not subject to amendment.

7.2   Transfer. The transfer of the fee simple title to a Home, whether voluntary or by operation of law, terminating the Owner's title to that Home shall terminate the Owner's rights to the use of and enjoyment of the Common Areas as it pertains to that Home and shall terminate such Owner's membership in Association. An Owner's rights and privileges under this Declaration are not assignable separately from a Home. The Owner of each Home is entitled to the benefits of, and is burdened with the duties and responsibilities set forth in, the provisions of this Declaration. All parties acquiring any right, title and interest in and to any Home shall be fully bound by the provisions of this Declaration. In no event shall any Owner acquire any rights that are greater than the rights granted to, and limitations placed upon its predecessor in title pursuant to the provisions of this Declaration. In the event that any Owner desires to sell or otherwise transfer title of his or her Home, such Owner shall give the Board at least fourteen (14) days prior written notice of the name and address of the purchaser or transferee, the date on which such transfer of title is to take place, and such other information as the Board may reasonably require. The transferor shall remain jointly and severally liable with the transferee for all obligations of the Owner and the Home pursuant to this Declaration including, without limitation, payment of all Assessments accruing prior to the date of transfer. Until written notice is received as provided in this Section, the transferor and transferee shall be jointly and severally liable for Assessment accruing subsequent to the date of transfer. In the event that upon the conveyance of a Home an Owner fails in the deed of conveyance to reference the imposition of this Declaration on the Home, the

transferring Owner shall remain liable for Assessments accruing on the Home from and after the date of conveyance.

7.3     Membership and Voting Rights. Upon acceptance of title to a Home, and as more fully provided in the Articles and By-Laws, each Owner (or his or her lessee, if applicable) shall be a member of Association. Membership rights are governed by the provisions of this Declaration, the deed to a Home, the Articles and By-Laws. Membership shall be an appurtenance to and may not be separated from, the ownership of a Home. Developer rights with respect to Association are set forth in this Declaration, the Articles and the By-Laws.

7.4     Ownership by Entity. In the event that an Owner is other than a natural person, that Owner shall, prior to occupancy of the Home, designate one or more persons who are to be the occupants of the Home and register such persons with Association. All provisions of this Declaration and Rules and Regulations promulgated pursuant thereto shall apply to both such Owner and the designated occupants.

7.5     Voting Interests. Voting interests in Association are governed by the provisions of the Articles and By-Laws.

7.6     Document Recordation by Owners Prohibited. Neither Association nor any Owner, nor group of Owners, may record any documents which, in any way, affect or restrict the rights of Developer, or conflict with the provisions of this Declaration or the other Association Documents.

7.7     Conflicts. In the event of any conflict among this Declaration, the Articles, the By-Laws or any of the other Association Documents, this Declaration shall control.

8.     Paramount Right of Developer. Notwithstanding anything to the contrary herein, prior to the Community Completion Date Developer shall have the paramount right to dedicate, transfer, and/or convey (by absolute conveyance, easement, or otherwise) portions of Bridgewater for various public purposes or for the provision of Telecommunications Systems, or to make any portions of Bridgewater part of the Common Areas, or to create and implement a special taxing district which may include all or any portion of Bridgewater. In addition, the Common Areas of Bridgewater may include decorative improvements, and berms. Developer may remove, modify, eliminate or replace these items from time to time in its sole discretion. SALES BROCHURES, SITE PLANS, AND MARKETING MATERIALS ARE CURRENT CONCEPTUAL REPRESENTATIONS AS TO WHAT FACILITIES, IF ANY, WILL BE INCLUDED WITHIN THE COMMON AREAS. DEVELOPER SPECIFICALLY RESERVES THE RIGHT TO CHANGE THE LAYOUT, COMPOSITION, AND DESIGN OF ANY AND ALL COMMON AREAS AT ANY TIME WITHOUT NOTICE AT ITS DISCRETION.

9.     Operation of Common Areas.

9.1     Prior to Conveyance. Prior to the conveyance, identification and/or dedication of the Common Areas to Association as set forth in Section 9.4 herein, any portion of the Common Areas owned by Developer shall be operated, maintained, and administered at the sole cost of Association for all purposes and uses reasonably intended, as Developer in its sole discretion deems appropriate. During such period, Developer shall own, operate, and administer the Common Areas without interference from any Owner or Lender of a Home or any portion of Bridgewater or Home or any other person or entity whatsoever. Owners shall have no right in or to any Common Areas referred to in this Declaration unless and until same are actually constructed, completed, and conveyed to, leased by, dedicated to, and/or maintained by Association. The current conceptual plan and/or representations, if any, regarding the composition of the Common Areas are not a guarantee of the final composition of the Common Areas. No party should rely upon any statement contained herein as a representation or warranty as to the extent of the Common Areas to be owned, leased by, or dedicated to Association. Developer, so long as it controls Association, further specifically retains the right to add to, delete from, or modify any of the Common Areas referred to herein at its discretion and without notice.

9.2     Construction of Common Areas Facilities. Developer has constructed or will construct, at its sole cost and expense, certain facilities and improvements as part of the Common Areas, together with equipment and

personalty contained therein, and such other improvements and personalty as Developer determines in its sole discretion. Developer shall be the sole judge of the composition of such facilities and improvements. Prior to the Community Completion Date Developer reserves the absolute right to construct additional Common Areas facilities and improvements within Bridgewater, from time to time, in its sole discretion, and to remove, add to modify and change the boundaries, facilities and improvements now or then part of the Common Areas. Developer is not obligated to, nor has it represented that it will, modify or add to the facilities, improvements, or Common Areas as they are contemplated as of the date hereof. Developer is the sole judge of the foregoing, including the plans, specifications, design, location, completion schedule, materials, size, and contents of the facilities, improvements, appurtenances, personalty (e.g., furniture), color, textures, finishes, or Common Areas, or changes or modifications to any of them.

9.3     Use of Common Areas by Developer. Until the Community Completion Date Developer shall have the right to use any portion of the Common Areas, without charge, for any purpose deemed appropriate by Developer.

9.4     Conveyance.

9.4.1     Generally. Within sixty (60) days after the Turnover Date, or earlier as determined by Developer in its sole discretion, all or portions of the Common Areas may be dedicated by Plats, created in the form of easements, or conveyed by written instrument recorded in the Public Records, or by Quitclaim Deed from Developer to Association. Association shall pay all costs of the conveyance. The dedication, creation by easement, or conveyance shall be subject to easements, restrictions, reservations, conditions, limitations, and declarations of record, real estate taxes for the year of conveyance, zoning, land use regulations and survey matters. Association shall be deemed to have assumed and agreed to pay all continuing obligations and service and similar contracts relating to the ownership operation, maintenance, and administration of the conveyed portions of Common Areas and other obligations relating to the Common Areas imposed herein. Association shall, and does hereby, indemnify and hold Developer harmless on account thereof. Association, by its joinder in this Declaration, hereby accepts such dedication(s) or conveyance(s) without setoff, condition, or qualification of any nature. The Common Areas, personal property and equipment thereon and appurtenances thereto shall be dedicated or conveyed in "as is, where is" condition WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, IN FACT OR BY LAW, AS TO THE CONDITION, FITNESS OR MERCHANTABILITY OF THE COMMON AREAS BEING CONVEYED. Notwithstanding the foregoing, any such conveyance or encumbrance of such Common Areas is subject to each irrevocable Owner's ingress and egress easement to his or her Home as set forth in this Declaration.

9.4.2     Form of Deed. Each deed of the Common Areas shall be subject to the following provisions:

9.4.2.1     a perpetual nonexclusive easement in favor of governmental agencies for the maintenance and repair of existing road, speed and directional signs, if any;

9.4.2.2     matters reflected in the plat(s) of the Community;

9.4.2.3     perpetual non-exclusive easements in favor of Developer, its successors, and assigns in, to , upon and over all of the Common Areas for the purposes of vehicular and pedestrian ingress and egress, installation of utilities, landscaping and/or drainage, without charge, including, without limitation, the right to use such roadways for construction vehicles and equipment. The easements reserved in the deed shall run in favor of Developer, and its employees, representatives, agents, licensees, guests, invitees, successors and/or assigns;

9.4.2.4     all restrictions, easements, covenants and other matters of record;

9.4.2.5     in the event that Association believes that Developer shall have failed in any respect to meet Developer's obligations under this Declaration or has failed to comply with any of Developer's obligations under law or the Common Areas conveyed herein are defective in any respect, Association shall give

written notice to Developer detailing the alleged failure or defect. Once Association has given written notice to Developer pursuant to this Section, Association shall be obligated to permit Developer and their agents to perform inspections of the Common Areas and to perform all tests and make all repairs/replacements deemed necessary by Developer to respond to such notice at all reasonable times. Association agrees that any inspection, test and/or repair/replacement scheduled on a business day between 9 a.m. and 5 p.m. shall be deemed scheduled at a reasonable time. The rights reserved in this Section include the right of Developer to repair or address, in Developer's sole option and expense, any aspect of the Common Areas deemed defective by Developer during its inspections of the Common Areas. Association's failure to give the notice and/or otherwise comply with the provisions of this Section will damage Developer. At this time, it is impossible to determine the actual damages Developer might suffer. Accordingly, if Association fails to comply with its obligations under this Section in any respect, Association shall pay to Developer liquidated damages in the amount of $250,000.00 which Association and Developer agree is a fair and reasonable remedy; and

9.4.2.6    a reservation of right in favor of Developer (so long as Developer owns any portion of the Community) to require that Association reconvey all or a portion of the Common Areas conveyed by quitclaim deed in favor of Developer in the event that such property is required to be owned by Developer for any purpose, including, without limitation, the reconfiguration of any adjacent property by replatting or otherwise.

9.5    Operation After Conveyance.    After the conveyance or dedication of any portion of the Common Areas to Association, the portion of the Common Areas so dedicated shall be owned, operated and administered by Association for the use and benefit of the owners of all property interests in Bridgewater including, but not limited to, Association, Developer, Owners and any Lenders. Subject to Association's right to grant easements and other interests as provided herein, Association may not convey, abandon, alienate, encumber, or transfer all or a portion of the Common Areas to a third party without (i) if prior to and including the Turnover Date, the approval of (a) a majority of the Board; and (b) the consent of Developer, or (ii) after the Turnover Date, approval of (a) sixty-six and two-thirds percent (66⅔%) of the Board; and (b) seventy-five percent (75%) of all of the votes in Association.

9.6    Paved Common Areas.    Without limiting any other provision of this Declaration, Association is responsible for the maintenance of all paved surfaces including, but not limited to, cart paths, roads, pathways, and sidewalks forming a part of the Common Areas, if any. Although pavement appears to be a durable material, it requires maintenance. Association shall have the right, but not the obligation, to arrange for an annual inspection of all paved areas forming a part of the Common Areas by a licensed paving contractor and/or engineer with a Florida Department of Transportation Asphalt Pavement Certification. The cost of such inspection shall be a part of the Operating Costs of Association. Association shall determine annually the parameters of the inspection to be performed, if any. By way of example, and not of limitation, the inspector may be required to inspect the roads and sidewalks forming part of the Common Areas annually for deterioration and to advise Association of the overall pavement conditions including any upcoming maintenance needs. Any patching, grading, or other maintenance work should be performed by a Company licensed to perform the work. From and after the Community Completion Date, Association should monitor the roads, cart paths and sidewalks forming the Common Areas monthly to ensure that vegetation does not grow into the asphalt and that there are no eroded or damaged areas that need immediate maintenance.

9.7    Delegation and Managers.    Once conveyed or dedicated to Association, the Common Areas and facilities and improvements located thereon shall, subject to the provisions of this Declaration and the document of conveyance or dedication, at all times be under the complete supervision, operation, control, and management of Association. Notwithstanding the foregoing Association may delegate all or a portion of its obligations hereunder to a licensed manager or professional management company. Association specifically shall have the right to pay for management services on any basis approved by the Board (including bonuses or special fee arrangements for meeting financial or other goals). Developer, its affiliates and/or subsidiaries shall have the right to manage Association. Owners and Association acknowledge that it is fair and reasonable to have Developer, its affiliates and/or subsidiaries manage Association. Further, in the event that a Common Area is created by easement, Association's obligations and rights with respect to such Common Area may be limited by the terms of the document creating such easement.

9.8    Use.

9.8.1  Nonexclusive Use. The Common Areas shall be used and enjoyed by the Owners on a non-exclusive basis in common with other persons, entities and corporations (who may, but are not required to be, members of Association) entitled to use those portions of the Common Areas. Prior to the Community Completion Date, Developer, and thereafter, Association, has the right, at any and all times, and from time to time, to further additionally provide and make the Common Areas available to other individuals, persons, firms, or corporations, as it deems appropriate. The granting of such rights shall not invalidate this Declaration, reduce or abate any Owner's obligations pursuant to this Declaration, or give any Owner the right to avoid any of the covenants, agreements or obligations to be performed hereunder.

9.8.2  Right to Allow Use. Developer and/or Association may enter into easement agreements or other use or possession agreements whereby the Owners, Telecommunications Providers, and/or Association and/or others may obtain the use, possession of, or other rights regarding certain property, on an exclusive or non-exclusive basis, for certain specified purposes. Association may agree to maintain and pay the taxes, insurance, administration, upkeep, repair, and replacement of such property, the expenses of which shall be Operating Costs. Any such agreement by Association prior to the Community Completion Date shall require the consent of Developer. Thereafter, any such agreement shall require the approval of the majority of the Board of Directors.

9.8.3  Obstruction of Common Areas. No portion of the Common Areas may be obstructed, encumbered, or used by Owners for any purpose other than as permitted by Association.

9.8.4  Assumption of Risk. Without limiting any other provision herein, each person within any portion of Bridgewater accepts and assumes all risk and responsibility for noise, liability, injury, or damage connected with use or occupancy of any portion of Bridgewater (e.g., the Common Areas) including, without limitation, (a) noise from maintenance equipment, (b) use of pesticides, herbicides and fertilizers, view restrictions caused by maturation of trees and shrubbery, (d) reduction in privacy caused by the removal or pruning of shrubbery or trees within Bridgewater and (e) design of any portion of Bridgewater. Each person entering onto any portion of Bridgewater also expressly indemnifies and agrees to hold harmless Developer, the District, and Association and all employees, directors, representatives, officers, agents, and partners of the foregoing, from any and all damages, whether direct or consequential, arising from or related to the person's use of the Common Areas and/or the Facilities, including for attorneys' fees, paraprofessional fees and costs at trial and upon appeal. Without limiting the foregoing, all persons using the Common Areas and/or the Facilities, including without limitation, any pool or area adjacent to a lake, do so at their own risk. BY ACCEPTANCE OF A DEED, EACH OWNER ACKNOWLEDGES THAT THE COMMON AREAS MAY CONTAIN WILDLIFE SUCH AS ALLIGATORS, DOGS, RACCOONS, SNAKES, DUCKS, DEER, SWINE, TURKEYS, AND FOXES. DEVELOPER AND ASSOCIATION SHALL HAVE NO RESPONSIBILITY FOR MONITORING SUCH WILDLIFE OR NOTIFYING OWNERS OR OTHER PERSONS OF THE PRESENCE OF SUCH WILDLIFE. EACH OWNER AND HIS OR HER GUESTS AND INVITEES ARE RESPONSIBLE FOR THEIR OWN SAFETY.

9.8.5  Owner's Obligation to Indemnify. Each Owner agrees to indemnify and hold harmless Developer, the District, and Association, their officers, partners, agents, employees, affiliates, directors and attorneys (collectively, "**Indemnified Parties**") against all actions, injury, claims, loss, liability, damages, costs and expenses of any kind or nature whatsoever ("**Losses**") incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect, or consequential, as a result of or in any way related to the Common Areas and/or Facilities, including, without limitation, use of the lakes and other waterbodies within Bridgewater by Owners, and their guests, family members, invitees, or agents, or the interpretation of this Declaration and/or exhibits attached hereto and/or from any act or omission of Developer, the District, Association, or of any of the Indemnified Parties. Should any Owner bring suit against Developer, the District, Association, or any of the Indemnified Parties for any claim or matter and fail to obtain judgment therein against such Indemnified Parties, such Owner shall be liable to such parties for all Losses, costs and expenses incurred by the Indemnified Parties in the defense of such suit, including attorneys' fees and paraprofessional fees at trial and upon appeal.

9.9  Rules and Regulations.

9.9.1  Generally. Prior to the Turnover Date, Developer, and thereafter Association, shall have the right to adopt Rules and Regulations governing the use of the Common Areas and Bridgewater. The Rules and

Regulations need not be recorded in the Public Records. The Common Areas shall be used in accordance with this Declaration and Rules and Regulations promulgated hereunder.

9.9.2   Developer Not Subject to Rules and Regulations. The Rules and Regulations shall not apply to the Developer or to any property owned by Developer and shall not be applied in a manner which would adversely affect the interests of the Developer. Without limiting the foregoing, Developer, Builder and/or their assigns, shall have the right to: (i) develop and construct commercial, club uses, and industrial uses, Homes, Common Areas, and related improvements within Bridgewater, and make any additions, alterations, improvements, or changes thereto; (ii) maintain sales offices (for the sale and re-sale of (a) Homes and (b) residences and properties located outside of Bridgewater), general office and construction operations within Bridgewater; (iii) place, erect or construct portable, temporary or accessory buildings or structure within Bridgewater for sales, construction storage or other purposes; (iv) temporarily deposit, dump or accumulate materials, trash, refuse and rubbish in connection with the development or construction of any portion of Bridgewater; (v) post, display, inscribe or affix to the exterior of any portion of the Common Areas or portions of Bridgewater owned by Developer, signs and other materials used in developing, constructing, selling or promoting the sale of any portion Bridgewater including, without limitation, Homes; (vi) excavate fill from any lakes or waterways within and/or contiguous to Bridgewater by dredge or dragline, store fill within Bridgewater and remove and/or sell excess fill; (vii) grow or store plants and trees within, or contiguous to, Bridgewater and use and/or sell excess plants and trees; and (viii) undertake all activities which, in the sole opinion of Developer, are necessary for the development and sale of any lands and improvements comprising Bridgewater.

9.10   Public Facilities. Bridgewater may include one or more facilities which may be open and available for the use of the general public. By way of example, there may be a public park, fire station, police station, or other facility within the boundaries of Bridgewater.

9.11   Default by Another Owner. No default by any Owner in the performance of the covenants and promises contained in this Declaration or by any person using the Common Areas or any other act of omission by any of them shall be construed or considered (a) a breach by Developer or Association or a non-defaulting Owner or other person or entity of any of their promises or covenants in this Declaration; or (b) an actual, implied or constructive dispossession of another Owner from the Common Areas; or (c) an excuse, justification, waiver or indulgence of the covenants and promises contained in this Declaration.

9.12   Special Taxing Districts. For as long as Developer controls Association, Developer shall have the right, but not the obligation, to dedicate or transfer or cause the dedication or transfer of all or portions of the Common Areas of Association to a special taxing district or a public agency or authority under such terms as Developer deems appropriate in order to create or contract with special taxing districts and community development districts (or others) for lighting, perimeter walls, entrance features, roads, landscaping, irrigation areas, lakes, waterways, ponds, surface water management systems, wetlands mitigation areas, parks, recreational or other services, security or communications, or other similar purposes deemed appropriate by Developer, including without limitation, the maintenance and/or operation of any of the foregoing. As hereinafter provided, Developer may sign any taxing district petition as attorney-in-fact for each Owner. Each Owner's obligation to pay taxes associated with such district shall be in addition to such Owner's obligation to pay Assessments. Any special taxing district shall be created pursuant to all applicable ordinances of Pasco County and all other applicable governing entities having jurisdiction with respect to the same.

9.13   Water Mains. In the event the County or any of its subdivisions, agencies, and/or divisions must remove any portion of a Home driveway which is constructed of pavers within any portion of the Common Areas, then Association will be responsible to replace or repair the driveway at Association's expense, if such expenses are not paid for by the County or other entity.

9.14   Association's Obligation to Indemnify. Association and Owners each covenant and agree jointly and severally to indemnify, defend and hold harmless Developer, its officers, directors, shareholders, and any related persons or corporations and its employees from and against any and all claims, suits, actions, causes of action or damages arising from any personal injury, loss of life, or damage to property, sustained on or about the Common Areas, or other property serving Association, and improvements thereon, or resulting from or arising out of activities

Bridgewater
Declaration
13
10/6/03

or operations of Association or Owners, and from and against all costs, expenses, court costs, attorneys' fees and paraprofessional fees (including, but not limited to, all trial and appellate levels and whether or not suit be instituted), expenses and liabilities incurred or arising from any such claim, the investigation thereof, or the defense of any action or proceedings brought thereon, and from and against any orders judgments or decrees which may be entered relating thereto. The costs and expense of fulfilling this covenant of indemnification shall be Operating Costs to the extent such matters are not covered by insurance maintained by Association.

9.15 <u>Site Plans and Plats</u>. Bridgewater may be subject to one or more plats (each individually, a "<u>Plat</u>"). The Plat may identify some of the Common Areas within Bridgewater. The description of the Common Areas on a Plat is subject to change and the notes on a Plat are not a guarantee of what facilities will be constructed on such Common Areas. Site plans used by Developer in its marketing efforts illustrate the types of facilities which may be constructed on the Common Areas, but such site plans are not a guarantee of what facilities will actually be constructed. Each Owner should not rely on a Plat or any site plans used for illustration purposes as the Declaration governs the rights and obligations of Developer and Owners with respect to the Common Areas.

10. Bridgewater Community Development District.

10.1 <u>Generally</u>. Developer may create the Bridgewater Community Development District ("<u>District</u>") within Bridgewater. Portions of Bridgewater may be owned by the District, such as the roads, drainage system and/or utilities. In the event that any portions of Bridgewater are owned by the District, such facilities shall not be part of the Common Areas, but will be part of the infrastructure facilities owned by the District ("<u>Facilities</u>"). AT THIS TIME IT IS NOT KNOWN WHAT PORTIONS OF BRIDGEWATER WILL BE DESIGNATED COMMON AREAS OR FACILITIES OF THE DISTRICT, IF ANY. FINAL DETERMINATION OF WHICH PROPERTIES WILL BE COMMON AREAS MAY NOT OCCUR UNTIL THE COMPLETION OF ALL DEVELOPMENT.

10.2 <u>Creation of the District</u>. The District may issue Special Assessment Bonds (the "<u>Bonds</u>") to finance a portion of the cost of the Facilities. The District is an independent, multi-purpose, special district created pursuant to Chapter 190 of the Florida Statutes. The creation of the District puts residential units and non-residential development of Bridgewater under the jurisdiction of the District. The District may be authorized to finance, fund, install, equip, extend, construct or reconstruct, without limitation, the following: water and sewer facilities, environmental mitigation, roadways, Surface Water Management System, utility plants and lines, and land acquisition, miscellaneous utilities for the community and other infrastructure projects and services necessitated by the development of, and serving lands, within Bridgewater ("<u>Public Infrastructure</u>"). The estimated design, development, construction and acquisition costs for these facilities may be funded by the District in one or more series of governmental bond financings utilizing special assessment bonds or other revenue backed bonds. The District may issue both long term debt and short term debt to finance the Public Infrastructure. The principal and interest on the special assessments bonds may be repaid through non ad valorem special assessments ("<u>District Debt Service Assessments</u>") levied on all benefiting properties in the District, which property has been found to be specially benefited by the Public Infrastructure. The principal and interest on the other revenue backed bonds ("<u>District Revenue Bonds</u>") may be repaid through user fees, franchise fees or other use related revenues. In addition to the bonds issued to fund the Public Infrastructure costs, the District may also impose an annual non ad valorem special assessment to fund the operations of the District and the maintenance and repair of its Public Infrastructure and services ("<u>District Maintenance Special Assessments</u>").

10.3 <u>District Assessments</u>. The District Debt Service Assessments and District Maintenance Special Assessments will not be taxes but, under Florida law, constitute a lien co-equal with the lien of state, county, municipal, and school board taxes and may be collected on the ad valorem tax bill sent each year by the Tax Collector of Pasco County and disbursed to the District. The homestead exemption is not applicable to the District Assessments. Because a tax bill cannot be paid in part, failure to pay the District Debt Service Assessments, District Maintenance Special Assessments or any other portion of the tax bill will result in the sale of tax certificates and could ultimately result in the loss of title to the property of the delinquent taxpayer through the issuance of a tax deed. The District Revenue Bonds are not taxes or liens on property. If the fees and user charges underlying the District Revenue bonds are not paid, then such fees and user charges could become liens on the property which

OR BK **5574** PG **953**
20 of 102

could ultimately result in the loss of title to the property through the issuance of a tax deed. The initial amount of the District Debt Service Assessments per year per Home and the total amount of District Maintenance Special Assessments are unknown at this time. The actual amount of District Debt Service Assessments will be set forth in the District Assessment Methodology Report. District Maintenance Special Assessments relating to Facilities will be determined by the District. Any future District Assessments and/or other charges due with respect to the Facilities are direct obligations of each Owner and are secured by a lien against the Home as set forth in this Section 10.3. Failure to pay such sums may result in loss of property as set forth in this Section 10.3. The District may construct, in part or in whole, by the issuance of Bonds (as explained in Section 10.2 above), certain facilities which may consist of roads, utilities and/or drainage system, as the District determines in its sole discretion.

10.4    Common Areas and Facilities Part of District. Portions of the Common Areas may be conveyed by Developer to the District. Such Facilities will be part of the District and the District shall govern the use and maintenance of the Facilities. Some of the provisions of this Declaration will not apply to such Facilities, as the Facilities will no longer be Common Areas. By way of example and not of limitation, the procedures set forth in Section 9.4 herein respecting Developer's obligation to convey the Common Areas will not apply to the Facilities. ANY CONVEYANCE OF COMMON AREAS TO THE DISTRICT SHALL IN NO WAY INVALIDATE THIS DECLARATION. Developer may decide, in its sole and absolute discretion, to convey additional portions of the Common Areas to either the District or Association, thereby making such Common Areas part of the District's Facilities. The District or Association may promulgate membership rules, regulations and/or covenants which may outline use restrictions for the Facilities, or Association's responsibility to maintain the Facilities, if any. The establishment of the District and the inclusion of Facilities in the District will obligate each Owner to become responsible for the payment of District Capital and Operation Assessments for the construction and operation of the Facilities as set forth in this Section.

10.5    Facilities Owned by District. The Facilities may be owned and operated by the District or owned by the District and maintained by Association. The Facilities may be owned by a governmental entity other than the District. The Facilities shall be used and enjoyed by the Owners, on a non-exclusive basis, in common with such other persons, entities, and corporations that may be entitled to use the Facilities.

11.    Maintenance by Association.

11.1    Common Areas. Except as otherwise specifically provided in this Declaration to the contrary, Association shall at all times maintain, repair, replace and insure the Common Areas, including all improvements placed thereon.

11.2    District Facilities. The District may contract with Association for maintenance, repair and replacement of the Facilities in the District's sole and absolute discretion.

11.3    Adjoining Areas. Association shall also maintain those drainage areas, swales, lakes maintenance easements, lake slopes and banks, driveways, and landscape areas that are within the Common Areas and immediately adjacent to a Home, provided that such areas are readily accessible to Association. Under no circumstances shall Association be responsible for maintaining any areas within fences or walls that form a part of a Home.

11.4    Negligence. The expense of any maintenance, repair or construction of any portion of the Common Areas necessitated by the negligent or willful acts of an Owner or persons utilizing the Common Areas, through or under an Owner shall be borne solely by such Owner, and the Home owned by that Owner shall be subject to an Individual Assessment for that expense. By way of example, and not of limitation, an Owner shall be responsible for the removal of all landscaping and structures placed within easements or Common Areas without the prior written approval of Association.

11.5    Right of Entry. Developer and Association are granted a perpetual and irrevocable easement over, under and across Bridgewater for the purposes herein expressed, including, without limitation, for inspections to ascertain compliance with the provisions of this Declaration, and for the performance of any maintenance, alteration

OR BK **5574** PG **954**
21   of   102

or repair which it is entitled to perform. Without limiting the foregoing, Developer specifically reserves easements for all purposes necessary to comply with any governmental requirement or to satisfy any condition that is a prerequisite for a governmental approval. By way of example, and not of limitation, Developer may construct, maintain, repair, alter, replace and/or remove improvements; install landscaping; install utilities; and/or remove structures on any portion of Bridgewater if Developer is required to do so in order to obtain the release of any bond posted with any governmental agency.

11.6    Maintenance of Property Owned by Others. Association shall, if designated by Developer (or by Association after the Community Completion Date) by amendment to this Declaration or any document of record including, without limitation declaration(s) of condominium, maintain vegetation, landscaping, sprinkler system, community identification/features and/or other areas or elements designated by Developer (or by Association after the Community Completion Date) upon areas which are within or outside of Bridgewater and which are owned by, or dedicated to, others including, but not limited to, a utility, governmental or quasi-governmental entity, so as to enhance the appearance of Bridgewater. These areas may include (by way of example and not limitation) swale areas or median areas within the right-of-way of public streets, roads, drainage areas, community identification or features, community signage or other identification and/or areas within canal rights-of-ways or other abutting waterways. To the extent there is any agreement between Developer and Association for the maintenance of any lakes or ponds outside Bridgewater, Association shall maintain the same as part of the Common Areas.

12.    Use Restrictions.

12.1    Alterations and Additions. No material alteration, addition or modification to a Lot or Home, or material change in the appearance thereof, shall be made without the prior written approval thereof being first had and obtained from the ACC as required by this Declaration.

12.2    Animals. No animals of any kind shall be raised, bred or kept within Bridgewater for commercial purposes. Otherwise, Owners may keep domestic pets as permitted by Pasco County ordinances up to a limit of two (2) such pets per Home and otherwise in accordance with the Rules and Regulations established by the Board from time to time. Notwithstanding the foregoing, pets may be kept or harbored in a Home only so long as such pets or animals do not constitute a nuisance. A determination by the Board that an animal or pet kept or harbored in a Home is a nuisance shall be conclusive and binding on all parties. All pets shall be walked on a leash. No pet shall be permitted outside a Home unless such pet is kept on a leash or within an enclosed portion of the yard of a Home, as approved by the ACC. No pet or animal shall be "tied out" on the exterior of the Home or in the Common Areas, or left unattended in a yard or on a balcony, porch, or patio. No dog runs or enclosures shall be permitted on any Home. When notice of removal of any pet is given by the Board, the pet shall be removed within forty-eight (48) hours of the giving of the notice. All pets shall defecate only in the "pet walking" areas within Bridgewater designated for such purpose, if any, or on that Owner's Home. The person walking the pet or the Owner shall clean up all matter created by the pet. Each Owner shall be responsible for the activities of its pet. Notwithstanding anything to the contrary, seeing eye dogs shall not be governed by the restrictions contained in this Section.

12.3    Artificial Vegetation. No artificial grass, plants or other artificial vegetation, or rocks or other landscape devices, shall be placed or maintained upon the exterior portion of any Home or Lot, unless approved by the ACC.

12.4    Cars and Trucks.

12.4.1    Parking. Owners' automobiles shall be parked in the garage or driveway, if provided, and shall not block the sidewalk. No vehicles of any nature shall be parked on any portion of Bridgewater or a Lot except on the surfaced parking area thereof. All lawn maintenance vehicles shall park on the driveway of the Home and not in the roadway or swale. To the extent Bridgewater has any guest parking, Owners are prohibited from parking in such guest parking spaces. No vehicles used in business for the purpose of transporting goods, equipment and the like, or any trucks or vans which are larger than three-quarter (3/4) ton shall be parked in Bridgewater except during the period of a delivery. No vehicle shall be used as a domicile or residence either temporarily or permanently.

12.4.2   Repairs and Maintenance of Vehicles.  No vehicle which cannot operate on its own power shall remain on Bridgewater for more than twelve hours, except in the garage of a Home.  No repair or maintenance, except emergency repair, of vehicles shall be made within Bridgewater, except in the garage of a Home.  No vehicles shall be stored on blocks.  No tarpaulin covers on vehicles shall be permitted anywhere within the public view.

12.4.3   Prohibited Vehicles.  No commercial vehicle, limousines, recreational vehicle, boat, trailer including, but not limited to, boat trailers, house trailers, and trailers of every other type, kind or description, or camper, may be kept with Bridgewater except in the garage of a Home.  The term commercial vehicle shall not be deemed to include law enforcement vehicles or recreational or utility vehicles (*i.e.*, Broncos, Blazers, Explorers, Navigators, etc.) or clean "non- working" vehicles such as pick-up trucks, vans, or cars if they are used by the Owner on a daily basis for normal transportation.  Notwithstanding any other provision in this Declaration to the contrary, the foregoing provisions shall not apply to construction vehicles in connection with the construction, improvement, installation, or repair by Developer of Homes, Common Areas, or any other Bridgewater facility.  No vehicles displaying commercial advertising shall be parked within the public view.  No vehicles bearing a "for sale" sign shall be parked within the public view anywhere on Bridgewater.  For any Owner who drives an automobile issued by the County or other governmental entity (*i.e.*, police cars), such automobile shall not be deemed to be a commercial vehicle and may be parked in the garage or driveway of the Home.

12.5   Casualty Destruction to Improvements.  In the event that a Home or other improvement is damaged or destroyed by casualty loss or other loss, then within a reasonable period of time after such incident, the Owner thereof shall either commence to rebuild or repair the damaged Home or improvement and diligently continue such rebuilding or repairing until completion, or properly clear the damaged Home or improvement and restore or repair the Home as set forth in Sections 13.2.2 herein and as approved by the ACC.  As to any such reconstruction of a destroyed Home or improvements, the same shall only be replaced as approved by the ACC.

12.6   Commercial Activity.  Except for normal construction activity, sale, and re-sale of a Home, sale or re-sale of other property owned by Developer, administrative offices of Developer, no commercial or business activity shall be conducted in any Home within Bridgewater.  Notwithstanding the foregoing, and subject to applicable statutes and ordinances, an Owner may maintain a home business office within a Home for such Owner's personal use; provided, however, business invitees, customers, and clients shall not be permitted to meet with Owners in Homes unless the Board provides otherwise in the Rules and Regulations.  No Owner may actively engage in any solicitations for commercial purposes within Bridgewater.  No solicitors of a commercial nature shall be allowed within Bridgewater, without the prior written consent of Association.  No day care center or facility may be operated out of a Home.  No garage sales are permitted, except as permitted by Association.  Prior to the Community Completion Date, Association shall not permit any garage sales without the prior written consent of Developer.

12.7   Completion and Sale of Units.  No person or entity shall interfere with the completion and sale of Homes within Bridgewater.  WITHOUT LIMITING THE FOREGOING, EACH OWNER, BY ACCEPTANCE OF A DEED, AGREES THAT ACTIONS OF OWNERS MAY IMPACT THE VALUE OF HOMES; THEREFORE EACH OWNER IS BENEFITED BY THE FOLLOWING RESTRICTION: PICKETING AND POSTING OF NEGATIVE SIGNS IS STRICTLY PROHIBITED IN ORDER TO PRESERVE THE VALUE OF THE HOMES IN BRIDGEWATER AND THE RESIDENTIAL ATMOSPHERE THEREOF.

12.8   Control of Contractors.  Except for direct services which may be offered to Owners (and then only according to the Rules and Regulations relating thereto as adopted from time to time), no person other than an Association officer shall direct, supervise, or in any manner attempt to assert any control over any contractor of Association.

12.9   Cooking.  No cooking shall be permitted nor shall any goods or beverages be consumed on the Common Areas except in areas designated for those purposes by Association.  The ACC shall have the right to prohibit or restrict the use of grills or barbecue facilities throughout Bridgewater.

12.10   Decorations.  No decorative objects including, but not limited to, birdbaths, light fixtures, sculptures, statues, weather vanes, or flagpoles shall be installed or placed within or upon any portion of Bridgewater without the prior written approval of the ACC.  Notwithstanding the foregoing, holiday lighting and decorations shall be permitted to be placed upon the exterior portions of the Home and upon the Lot in the manner permitted hereunder commencing on Thanksgiving and shall be removed not later than January 15th of the following year.  The ACC may establish standards for other holiday lights.  The ACC may require the removal of any lighting that creates a nuisance (e.g., unacceptable spillover to adjacent Home).

12.11   Disputes as to Use.  If there is any dispute as to whether the use of any portion of Bridgewater complies with this Declaration, such dispute shall, prior to the Community Completion Date, be decided by Developer, and thereafter by Association.  A determination rendered by such party with respect to such dispute shall be final and binding on all persons concerned.

12.12   Drainage System.  Drainage systems and drainage facilities may be part to the Facilities, Common Areas, and/or Homes.  Once a drainage system or drainage facilities are installed by Developer, the maintenance of such system and/or facilities thereafter shall be the responsibility of the Owner of the Home which includes such system and/or facilities.  In the event that such system or facilities (whether comprised of swales, pipes, pumps, waterbody slopes, or other improvements) is adversely affected by landscaping, fences, structures, or additions, the cost to correct, repair, or maintain such drainage system and/or facilities shall be the responsibility of the Owner of each Home containing all or a part of such drainage system and/or facilities.  By way of example, and not of limitation, if the Owner of one Home plants a tree (pursuant to ACC approval) and the roots of such tree subsequently affect pipes or other drainage facilities within another Home, the Owner that plants the tree shall be solely responsible for the removal of the roots which adversely affects the adjacent Home.  Likewise, if the roots of a tree located within the Common Areas adversely affect an adjacent Home, Association shall be responsible for the removal of the roots and the costs thereof shall be Operating Costs.  Notwithstanding the foregoing, Association and Developer shall have no responsibility or liability for drainage problems of any type whatsoever.

12.13   Driveway Easement.  Each Owner shall be responsible to repair any damage to a driveway which comprises part of a Home, including, but not limited to, any damage caused by Association or by the holder of any easement over which such driveway is constructed.  Each Owner, by acceptance of a deed to a Home, shall be deemed to have agreed to indemnify and hold harmless Association and the holder of any such easement, including without limitation, all applicable utility companies and governmental agencies, their agents, servants, employees and elected officials, from and against any and all actions or claims whatsoever arising out of the use of the Common Areas and any easement or the construction and/or maintenance of any driveway in that portion of the Common Areas, easement area, or in a public right-of-way between the boundary of such Owner's Home and the edge of the adjacent paved roadway.  Further, each Owner agrees to reimburse Association any expense incurred in repairing any damage to such driveway in the event that such Owner fails to make the required repairs.

12.14   Extended Vacation and Absences.  In the event a Home will be unoccupied for an extended period, the Home must be prepared prior to departure by: (i) notifying Association; (ii) removing all removable furniture, plants and other objects from outside the Home; and (iii) designating a responsible firm or individual to care for the Home, should the Home suffer damage or require attention, and providing a key to that firm or individual.  The name of the designee shall be furnished to Association.  Association shall have no responsibility of any nature relating to any unoccupied Home.

12.15   Fences and Walls; Screens.  No walls or fences shall be erected or installed without prior written consent of the ACC.  No chain link fencing of any kind shall be allowed.  All screening and screened enclosures shall have the prior written approval of the ACC and shall be constructed utilizing white aluminum.  Screening shall be charcoal in color.  All enclosures of balconies or patios, including addition of vinyl windows, and all decks shall require the prior written approval of the ACC.  Due to Association's maintenance requirements and responsibilities, the installation of fences within a drainage easement area is not expected to be approved by the ACC.  However, in the event a fence is installed within a drainage easement area, with prior written ACC approval, the Owner is solely responsible for fence repair or replacement if the drainage easement area needs to be accessed or as otherwise provided in Section 14.10 hereof.  Wooden fences shall be made of ultrawood or a like material and shall have a warranty of no less than forty (40) years.

12.16   Fuel Storage. No fuel storage shall be permitted within Bridgewater, except as may be necessary or reasonably used for swimming pools, spas, barbecues, fireplaces or similar devices.

12.17   Garages. Each single family Home will have its own garage. Homes on forty (40) foot Lots will have a single garage with a driveway that will accommodate two vehicles. Homes on fifty (50) foot or greater Lots will have two (2) or more garages. No garage shall be converted into a general living area. Garage doors shall remain closed at all times except when vehicular or pedestrian access is required.

12.18   Garbage Cans. Trash collection and disposal procedures established by Association shall be observed. It is possible Association may provide for garbage pick-up, the cost of which shall be Operating Costs. No outside burning of trash or garbage is permitted. No garbage cans, supplies or other similar articles shall be maintained on any Home so as to be visible from outside the Home or Parcel.

12.19   General Use Restrictions. Each Home, the Common Areas and any portion of Bridgewater shall not be used in any manner contrary to the Association Documents.

12.20   Hurricane Shutters. Any hurricane shutters or other protective devices visible from outside a Home shall be of a type as approved in writing by the ACC. Panel, accordion and roll-up style hurricane shutters may not be left closed during hurricane season (nor at any other time). Any such approved hurricane shutters may be installed or closed up to forty-eight (48) hours prior to the expected arrival of a hurricane and must be removed or opened within seventy-two (72) hours after the end of a hurricane watch or warning or as the Board may determine otherwise. Except as the Board may otherwise decide, shutters may not be closed at any time other than a storm event. Any approval by the ACC shall not be deemed an endorsement of the effectiveness of hurricane shutters.

12.21   Irrigation. Due to water quality, irrigation systems may cause staining on Homes, other structures or paved areas. It is each Owner's responsibility to treat and remove any such staining. No Owner whose Home adjoins a waterway or lake may utilize the waterway or lake to irrigate unless so provided by Developer as part of original construction, subject to applicable permitting. Any use of the lake water is at the Owner's sole risk. Each Owner acknowledges that chemicals are used to control aquatic vegetation. Association may use waterways and lakes to irrigate Common Areas subject to applicable permitting. BY ACCEPTANCE OF A DEED TO A HOME OR LOT, EACH OWNER ACKNOWLEDGES THAT THE WATER LEVELS OF ALL LAKES AND WATERBODIES MAY VARY. THERE IS NO GUARANTEE BY DEVELOPER OR ASSOCIATION THAT WATER LEVELS WILL BE CONSTANT OR AESTHETICALLY PLEASING AT ANY PARTICULAR TIME. Developer, Association shall have the right to use one or more pumps to remove water from lakes and waterbodies for irrigation purposes at all times, subject to applicable permitting. Developer may utilize a computerized loop system to irrigate the Common Areas and/or Homes. Any computerized loop irrigation system that is not specifically the maintenance obligation of an Owner, shall be the maintenance obligation of Association and shall be deemed part of the Common Areas.

12.22   Lake and Canal Slopes. The rear yard of some Homes may border lakes and canals forming part of the Common Areas. Association shall maintain any portion of the Common Areas contiguous to the rear lot line of such Home which comprise part of the lake slopes and banks and/or canal slopes and banks to prevent or restore erosion of slopes and banks due to drainage or roof culvert outfalls. The Owner of each Home bordering on the lake and canals shall ensure that lake and canal slopes and banks remain free of any structural or landscape encroachments so as to permit vehicular access for maintenance when needed. Each Owner hereby grants Association an easement of ingress and egress across his or her Home to all adjacent lake and canal areas for the purpose of insuring compliance with the requirements of this Section.

12.23   Laundry. Subject to the provisions of Section 163.04 of the Florida Statutes, to the extent applicable, no rugs, mops, or laundry of any kind, or any other similar type article, shall be shaken, hung or exposed so as to be visible outside the Home or Lot.

12.24   Lawful Use. No immoral, improper, offensive, unlawful or obnoxious use shall be made in any portion of Bridgewater. All laws, zoning ordinances and regulations of all governmental entities having jurisdiction

thereof shall be observed. The responsibility of meeting the requirements of governmental entities for maintenance, modification or repair of a portion of Bridgewater shall be the same as the responsibility for maintenance and repair of the property concerned.

12.25    Lawn Maintenance Standards.  The following maintenance standards (the "**Lawn Maintenance Standards**") apply to landscaping maintained by an Owner:

12.25.1    Trees.  Trees are to be pruned as needed.

12.25.2    Shrubs.  All shrubs are to be trimmed as needed.

12.25.3    Grass.

12.25.3.1    Cutting Schedule.  Grass should be cut on a regular schedule which maintains the grass in a neat and appropriate manner.

12.25.3.2    Edging.  Edging of all streets, curbs, beds and borders shall be performed as needed. CHEMICAL EDGING SHALL NOT BE PERMITTED.

12.25.4    Mulch.  Mulch shall be kept in a neat manner. Mulch shall be replaced as needed, at a minimum of twice per year.

12.25.5    Insect Control and Disease.  Disease and insect control shall be performed on an as needed basis.

12.25.6    Fertilization.  Fertilization of all turf, trees, shrubs, and palms shall be performed three (3) times a year.

12.25.7    Irrigation.  Sprinkler heads shall be maintained on a monthly basis.  Pump stations and valves shall be checked as needed by an independent contractor to assure proper automatic operation.

12.25.8    Weeding.  All beds are to be weeded upon every cut.  Weeds growing in joints in curbs, driveways, and expansion joints shall be removed as needed. Chemical treatment is permitted.

12.25.9    Trash Removal.  Dirt, trash, cuttings and debris resulting from all operations shall be removed and all areas left in clean condition before the end of the day.

12.25.10    Right of Association to Enforce.  Association shall have the right to enforce the foregoing Lawn Maintenance Standards by all necessary legal action.  Association also has the right to adopt rules and regulations respecting the Lawn Maintenance Standards.  In the event that Association is the prevailing party with respect to any litigation respecting the Lawn Maintenance Standards, it shall be entitled to recover all of its attorney's fees and paraprofessional fees, and costs, at trial and upon appeal.

12.26    Landscaping and Irrigation of Lots; Removal of Sod and Shrubbery; Additional Planting.

12.26.1    Following the conveyance of a Home by Developer or Builder to an Owner, no landscaping shall be permitted to be installed without the prior written approval of the ACC..

12.26.2    Every Owner shall be required to irrigate the grass and landscaping located on the Lots in a routine and ordinary manner, and shall ensure that sufficient irrigation occurs during all periods when the Owner is absent from the Lot.

12.26.3    All grass and landscaping located within any rear yard of a Lot that is fenced pursuant to Section 12.15 herein, shall be maintained by the Owner.  No gardens, Jacuzzis, fountains, playground equipment,

pools, screened rooms, or other permitted improvements shall be constructed within the rear yard of a Lot without the prior written approval of the ACC.

12.26.4  Without the prior consent of the ACC, no sod, topsoil, tree or shrubbery shall be removed from Bridgewater, and there shall be no change in the plant landscaping, elevation, condition of the soil or the level of the land of such areas which results in any change in the flow and drainage of surface water which the ACC, in its sole discretion, considers detrimental or potentially detrimental to person or property.  Notwithstanding the foregoing, Owners who install improvements to the Home (including, without limitation, concrete or brick pavers) which result in any change in the flow and/or drainage of surface water shall be responsible for the costs of drainage problems resulting from such improvement.  Further, in the event that such Owner fails to pay for such required repairs, each Owner agrees to reimburse Association for all expenses incurred in fixing such drainage problems including, without limitation, removing excess water and/or repairing the Surface Water Management System.

12.26.5  No landscape lighting shall be installed by an Owner without the prior written approval of the ACC.

12.27    Leases.

12.27.1  Lease Requirements.  Homes may be leased, licensed or occupied only in their entirety and no fraction or portion may be rented.  No bed and breakfast facility may be operated out of a Home.  Individual rooms of a Home may not be leased on any basis.  No transient tenants may be accommodated in a Home.  All leases or occupancy agreements shall be in writing and a copy of all leases of Homes shall be provided to Association if so requested by Association.  No Home may be subject to more than two (2) leases in any twelve (12) month period, regardless of the lease term.  No time-share or other similar arrangement is permitted.  The Owner must make available to the lessee or occupants copies of the Association Documents.  No lease term shall be less than thirty (30) days.  Notwithstanding the foregoing, this Section shall not apply to a situation where an Owner or resident of a Home receives in-home care by a professional caregiver residing within the Home.

12.27.2  Maximum Number of Occupants Per Leased Home.  Each leased Home shall be occupied only by a tenant, members of his or her family, overnight guests and professional caregivers as a residence and for no other purpose.  The maximum number of occupants in any leased Home, including overnight guests and professional caregivers, shall be as follows:

12.27.2.1    In the event the leased Home contains two (2) bedrooms, no more than three (3) persons shall be permitted.

12.27.2.2    In the event the leased Home contains three (3) bedrooms, no more than four (4) persons shall be permitted.

12.27.2.3    In the event the leased Home contains four (4) bedrooms, no more than six (6) persons shall be permitted.

12.28    Maintenance by Owners.

12.28.1  Standard of Maintenance.  Any property, structures, improvements, shadow box fences, and appurtenances shall be well maintained and kept in first class, good, safe, clean, neat and attractive condition consistent with the general appearance of Bridgewater by the Owner of each Home.  Each Owner is specifically responsible for maintaining all grass, landscaping and improvements within any portion of a Home that is fenced.

12.28.2  Enclosed Common Area.  If an Owner has enclosed the yard of a Home, or any portion thereof, with ACC approval, then such Owner must maintain any portion of the Common Areas that is no longer readily accessible to Association.

12.28.3  Weeds and Refuse.  No weeds, underbrush, or other unsightly growth shall be permitted to be grown or remain upon any Home.  No refuse or unsightly objects shall be allowed to be placed or suffered to remain upon any Home.

12.29  Minor's Use of Facilities.  Parents shall be responsible for all actions of their minor children at all times in and about Bridgewater.  Neither Developer nor Association shall be responsible for any use of the facilities by anyone, including minors.

12.30  Nuisances.  No nuisance or any use or practice that is the source of unreasonable annoyance to others or which interferes with the peaceful possession and proper use of Bridgewater is permitted.  No fireworks or firearms shall be discharged within Bridgewater.  Nothing shall be done or kept within the Common Areas, or any other portion of Bridgewater, including a Home or Parcel which will increase the rate of insurance to be paid by Association.

12.31  Oil and Mining Operations.  No oil, drilling development operations, oil refining, quarrying or mining operations of any kind shall be permitted upon or on any Lot, nor shall oil wells, tanks, tunnels, mineral excavations or shafts be permitted upon or on any Lot.  No derrick or other structure designed for use in boring for oil or natural gas shall be erected, maintained or permitted on any Lot.

12.32  Personal Property.  All personal property of Owners or other occupants of Homes shall be stored within the Homes.  No personal property may be stored on, nor any use made of, the Common Areas, any Parcel or Home, or any other portion of Bridgewater, which is unsightly or which interferes with the comfort and convenience of others.

12.33  Pools.  No above-ground pools shall be permitted.  All in-ground pools, hot tubs, spas and appurtenances installed shall require the prior written approval of the ACC as set forth in this Declaration.  The design must incorporate, at a minimum, the following: (i) the composition of the material must be thoroughly tested and accepted by the industry for such construction; (ii) any swimming pool constructed on any Lot shall have an elevation at the top of the pool of not over two (2) feet above the natural grade unless approved by the ACC; (iii) pool cages and screens must be of a design, color and material approved by the ACC and shall be no higher than twelve (12) feet unless otherwise approved by the ACC; and (iv) pool screening shall in no event be higher than the roof line of the Home.  Pool screening shall not extend beyond the sides of the Home without express approval by the ACC.  All pools shall be adequately maintained and chlorinated (or cleaned with similar treatment).  Unless installed by Developer, no diving boards, slides, or platforms shall be permitted without ACC approval.

12.34  Roofs, Driveways and Pressure Treatment.  Roofs and/or exterior surfaces and/or pavement, including, but not limited to, walks and drives, shall be pressure treated within thirty (30) days of notice by the ACC.  No surface applications to driveways shall be permitted without the prior written approval of the ACC as to material, color and pattern.  Such applications shall not extend beyond the front Lot line or include the sidewalk.  Each Owner shall be responsible to pressure clean between paintings.

12.35  Satellite Dishes and Antennae.  No exterior visible antennae, radio masts, towers, poles, aerials, satellite dishes, or other similar equipment shall be placed on any Home or Lot without the prior written approval thereof being first had and obtained from the ACC as required by this Declaration.  The ACC may require, among other things, that all such improvements be screened so that they are not visible from adjacent Homes, or from the Common Areas.  No Owner shall operate any equipment or device which will interfere with the radio or television reception of others.  All antennas not covered by the Federal Communications Commission ("FCC") rules are prohibited.  Installation, maintenance, and use of all antennas shall comply with restrictions adopted by the Board and shall be governed by the then current rules of the FCC.

12.36  Servants.  Servants and domestic help of any Owner may not gather or lounge in or about the Common Areas.

12.37   Signs and Flags.   No sign (including brokerage or for sale/lease signs), flag, banner, sculpture, fountain, outdoor play equipment, solar equipment, artificial vegetation, sports equipment, advertisement, notice or other lettering shall be exhibited, displayed, inscribed, painted or affixed in, or upon any part of Bridgewater that is visible from the outside without the prior written approval thereof being first had and obtained from the ACC as required by this Declaration.  Owners of Homes must obtain "For Sale" and "For Rent" signs, or the standards therefor, from Association.  No sign may be placed in the window of a Home.  Developer and Builders are exempt from this Section.  No in-ground flag poles (except as Developer may use) shall be permitted within Bridgewater, unless written approval of the ACC is obtained.  Notwithstanding the foregoing, flags which are no larger than 24" x 36", attached to a Home and displayed for the purpose of a holiday, and United States of America Flags shall be permitted without ACC approval.

12.38   Sports Equipment.   No recreational, playground or sports equipment shall be installed or placed within or about any portion of Bridgewater without prior written consent of the ACC.  No basketball backboards, skateboard ramps, or play structures will be permitted without written approval by the ACC.  Such approved equipment shall be located at the rear of the Home or on the inside portion of corner Homes within the setback lines. Tree houses or platforms of a similar nature shall not be constructed on any part of a Home.  No basketball hoops shall be attached to a Home and any portable basketball hoops must be stored inside the Home.  No tennis courts are permitted within Lots.

12.39   Storage.   No temporary or permanent utility or storage shed, storage building, tent, or other structure or improvement shall be permitted and no other structure or improvement shall be constructed, erected, altered, modified or maintained without the prior approval of the ACC, which approval shall conform to the requirements of this Declaration.  Water softeners, trash containers, and other similar devices shall be properly screened from the street in a manner approved by the ACC.

12.40   Subdivision and Regulation of Land.   No portion of any Home or Parcel shall be divided or subdivided or its boundaries changed without the prior written approval of Association.  No Owner shall inaugurate or implement any variation from, modification to, or amendment of governmental regulations, land use plans, land development regulations, zoning, or any other development orders or development permits applicable to Bridgewater, without the prior written approval of Developer, which may be granted or denied in its sole discretion.

12.41   Substances.   No flammable, combustible or explosive fuel, fluid, chemical, hazardous waste, or substance shall be kept on any portion of Bridgewater or within any Home or Parcel, except those which are required for normal household use.  All propane tanks and bottled gas for household and/or pool purposes (excluding barbeque grill tanks) must be installed underground or in a manner to be screened from view by landscaping or other materials approved by the ACC.

12.42   Swimming, Boating and Docks.   Swimming, boating, and personal watercraft (i.e. jet skis) are prohibited within any of the lakes or waterbodies within or adjacent to Bridgewater.   No docks may be erected within any waterbody.

12.43   Use of Homes.   Each Home is restricted to residential use as a residence by the Owner or permitted occupant thereof, its immediate family, guests, tenants and invitees.

12.44   Visibility on Corners.   Notwithstanding anything to the contrary in these restrictions, no obstruction to visibility at street intersections shall be permitted and such visibility clearances shall be maintained as required by the ACC and governmental agencies.  No vehicles, objects, fences, walls, hedges, shrubs or other planting shall be placed or permitted on a corner Lot where such obstruction would create a traffic problem.

12.45   Wetlands and Mitigation Areas.   It is anticipated that the Common Areas may include one or more preserves, wetlands, and/or mitigation areas.  No Owner or other person shall take any action or enter onto such areas so as to adversely affect the same.  Such areas are to be maintained by Association in their natural state and no vegetation in these areas shall be removed, cut, trimmed or sprayed with herbicide without specific written approval from the SWFWMD.  Association shall allocate sufficient funds in its budget for monitoring and maintenance of the

wetland mitigation area(s) each year until the SWFWMD determines that such area(s) is successful in accordance with the Permit.

12.46    Windows or Wall Units.  No window or wall air conditioning unit may be installed in any window or wall of a Home.

12.47    Window Treatments.  Window treatments shall consist of drapery, blinds, decorative panels, or other tasteful window covering, and no newspaper, aluminum foil, sheets or other temporary window treatments are permitted, except for periods not exceeding one (1) week after an Owner or tenant first moves into a Home or when permanent window treatments are being cleaned or repaired.  No security bars shall be placed on the windows of any Home without prior written approval of the ACC.  No awnings, canopies or shutters shall be affixed to the exterior of a Home without the prior written approval of the ACC.  No reflective tinting or mirror finishes on windows shall be permitted unless approved by the ACC.  Window treatments facing the street shall be of a neutral color, such as white or off-white.

12.48    Easement for Unintentional and Non-Negligent Encroachments.  If any other building or improvement on a Home shall encroach upon another Home by reason of original construction by Developer, then an easement for such encroachment shall exist so long as the encroachment exists.  It is contemplated that each Home shall contain an improvement with exterior walls, footings, and other protrusions which may pass over or underneath an adjacent Home.  A perpetual nonexclusive easement is herein granted to allow the footers for such walls and other protrusions and to permit any natural water run off from roof overhangs, eaves and other protrusions onto an adjacent Home.

13.    Requirement to Maintain Insurance.

13.1    Association.  Association shall maintain the following insurance coverage:

13.1.1    Flood Insurance.  If the Common Areas are located within an area which has special flood hazards and for which flood insurance has been made available under the National Flood Insurance Program (NFIP), coverage in appropriate amounts, available under NFIP for all buildings and other insurable property within any portion of the Common Areas located within a designated flood hazard area.

13.1.2    Liability Insurance.  Commercial general liability insurance coverage providing coverage and limits deemed appropriate.  Such policies must provide that they may not be canceled or substantially modified by any party, without at least thirty (30) days' prior written notice to Developer (until the Community Completion Date) and Association.

13.1.3    Directors and Officers Liability Insurance.  Each member of the Board shall be covered by directors and officers liability insurance in such amounts and with such provisions as approved by the Board.

13.1.4    Other Insurance.  Such other insurance coverages as appropriate from time to time.  All coverage obtained by Association shall cover all activities of Association and all properties maintained by Association, whether or not Association owns title thereto.

13.1.5    Developer.  Prior to the Turnover Date, Developer shall have the right, at Association's expense, to provide insurance coverage under its master insurance policy in lieu of any of the foregoing.

13.2    Homes.

13.2.1    Requirement to Maintain Insurance.  Each Owner shall be required to obtain and maintain adequate insurance of his or her Home.  Such insurance shall be sufficient for necessary repair or reconstruction work, and related costs.  Upon the request of Association, each Owner shall be required to supply the Board with evidence of insurance coverage on his Home which complies with the provisions of this Section.

Without limiting any other provision of this Declaration or the powers of Association, Association shall specifically have the right to bring an action to require an Owner to comply with his or her obligations hereunder.

13.2.2′   Requirement to Reconstruct or Demolish.  In the event that any Home is destroyed by fire or other casualty, the Owner of such Home shall do one of the following:  the Owner shall commence reconstruction and/or repair of the Home (**"Required Repair"**), or Owner shall tear the Home down, remove all the debris, and resod and landscape the property comprising the Home as required by the ACC (**"Required Demolition"**) to the extent permitted under law.  If an Owner elects to perform the Required Repair, such work must be commenced within thirty (30) days of the Owner's receipt of the insurance proceeds respecting such Home.  If an Owner elects to perform the Required Demolition, the Required Demolition must be completed within six (6) months from the date of the casualty or such longer period of time established by the Board in its sole and absolute discretion subject to extension if required by law.  If an Owner elects to perform the Required Repair, such reconstruction and/or repair must be completed in a continuous, diligent, and timely manner.  Association shall have the right to inspect the progress of all reconstruction and/or repair work.  Without limiting any other provision of this Declaration or the powers of Association, Association shall have a right to bring an action against an Owner who fails to comply with the foregoing requirements.  By way of example, Association may bring an action against an Owner who fails to either perform the Required Repair or Required Demolition on his or her Home within the time periods and in the manner provided herein.  Each Owner acknowledges that the issuance of a building permit or a demolition permit in no way shall be deemed to satisfy the requirements set forth herein, which are independent of, and in addition to, any requirements for completion of work or progress requirements set forth in applicable statutes, zoning codes, and/or building codes.

13.2.3   Standard of Work.  The standard for all demolition, reconstruction, and other work performed as required by this Section 13.2.3 shall be in accordance with the Community Standards and any other standards established by Association with respect to any casualty that affects all or a portion of Bridgewater.

13.2.4   Additional Rights of Association.  If an Owner refuses or fails, for any reason, to perform the Required Repair or Required Demolition as herein provided, then Association, in its sole and absolute discretion, by and through its Board is hereby irrevocably authorized by such Owner to perform the Required Repair.  All Required Repair performed by Association pursuant to this Section shall be in conformance with the original plans and specifications for the Home.  Association shall have the absolute right to perform the Required Demolition to a Home pursuant to this Section if any contractor certifies in writing to Association that such Home cannot be rebuilt or repaired.  The Board may levy an Individual Assessment against the Owner in whatever amount sufficient to adequately pay for Required Repair or Required Demolition performed by Association.

13.2.5   Association Has No Liability.  Notwithstanding anything to the contrary this Section, Association, its directors and officers, shall not be liable to any Owner should an Owner fail for any reason whatsoever to obtain insurance coverage on a Home.  Moreover, Association, its directors and officers, shall not be liable to any person if Association does not enforce the rights given to Association in this Section.

13.3   Fidelity Bonds.  If available, a blanket fidelity bond for all officers, directors, trustees and employees of Association, and all other persons handling or responsible for funds of, or administered by, Association.  In the event Association delegates some or all of the responsibility for the handling of the funds to a professional management company or licensed manager, such bonds shall be required for its officers, employees and agents, handling or responsible for funds of, or administered on behalf of Association.  The amount of the fidelity bond shall be based upon reasonable business judgment.  The fidelity bonds required herein must meet the following requirements (to the extent available at a reasonable premium):

13.3.1   The bonds shall name Association as an obligee.

13.3.2   The bonds shall contain waivers, by the issuers of the bonds, of all defenses based upon the exclusion of persons serving without compensation from the definition of "employee" or similar terms or expressions.

13.3.3   The premiums on the bonds (except for premiums on fidelity bonds maintained by a professional management company, or its officers, employees and agents), shall be paid by Association.

13.3.4   The bonds shall provide that they may not be canceled or substantially modified (including cancellation for non-payment of premium) without at least thirty (30) days' prior written notice to Developer (until the Community Completion Date) and Association.

13.4   Association as Agent.   Association is irrevocably appointed agent for each Owner of any interest relating to the Common Areas to adjust all claims arising under insurance policies purchased by Association and to execute and deliver releases upon the payment of claims.

13.5   Casualty to Common Areas.   In the event of damage to the Common Areas, or any portion thereof, Association shall be responsible for reconstruction after casualty.

13.6   Nature of Reconstruction.   Any reconstruction of improvements hereunder shall be substantially in accordance with the plans and specifications of the original improvement, or as the improvement was last constructed, subject to modification to conform with the then current governmental regulation(s).

13.7   Additional Insured.   Developer and its Lender(s) shall be named as additional insured on all policies obtained by Association, as their interests may appear.

13.8   Cost of Payment of Premiums.   The costs of all insurance maintained by Association hereunder, and any other fees or expenses incurred which may be necessary or incidental to carry out the provisions hereof are Operating Costs.

14.   Property Rights.

14.1   Owners' Easement of Enjoyment.   Every Owner, and its immediate family, tenants, guests and invitees, and every owner of an interest in Bridgewater shall have a non-exclusive right and easement of enjoyment in and to those portions of the Common Areas which it is entitled to use for their intended purpose, subject to the following provisions:

14.1.1   Easements, restrictions, reservations, conditions, limitations and declaration of record, now or hereafter existing, and the provisions of this Declaration, as amended.

14.1.2   The right of Association to suspend an Owner's rights hereunder or to impose fines in accordance with Section 720.305 of the Florida Statutes, as amended from time to time.

14.1.3   The right to suspend the right to use all (except vehicular and pedestrian ingress and egress and necessary utilities) or a portion of the Common Areas by an Owner, its immediate family, etc. for any period during which any Assessment against that Owner remains unpaid.

14.1.4   The right of Developer and/or Association to dedicate or transfer all or any part of the Common Areas.   No such dedication or transfer shall be effective prior to the Community Completion Date without prior written consent of Developer.

14.1.5   The perpetual right of Developer to access and enter the Common Areas at any time, even after the Community Completion Date, for the purposes of inspection and testing of the Common Areas. Association and each Owner shall give Developer unfettered access, ingress and egress to the Common Areas so that Developer and/or its agents can perform all tests and inspections deemed necessary by Developer. Developer shall have the right to make all repairs and replacements deemed necessary by Developer.   At no time shall Association and/or an Owner prevent, prohibit and/or interfere with any testing, repair or replacement deemed necessary by Developer relative to any portion of the Common Areas.

14.1.6   The right of Developer and/or Association to modify the Common Areas as set forth in this Declaration.

14.1.7   The rights of Developer and/or Association regarding Bridgewater as reserved in this Declaration, including the right to utilize the same and to grant use rights, etc. to others.

14.1.8   Rules and Regulations adopted governing use and enjoyment of the Common Areas.

14.1.9   An Owner relinquishes use of the Common Areas at any time that a Home is leased to a lessee.

14.2   Ingress and Egress.   An easement for ingress and egress is hereby created for pedestrian traffic over, and through and across sidewalks paths, walks, driveways, passageways, and lanes as the same, from time to time, may exist upon, or be designed as part of, the Common Areas, and for vehicular traffic over, through and across such portions of the Common Areas as, from time to time, may be paved and intended for such purposes.

14.3   Development Easement.   In addition to the rights reserved elsewhere herein, Developer reserves an easement for itself or its nominees over, upon, across, and under Bridgewater as may be required in connection with the development of Bridgewater, and other lands designated by Developer and to promote or otherwise facilitate the development, construction and sale and/or leasing of Homes, any portion of Bridgewater, and other lands designated by Developer. Without limiting the foregoing, Developer specifically reserves the right to use all paved roads and rights of way within Bridgewater for vehicular and pedestrian ingress and egress to and from construction sites and for the construction and maintenance of any Telecommunications Systems provided by Developer. Specifically, each Owner acknowledges that construction vehicles and trucks may use portions of the Common Areas. Developer shall have no liability or obligation to repave, restore, or repair any portion of the Common Areas as a result of the use of the same by construction traffic, and all maintenance and repair of such Common Areas shall be deemed ordinary maintenance of Association payable by all Owners as part of Operating Costs. Without limiting the foregoing, at no time shall Developer be obligated to pay any amount to Association on account of Developer's use of the Common Areas for construction purposes. Developer intends to use the Common Areas for sales of new and used Homes. Further, Developer may market other residences and commercial properties located outside of Bridgewater from Developer's sales facilities located within Bridgewater. Developer has the right to use all portions of the Common Areas in connection with its marketing activities, including, without limitation, allowing members of the general public to inspect model Homes, installing signs and displays, holding promotional parties and picnics, and using the Common Areas for every other type of promotional or sales activity that may be employed in the marketing of new and used residential Homes or the leasing of residential apartments. The easements created by this Section, and the rights reserved herein in favor of Developer, shall be construed as broadly as possible and supplement the rights of Developer set forth in Section 20.6 of this Declaration. At no time shall Developer incur any expense whatsoever in connection with its use and enjoyment of such rights and easements. Without limiting any other provision of this Declaration, Developer may non-exclusively assign its rights hereunder to each Builder.

14.4   Public Easements.   Fire, police, school transportation, health, sanitation and other public service and utility company personnel and vehicles shall have a permanent and perpetual easement for ingress and egress over and across the Common Areas. In addition, Telecommunications Providers shall also have the right to use all paved roadways for ingress and egress to and from Telecommunications Systems within Bridgewater.

14.5   Delegation of Use.   Every Owner shall be deemed to have delegated its right of enjoyment to the Common Areas to occupants or lessees of that Owner's Home subject to the provisions of this Declaration and the Rules and Regulations, as may be promulgated, from time to time. Any such delegation or lease shall not relieve any Owner from its responsibilities and obligations provided herein.

14.6   Easement for Encroachments.   In the event that any improvement upon Common Areas, as originally constructed, shall encroach upon any other property or improvements thereon, or for any reason, then an easement appurtenant to the encroachment shall exist for so long as the encroachment shall naturally exist.

14.7    Permits, Licenses and Easements.   Prior to the Community Completion Date, Developer, and thereafter Association, shall, in addition to the specific rights reserved to Developer herein, have the right to grant, modify, amend and terminate permits, licenses and easements over, upon, across, under and through Bridgewater (including Homes) for Telecommunications Systems, utilities, roads and other purposes reasonably necessary or useful as it determines, in its sole discretion.   To the extent legally required, each Owner shall be deemed to have granted to Developer and, thereafter, Association an irrevocable power of attorney, coupled with an interest, for the purposes herein expressed.

14.8    Blanket Easement in Favor of District.   In the event the District is created, the District shall also have blanket easements necessary for District operations above, across and under Bridgewater.   The easement shall permit, without limitation, all construction, maintenance and replacement activities of the District.

14.9    Support Easement and Maintenance Easement.   An easement is hereby created for the existence and maintenance of supporting structures (and the replacement thereof) in favor of the entity required to maintain the same.   An easement is hereby created for maintenance purposes (including access to perform such maintenance) over and across Bridgewater (including Homes) for the reasonable and necessary maintenance of Common Areas, utilities, cables, wires and other similar facilities.

14.10    Drainage.   A non-exclusive easement shall exist in favor of Developer, Association, and their designees, and any applicable water management district, state agency, county agency and/or federal agency having jurisdiction over Bridgewater over, across and upon Bridgewater for drainage, irrigation and water management purposes.   A non-exclusive easement for ingress, egress and access shall exist for such parties to enter upon and over any portion of Bridgewater (including Homes) in order to construct, maintain, inspect, record data on, monitor, test, or repair, as necessary, any water management areas, irrigation systems and facilities thereon and appurtenances thereto.   No structure, landscaping, or other material shall be placed or be permitted to remain which may damage or interfere with the drainage or irrigation of Bridgewater and/or installation or maintenance of utilities or which may obstruct or retard the flow of water through Bridgewater and/or water management areas and facilities or otherwise interfere with any drainage, irrigation and/or easement provided for in this Section or the use rights set forth elsewhere in this Declaration.

14.11    Easement in favor of Association.   Association is hereby granted an easement over all of Bridgewater, including all Homes and Lots, for the purpose of (a) constructing, maintaining and operating all Common Areas, including, but not limited to, lakes, perimeter walls and fences, and (b) performing any obligations of an Owner for which Association intends to impose an Individual Assessment.

14.12    Duration.   All easements created herein or pursuant to the provisions hereof shall be perpetual unless stated to the contrary.

15.    Assessments.

15.1    Types of Assessments.   Each Owner, by acceptance of a deed or instrument of conveyance for the acquisition of title in any manner (whether or not so expressed in the deed), including any purchaser at a judicial sale, shall hereafter be deemed to have covenanted and agreed to pay to Association at the time and in the manner required by the Board, assessments or charges and any special assessments as are fixed, established and collected from time to time by Association (collectively, the "**Assessments**").   All Owners and Builders shall pay Assessments.   Each Builder shall pay such portion of Operating Costs which benefits any Lot owned by such Builder, as determined by Developer, in Developer's sole discretion.   By way of example, and not of limitation, Developer may require that each Builder pay some portion of Assessments on a Lot owned by a Builder which does not contain a Home.   As vacant Lots owned by Builders may not receive certain services (e.g., Telecommunications Services), Builders shall not be required to pay for the same.

15.2    Purpose of Assessments.   The Assessments levied by Association shall be used for, among other things, the purpose of promoting the recreation, health, safety and welfare of the residents of Bridgewater, and in particular for the improvement and maintenance of the Common Areas and any easement in favor of Association,

including but not limited to the following categories of Assessments as and when levied and deemed payable by the Board:

15.2.1 Any monthly or quarterly assessment (as determined by the Board) or charge for the purpose of operating Association and accomplishing any and all of its purposes, as determined in accordance herewith, including, without limitation, payment of Operating Costs and collection of amounts necessary to pay any deficits from prior years' operation (hereinafter "**Installment Assessments**");

15.2.2 Any special assessments for capital improvements, major repairs, emergencies, the repair or replacement of the Common Areas, or nonrecurring expenses (hereinafter "**Special Assessments**");

15.2.3 Any specific fees, dues or charges to be paid by Owners for any special services provided to or for the benefit of an Owner or Home, for any special or personal use of the Common Areas, or to reimburse Association for the expenses incurred in connection with that service or use (hereinafter "**Use Fees**");

15.2.4 Assessments of any kind for the creation of reasonable reserves for any of the aforesaid purposes. At such time as there are improvements in any Common Areas for which Association has a responsibility to maintain, repair, and replace, the Board may, but shall have no obligation to, include a "Reserve for Replacement" in the Installment Assessments in order to establish and maintain an adequate reserve fund for the periodic maintenance, repair, and replacement of improvements comprising a portion of the Common Areas (hereinafter "**Reserves**"). Assessments pursuant to this Section shall be payable in such manner and at such times as determined by Association, and may be payable in installments extending beyond the fiscal year in which the Reserves are approved. Until the Community Completion Date, Reserves shall be subject to the prior written approval of Developer, which may be withheld for any reason; and

15.2.5 Assessments for which one or more Owners (but less than all Owners) within Bridgewater is subject ("**Individual Assessments**") such as costs of special services provided to a Home or Owner or cost relating to enforcement of the provisions of this Declaration or the architectural provisions hereof as it relates to a particular Owner or Home. By way of example, and not of limitation, in the event an Owner fails to maintain the exterior of his Home (other than those portions of a Home maintained by Association) in a manner satisfactory to Association, Association shall have the right, through its agents and employees, to enter upon the Home and to repair, restore, and maintain the Home as required by this Declaration. The cost thereof, plus the reasonable administrative expenses of Association, shall be an Individual Assessment. The lien for an Individual Assessment may be foreclosed in the same manner as any other Assessment. The lien for an Individual Assessment may be foreclosed in the same manner as any other Assessment. As a further example, if one or more Owners receive optional Telecommunications Services such as Toll Calls, Cable Services and/or Data Transmission Services, and Association pays a Telecommunications Provider for such services, then the cost of such services shall be an Individual Assessment as to each Owner receiving such services. Further, in the event that Association decides it is in the best interest of Bridgewater that Association perform any other obligation of an Owner under this Declaration, the cost of performing such obligation shall be an Individual Assessment. The lien for an Individual Assessment may be foreclosed in the same manner as any other Assessment.

15.3 **Designation.** The designation of Assessment type shall be made by Association. Prior to the Community Completion Date, any such designation must be approved by Developer. Such designation may be made on the budget prepared by Association. The designation shall be binding upon all Owners.

15.4 **Allocation of Operating Costs.**

15.4.1 For the period until the adoption of the first annual budget, the allocation of Operating Costs shall be as set forth in the initial budget prepared by Developer.

15.4.2 Commencing on the first day of the period covered by the annual budget, and until the adoption of the next annual budget, the Assessments shall be allocated so that each Owner shall pay his pro rata portion of Installment Assessments, Special Assessments, and Reserves based upon a fraction, the numerator of

which is one (1) and the denominator of which is the total number of Homes in Bridgewater conveyed to Owners or any greater number determined by Developer from time to time. Developer, in its sole and absolute discretion, may change such denominator from time to time. Under no circumstances will the denominator be less than the number of Homes owned by Owners other than Developer.

15.4.3   In the event the Operating Costs as estimated in the budget for a particular fiscal year are, after the actual Operating Costs for that period is known, less than the actual costs, then the difference shall, at the election of Association: (i) be added to the calculation of Installment Assessments, as applicable, for the next ensuing fiscal year; or (ii) be immediately collected from the Owners as a Special Assessment. Association shall have the unequivocal right to specially assess Owners retroactively on January 1st of any year for any shortfall in Installment Assessments, which Special Assessment shall relate back to the date that the Installment Assessments could have been made. No vote of the Owners shall be required for such Special Assessment (or for any other Assessment except to the extent specifically provided herein).

15.4.4   Each Owner agrees that so long as it does not pay more than the required amount it shall have no grounds upon which to object to either the method of payment or non-payment by other Owners of any sums due.

15.5   <u>General Assessments Allocation</u>. Except as hereinafter specified to the contrary, Installment Assessments, Special Assessments and Reserves shall be allocated equally to each Owner.

15.6   <u>Use Fees and Individual Assessment</u>. Except as hereinafter specified to the contrary, Use Fees and Individual Assessments shall be made against the Owners benefiting from, or subject to the special service or cost as specified by Association.

15.7   <u>Commencement of First Assessment</u>. Assessments shall commence as to each Owner on the day of the conveyance of title of a Home to an Owner. Assessments shall commence as to each Builder on the day of the conveyance of title or transfer of control of a Lot to such Builder.

15.8   <u>Shortfalls and Surpluses</u>. Each Owner acknowledges that because Installment Assessments, Special Assessments, and Reserves are allocated based on the formula provided herein, or upon the number of Homes conveyed to Owners on or prior to September 30 of the prior fiscal year, it is possible that Association may collect more or less than the amount budgeted for Operating Costs. Prior to the Turnover Date, Developer shall have the option to (i) fund the shortfall in Installment Assessments not raised by virtue of all income received by Association or (ii) to pay Installment Assessments on Homes or Lots owned by Developer. If Developer has cumulatively over funded Operating Costs and/or prepaid expenses of Association which have not been reimbursed to Developer prior to the Turnover Date, Association shall refund such amounts to Developer on or prior to the Turnover Date or as soon as possible thereafter (e.g. once the amount is finally determined). Developer shall never be required to (i) pay Installment Assessments if Developer has elected to fund the deficit instead of paying Installment Assessments on Homes or Lots owned by Developer, or (ii) pay Special Assessments, management fees or Reserves. Any surplus Assessments collected by Association may be (i) allocated towards the next year's Operating Costs, (ii) used to fund Reserves, whether or not budgeted, (iii) retained by Association, and/or (iv) used for any other purpose, in Association's sole and absolute discretion. Under no circumstances shall Association be required to pay surplus Assessments to Owners.

15.9   <u>Budget</u>. The initial budget prepared by Developer is adopted as the budget for the period of operation until adoption of the first annual Association budget. Thereafter, annual budgets shall be prepared and adopted by Board. To the extent Association has commenced or will commence operations prior to the date this Declaration is recorded or the first Home is closed, the Operating Costs may vary in one or more respects from that set forth in the initial budget. A Builder shall pay Assessments as per the Builder budget for each Lot owned by such Builder commencing from the date the Builder obtained title to such Lot. Developer shall fund entirely all Operating Costs not covered by Builders' Assessments until the month prior to the closing of the first Home. Thereafter, Assessments shall be payable by each Owner and Builder as provided in this Declaration. THE INITIAL BUDGET OF ASSOCIATION IS PROJECTED (NOT BASED ON HISTORICAL OPERATING

Case 8:12-cv-01087-JSM-TGW   Document 41-1   Filed 04/29/13   Page 47 of 65 PageID 350

FIGURES), THEREFORE, IT IS POSSIBLE THAT ACTUAL ASSESSMENTS MAY BE LESSER OR GREATER THAN PROJECTED.

15.10   Establishment of Assessments.  Assessments shall be established in accordance with the following procedures:

15.10.1  Installment Assessments shall be established by the adoption of a twelve (12) month operating budget by the Board. The budget shall be in the form required by Section 720.303(6) of the Florida Statutes, as amended from time to time. Written notice of the amount and date of commencement thereof shall be given to each Owner not less than ten (10) days in advance of the due date of the first installment thereof. Notwithstanding the foregoing, the budget may cover a period of less than twelve (12) months if the first budget is adopted mid-year or in order to change the fiscal year of Association. The Board may, from time to time, determine how the Assessments will be collected by Association (i.e., monthly, quarterly, or annually).

15.10.2  Special Assessments and Individual Assessments against the Owners may be established by Association, from time to time, and shall be payable at such time or time(s) as determined. Until the Community Completion Date, no Special Assessment shall be imposed without the consent of Developer.

15.10.3  Board may establish, from time to time, by resolution, rule or regulation, or by delegation to an officer or agent, including, a professional management company, Use Fees. The sums established shall be payable by the Owner utilizing the service or facility as determined by Board.

15.11   Initial Capital Contribution.  The first purchaser of each Lot or Home, at the time of closing of the conveyance from the Developer to the purchaser, shall pay to the Developer an initial capital contribution in the amount of three (3) months Assessments or $150.00, whichever is greater (**"Initial Capital Contribution"**). The funds derived from the Initial Capital Contributions shall be used at the discretion of the Developer for any purpose, including but not limited to, future and existing capital improvements, operating expenses, support costs and start-up costs. Developer may waive this requirement for some Lots and Homes, if the first purchaser is a Builder, and the Builder becomes unconditionally obligated to collect and pay the Initial Capital Contribution upon the subsequent sale of each Lot and Home to an end purchaser.

15.12   Resale Capital Contribution.  Association may establish a resale capital contribution (**"Resale Capital Contribution"**). There shall be collected upon every conveyance of an ownership interest in a Home by an Owner other than Developer or Builders an amount payable to Association. The Resale Capital Contribution shall not be applicable to conveyances from Developer or a Builder. After the Home has been conveyed by Developer or a Builder there shall be a recurring assessment payable to Association upon all succeeding conveyances of a Home. The amount of the Resale Capital Contribution and the manner of payment shall be determined by resolution of the Board from time to time; provided, however, all Homes shall be assessed a uniform amount.

15.13   Assessment Estoppel Certificates.  No Owner shall sell or convey its interest in a Home unless all sums due Association have been paid in full and an estoppel certificate in recordable form shall have been received by such Owner. Association shall prepare and maintain a ledger noting Assessments due from each Owner. The ledger shall be kept in the office of Association, or its designees, and shall be open to inspection by any Owner. Within ten (10) days of a written request therefor, there shall be furnished to an Owner an estoppel certificate in writing setting forth whether the Assessments have been paid and/or the amount which is due as of any date. As to parties other than Owners who, without knowledge of error, rely on the certificate, the certificate shall be conclusive evidence of the amount of any Assessment therein stated. The Owner requesting the estoppel certificate shall be required to pay Association a reasonable sum to cover the costs of examining records and preparing such estoppel certificate. Each Owner waives its rights (if any) to an accounting related to Operating Costs or Assessments.

15.14   Payment of Home Real Estate Taxes.  Each Owner shall pay all taxes and obligations relating to its Home which, if not paid, could become a lien against the Home which is superior to the lien for Assessments created by this Declaration.

15.15    Creation of the Lien and Personal Obligation. Each Owner, by acceptance of a deed or instrument of conveyance for the acquisition of title to a Home, shall be deemed to have covenanted and agreed that the Assessments, and/or other charges and fees set forth herein, together with interest, late fees, costs and reasonable attorneys' fees and paraprofessional fees at all levels of proceedings including appeals, collections and bankruptcy, shall be a charge and continuing lien in favor of Association encumbering the Home and all personal property located thereon owned by the Owner against whom each such Assessment is made. The lien is effective from and after recording a Claim of Lien in the Public Records stating the legal description of the Home, name of the Owner, and the amounts due as of that date, but shall relate back to the date that this Declaration is recorded. The Claim of Lien shall also cover any additional amounts which accrue thereafter until satisfied. Each Assessment, together with interest, late fees, costs and reasonable attorneys' fees and paraprofessional fees at all levels including appeals, collections and bankruptcy, and other costs and expenses provided for herein, shall be the personal obligation of the person who was the Owner of the Home at the time when the Assessment became due, as well as the Owner's heirs, devisees, personal representatives, successors or assigns.

15.16    Subordination of the Lien to Mortgages. The lien for Assessments shall be subordinate to bona fide first mortgages held by a Lender on any Home, if the mortgage is recorded in the Public Records prior to the Claim of Lien. The lien for Assessments shall not be affected by any sale or transfer of a Home, except in the event of a sale or transfer (by deed in lieu of foreclosure or otherwise) of a Home pursuant to a foreclosure of a bona fide first mortgage, in which event, the acquirer of title, its successors and assigns, shall not be liable for Assessments encumbering the Home or chargeable to the former Owner of the Home which became due prior to such sale or transfer. However, any such unpaid Assessments for which such acquirer of title is not liable may be reallocated and assessed to all Owners (including such acquirer of title) as a part of Operating Costs included within Installment Assessments. Any sale or transfer pursuant to a foreclosure (by deed in lieu of foreclosure or otherwise) shall not relieve the Owner from liability for, nor the Home from the lien of, any Assessments made thereafter. Nothing herein contained shall be construed as releasing the party liable for any delinquent Assessments from the payment thereof, or the enforcement of collection by means other than foreclosure. A Lender shall give written notice to Association if the mortgage held by such Lender is in default. Association shall have the right, but not the obligation, to cure such default within the time periods applicable to Owner. In the event Association makes such payment on behalf of an Owner, Association shall, in addition to all other rights reserved herein, be subrogated to all of the rights of the Lender. All amounts advanced on behalf of an Owner pursuant to this Section shall be added to Assessments payable by such Owner with appropriate interest.

15.17    Acceleration. In the event of a default in the payment of any Assessment, Association may accelerate the Assessments then due for up to the next ensuing twelve (12) month period.

15.18    Non-Payment of Assessments. If any Assessment is not paid within fifteen (15) days (or such other period of time established by the Board) after the due date, a late fee of $25.00 per month (or such greater amount established by the Board), together with interest in an amount equal to the maximum rate allowable by law (or such lesser rate established by the Board), per annum, beginning from the due date until paid in full, may be levied. The late fee shall compensate Association for administrative costs, loss of use of money, and accounting expenses. Association may, at any time thereafter, bring an action at law against the Owner personally obligated to pay the same, and/or foreclose the lien against the Home, or both. Association shall not be required to bring such an action if it believes that the best interests of Association would not be served by doing so. There shall be added to the Assessment all costs expended in preserving the priority of the lien and all costs and expenses of collection, including attorneys' fees and paraprofessional fees, at all levels of proceedings, including appeals, collection and bankruptcy. No Owner may waive or otherwise escape liability for Assessments provided for herein by non-use of, or the waiver of the right to use the Common Areas or by abandonment of a Home.

15.19    Exemption. Notwithstanding anything to the contrary herein, neither Developer, the District, nor any Home or property owned by Developer shall (unless specified to the contrary by Developer in a separate written instrument) be responsible for any Assessments of any nature or any portion of the Operating Costs. Developer, at Developer's sole option, may pay Assessments on Homes owned by it, or fund the Deficit, if any, as set forth in Section 15.8 herein. In addition, the Board shall have the right to exempt any portion of Bridgewater subject to this Declaration from the Assessments, provided that such portion of Bridgewater exempted is used (and as long as it is used) for any of the following purposes:

15.19.1 Any easement or other interest therein dedicated and accepted by the local public authority and devoted to public use;

15.19.2 Any real property interest held by a Telecommunications Provider;

15.19.3 Any of Bridgewater exempted from ad valorem taxation by the laws of the State of Florida or exempted from Assessments by other provisions of this Declaration;

15.19.4 Any easement or other interest dedicated or conveyed to not for profit corporations for the use and benefit of residents in the Development of Regional Impact of which Bridgewater is a part.

15.20   Collection by Developer. If for any reason Association shall fail or be unable to levy or collect Assessments, then in that event, Developer shall at all times have the right, but not the obligation: (i) to advance such sums as a loan to Association to bear interest and to be repaid as hereinafter set forth; and/or (ii) to levy and collect such Assessments by using the remedies available as set forth above, which remedies; including, but not limited to, recovery of attorneys' fees and paraprofessional fees at all levels including appeals, collections and bankruptcy, shall be deemed assigned to Developer for such purposes. If Developer advances sums, it shall be entitled to immediate reimbursement, on demand, from Association for such amounts so paid, plus interest thereon at the Wall Street Journal Prime Rate plus two percent (2%), plus any costs of collection including, but not limited to, reasonable attorneys' fees and paraprofessional fees at all levels including appeals, collections and bankruptcy.

15.21   Rights to Pay Assessments and Receive Reimbursement. Association, Developer, and any Lender of a Home shall have the right, but not the obligation, jointly and severally, and at their sole option, to pay any Assessments or other charges which are in default and which may or have become a lien or charge against any Home. If so paid, the party paying the same shall be subrogated to the enforcement rights of Association with regard to the amounts due.

15.22   Mortgagee Right. Each Lender may request in writing that Association notify such Lender of any default of the Owner of the Home subject to the Lender's Mortgage under the Association Documents which default is not cured within thirty (30) days after Association learns of such default. A failure by Association to furnish notice to any Lender shall not result in liability of Association because such notice is given as a courtesy to a Lender and the furnishing of such notice is not an obligation of Association to Lender.

16.   Information to Lenders and Owners.

16.1   Availability. There shall be available for inspections upon request, during normal business hours or under other reasonable circumstances, to Owners and Lenders current copies of the Association Documents.

16.2   Copying. Any Owner and/or Lender shall be entitled, upon written request, and at its cost, to a copy of the documents referred to above.

16.3   Notice. Upon written request by a Lender (identifying the name and address of the Lender and the name and address of the applicable Owner), the Lender will be entitled to timely written notice of:

16.3.1 Any condemnation loss or casualty loss which affects a material portion of a Home to the extent Association is notified of the same;

16.3.2 Any delinquency in the payment of Assessments owed by an Owner of a Home subject to a first mortgage held by the Lender, which remains uncured for a period of sixty (60) days;

16.3.3 Any lapse, cancellation, or material modification of any insurance policy or fidelity bond maintained hereunder;

16.3.4   Any proposed action (if any) which would require the consent of a specific mortgage holder.

17.   <u>Architectural Control</u>. The following provisions govern Bridgewater.

17.1   <u>Architectural Control Committee</u>. The ACC shall be a permanent committee of Association and shall administer and perform the architectural and landscape review and control functions relating to Bridgewater. The ACC shall consist of a minimum of three (3) members who shall initially be named by Developer and who shall hold office at the pleasure of Developer. Until the Community Completion Date, Developer shall have the right to change the number of members on the ACC, and to appoint, remove, and replace all members of the ACC. Developer shall determine which members of the ACC shall serve as its chairman and co-chairman. In the event of the failure, refusal, or inability to act of any of the members appointed by Developer, Developer shall have the right to replace any member within thirty (30) days of such occurrence. If Developer fails to replace that member, the remaining members of the ACC shall fill the vacancy by appointment. From and after the Community Completion Date, the Board shall have the same rights as Developer with respect to the ACC. The ACC shall enforce the Community Standards as if set forth herein.

17.2   <u>Membership</u>. There is no requirement that any member of the ACC be an Owner or a member of Association.

17.3   <u>General Plan</u>. It is the intent of this Declaration to create a general plan and scheme of development of Bridgewater. Accordingly, the ACC shall have the right to approve or disapprove all architectural, landscaping, and improvements within Bridgewater by Owners other than Developer. The ACC shall have the right to evaluate all plans and specifications as to harmony of exterior design, landscaping, location of any proposed improvements, relationship to surrounding structures, topography and conformity with such other reasonable requirements as shall be adopted by ACC. The ACC may impose standards for construction and development which may be greater or more stringent than standards prescribed in applicable building, zoning, or other local governmental codes. Prior to the Community Completion Date, any additional standards or modification of existing standards shall require the consent of Developer, which may be granted or denied in its sole discretion.

17.4   <u>Community Plan</u>. Developer has established an overall Community Plan. However, notwithstanding the above, or any other document, brochures or plans, Developer reserves the right to modify the Community Plan or any site plan at any time as it deems desirable in its sole discretion and in accordance with applicable laws and ordinances. WITHOUT LIMITING THE FOREGOING, DEVELOPER MAY PRESENT TO THE PUBLIC OR TO OWNERS RENDERINGS, PLANS, MODELS, GRAPHICS, TOPOGRAPHICAL TABLES, SALES BROCHURES, OR OTHER PAPERS RESPECTING BRIDGEWATER.   SUCH RENDERINGS, PLANS, MODELS, GRAPHICS, TOPOGRAPHICAL TABLES, SALES BROCHURES, OR OTHER PAPERS ARE NOT A GUARANTEE OF HOW BRIDGEWATER WILL APPEAR UPON COMPLETION AND DEVELOPER RESERVES THE RIGHT TO CHANGE ANY AND ALL OF THE FOREGOING AT ANY TIME AS DEVELOPER DEEMS NECESSARY IN ITS SOLE AND ABSOLUTE DISCRETION.

17.5   <u>Community Standards</u>. Each Owner and its contractors and employees shall observe, and comply with, the Community Standards which now or may hereafter be promulgated by the ACC and approved by the Board of Association from time to time. The Community Standards shall be effective from the date of adoption; shall be specifically enforceable by injunction or otherwise; and shall have the effect of covenants as set forth herein verbatim. The Community Standards shall not require any Owner to alter the improvements previously constructed. Until the Community Completion Date, Developer shall have the right to approve the Community Standards, which approval, may be granted in its sole discretion.

17.6   <u>Quorum</u>. A majority of the ACC shall constitute a quorum to transact business at any meeting. The action of a majority present at a meeting at which a quorum is present shall constitute the action of the ACC. In lieu of a meeting, the ACC may act in writing.

17.7    Power and Duties of the ACC.   No improvements shall be constructed on any portion of Bridgewater, no exterior of a Home shall be repainted, no landscaping, sign, or improvements erected, removed, planted, or maintained on any portion of Bridgewater, nor shall any material addition to or any change, replacement, or alteration of the improvements as originally constructed by Developer (visible from the exterior of the Home) be made until the plans and specifications showing the nature, kind, shape, height, materials, floor plans, color scheme, and the location of same shall have been submitted to and approved in writing by the ACC.

17.8    Procedure.   In order to obtain the approval of the ACC, each Owner shall observe the following:

17.8.1   Each applicant shall submit an application to the ACC with respect to any proposed improvement or material change in an improvement, together with the required application(s) and other fee(s) as established by the ACC. The applications shall include such information as may be required by the application form adopted by the ACC. The ACC may also require submission of samples of building materials and colors proposed to be used. At the time of such submissions, the applicant shall, if requested, submit to the ACC, such site plans, plans and specifications for the proposed improvement, prepared and stamped by a registered Florida architect or residential designer, and landscaping and irrigation plans, prepared by a registered landscape architect or designer showing all existing trees and major vegetation stands and surface water drainage plan showing existing and proposed design grades, contours relating to the predetermined ground floor finish elevation, pool plans and specifications and the times scheduled for completion, all as reasonably specified by the ACC.

17.8.2   In the event the information submitted to the ACC is, in the ACC's opinion, incomplete or insufficient in any manner, the ACC may request and require the submission of additional or supplemental information. The Owner shall, within fifteen (15) days thereafter, comply with the request.

17.8.3   No later than thirty (30) days after receipt of all information required by the ACC for final review, the ACC shall approve or deny the application in writing. The ACC shall have the right to refuse to approve any plans and specifications which are not suitable or desirable, in the ACC's sole discretion, for aesthetic or any other reasons or to impose qualifications and conditions thereon. In approving or disapproving such plans and specifications, the ACC shall consider the suitability of the proposed improvements, the materials of which the improvements are to be built, the site upon which the improvements are proposed to be erected, the harmony thereof with the surrounding area and the effect thereof on adjacent or neighboring property. In the event the ACC fails to respond within said thirty (30) day period, the plans and specifications shall be deemed disapproved by the ACC.

17.8.4   Construction of all improvements shall be completed within the time period set forth in the application and approved by the ACC.

17.8.5   In the event that the ACC disapproves any plans and specifications, the applicant may request a rehearing by the ACC for additional review of the disapproved plans and specifications. The meeting shall take place no later than thirty (30) days after written request for such meeting is received by the ACC, unless applicant waives this time requirement in writing. The ACC shall make a final written decision no later than thirty (30) days after such meeting. In the event the ACC fails to provide such written decision within said thirty (30) days, the plans and specifications shall be deemed disapproved.

17.8.6   Upon final disapproval (even if the members of the Board and ACC are the same), the applicant may appeal the decision of the ACC to the Board within thirty (30) days of the ACC's written review and disapproval. Review by the Board shall take place no later than thirty (30) days subsequent to the receipt by the Board of the Owner's request therefor. If the Board fails to hold such a meeting within thirty (30) days after receipt of request for such meeting, then the plans and specifications shall be deemed approved. The Board shall make a final decision no later than sixty (60) days after such meeting. In the event the Board fails to provide such written decision within said sixty (60) days after such meeting, such plans and specifications shall be deemed approved. The decision of the ACC, or if appealed, the Board, shall be final and binding upon the applicant, its heirs, legal representatives, successors and assigns.

17.9 <u>Alterations</u>. Any and all alterations, deletions, additions and changes of any type or nature whatsoever to then existing improvements or the plans or specifications previously approved by the ACC shall be subject to the approval of the ACC in the same manner as required for approval of original plans and specifications.

17.10 <u>Variances</u>. Association or ACC shall have the power to grant variances from any requirements set forth in this Declaration or from the Community Standards, on a case by case basis, provided that the variance sought is reasonable and results from a hardship upon the applicant. The granting of a variance shall not nullify or otherwise affect the right to require strict compliance with the requirements set forth herein or in the Community Standards on any other occasion.

17.11 <u>Permits</u>. The Owner is solely responsible to obtain all required building and other permits from all governmental authorities having jurisdiction.

17.12 <u>Construction by Owners</u>. The following provisions govern construction activities by Owners after consent of the ACC has been obtained:

17.12.1 Each Owner shall deliver to the ACC, if requested, copies of all construction and building permits as and when received by the Owner. Each construction site in Bridgewater shall be maintained in a neat and orderly condition throughout construction. Construction activities shall be performed on a diligent, workmanlike and continuous basis. Roadways, easements, swales, Common Areas and other such areas in Bridgewater shall be kept clear of construction vehicles, construction materials and debris at all times. No construction office or trailer shall be kept in Bridgewater and no construction materials shall be stored in Bridgewater subject, however, to such conditions and requirements as may be promulgated by the ACC. All refuse and debris shall be removed or deposited in a dumpster on a daily basis. No materials shall be deposited or permitted to be deposited in any canal or waterway or Common Areas or other Homes in Bridgewater or be placed anywhere outside of the Home upon which the construction is taking place. No hazardous waste or toxic materials shall be stored, handled and used, including, without limitation, gasoline and petroleum products, except in compliance with all applicable federal, state and local statutes, regulations and ordinances, and shall not be deposited in any manner on, in or within the construction or adjacent property or waterways. All construction activities shall comply with the Community Standards. If a contractor or Owner shall fail in any regard to comply with the requirements of this Section, the ACC may require that such Owner or contractor post security with Association in such form and amount deemed appropriate by the ACC in its sole discretion.

17.12.2 There shall be provided to the ACC, if requested, a list (name, address, telephone number and identity of contact person), of all contractors, subcontractors, materialmen and suppliers (collectively, **"Contractors"**) and changes to the list as they occur relating to construction. Each builder and all of its employees and Contractors and their employees shall utilize those roadways and entrances into Bridgewater as are designated by the ACC for construction activities. The ACC shall have the right to require that each Builder's and Contractor's employees check in at the designated construction entrances and to refuse entrance to persons and parties whose names are not registered with the ACC.

17.12.3 Each Owner is responsible for insuring compliance with all terms and conditions of these provisions and of the Community Standards by all of its employees and Contractors. In the event of any violation of any such terms or conditions by any employee or Contractor, or, in the opinion of the ACC, the continued refusal of any employee or Contractor to comply with such terms and conditions, after five (5) days' notice and right to cure, the ACC shall have, in addition to the other rights hereunder, the right to prohibit the violating employee or Contractor from performing any further services in Bridgewater.

17.12.4 The ACC may, from time to time, adopt standards governing the performance or conduct of Owners, Contractors and their respective employees within Bridgewater. Each Owner and Contractor shall comply with such standards and cause its respective employees to also comply with same. The ACC may also promulgate requirements to be inserted in all contracts relating to construction within Bridgewater and each Owner shall include the same therein.

17.13    Inspection. There is specifically reserved to Association and ACC and to any agent or member of either of them, the right of entry and inspection upon any portion of Bridgewater at any time within reasonable daytime hours, for the purpose of determination whether there exists any violation of the terms of any approval or the terms of this Declaration or the Community Standards.

17.14    Violation. Without limiting any other provision herein, if any improvement shall be constructed or altered without prior written approval, or in a manner which fails to conform with the approval granted, the Owner shall, upon demand of Association or the ACC, cause such improvement to be removed, or restored until approval is obtained or in order to comply with the plans and specifications originally approved. The Owner shall be liable for the payment of all costs of removal or restoration, including all costs and attorneys' fees and paraprofessional fees at all levels including appeals, collections and bankruptcy, incurred by Association or ACC. The costs shall be deemed an Individual Assessment and enforceable pursuant to the provisions of this Declaration. The ACC and/or Association is specifically empowered to enforce the architectural and landscaping provisions of this Declaration and the Community Standards, by any legal or equitable remedy.

17.15    Court Costs. In the event that it becomes necessary to resort to litigation to determine the propriety of any constructed improvement or to cause the removal of any unapproved improvement, Association and/or ACC shall be entitled to recover court costs, expenses and attorneys' fees and paraprofessional fees at all levels, including appeals, collections and bankruptcy, in connection therewith.

17.16    Certificate. In the event that any Owner fails to comply with the provisions contained herein, the Community Standards, or other rules and regulations promulgated by the ACC, Association and/or ACC may, in addition to all other remedies contained herein, record a Certificate of Non-Compliance against the Home stating that the improvements on the Home fail to meet the requirements of this Declaration and that the Home is subject to further enforcement remedies.

17.17    Certificate of Compliance. If requested by an Owner, prior to the occupancy of any improvement constructed or erected on any Home by other than Developer, or its designees, the Owner thereof shall obtain a Certificate of Compliance from the ACC, certifying that the Owner has complied with the requirements set forth herein. The ACC may, from time to time, delegate to a member or members of the ACC, the responsibility for issuing the Certificate of Compliance. The issuance of a Certificate of Compliance does not abrogate the ACC's rights set forth in Section 17.13 herein.

17.18    Exemption. Notwithstanding anything to the contrary contained herein, or in the Community Standards, any improvements of any nature made or to be made by Developer or its nominees, including, without limitation, improvements made or to be made to the Common Areas or any Home, shall not be subject to the review of the ACC, Association, or the provisions of the Community Standards.

17.19    Exculpation. Developer, Association, the directors or officers of Association, the ACC, the members of the ACC, or any person acting on behalf of any of them, shall not be liable for any cost or damages incurred by any Owner or any other party whatsoever, due to any mistakes in judgment, negligence, or any action of Developer, Association, ACC or their members, officers, or directors, in connection with the approval or disapproval of plans and specifications. Each Owner agrees, individually and on behalf of its heirs, successors and assigns by acquiring title to a Home, that it shall not bring any action or suit against Developer, Association or their respective directors or officers, the ACC or the members of the ACC, or their respective agents, in order to recover any damages caused by the actions of Developer, Association, or ACC or their respective members, officers, or directors in connection with the provisions of this Section. Association does hereby indemnify, defend and hold Developer and the ACC, and each of their members, officers, and directors harmless from all costs, expenses, and liabilities, including attorneys' fees and paraprofessional fees at all levels, including appeals, of all nature resulting by virtue of the acts of the Owners, Association, ACC or their members, officers and directors. Developer, Association, its directors or officers, the ACC or its members, or any person acting on behalf of any of them, shall not be responsible for any defects in any plans or specifications or the failure of same to comply with applicable laws or code nor for any defects in any improvements constructed pursuant thereto. Each party submitting plans and specifications for approval shall be solely responsible for the sufficiency thereof and for the quality of construction performed pursuant thereto.

18.    Association.  Each Owner and Home is subject to this Declaration which contains, among other things, architectural review requirements, assessment obligations, and use restrictions.

18.1    Surface Water Management System.

18.1.1    The Surface Water Management System within Bridgewater will be owned, maintained and operated by Association or the District as permitted by the SWFWMD.  If owned by Association as Common Areas, the costs of the operation and maintenance of the Surface Water Management System shall be part of the Operating Costs of Association.  If owned by the District as part of the Facilities, the costs of the operation and maintenance of the Surface Water Management System may be part of the District Maintenance Special Assessments.  Notwithstanding the foregoing, the SWFWMD has the right to take enforcement action, including a civil action for an injunction and penalties against Association to compel it to correct any outstanding problems with the Surface Water Management System facilities or in mitigation or conservation areas under the responsibility or control of Association.

18.1.2    Any lakes within Bridgewater shall be the maintenance responsibility of Association or the District.

18.1.3    No construction activities may be conducted relative to any portion of the Surface Water Management System.  Prohibited activities include, but are not limited to, digging or excavation, depositing fill, debris or any other material or item, constructing or altering any water control structure, or any other construction to modify the Surface Water Management System.

18.1.4    Construction and maintenance activities which are consistent with the design and permit conditions approved by the SWFWMD in the Permit may be conducted without specific written approval from the SWFWMD.

18.1.5    It shall be the responsibility of each Owner at the time of any construction to the Home to comply with the construction plans for the Surface Water Management System pursuant to Chapter 40D-4, F.A.C., as approved and on file with SWFWMD, and all other government regulations.  All Owners shall be responsible for maintaining designed flow paths for side and rear drainage as shown in the permitted plans.  If the constructed flow path is disturbed or modified, Association has the authority to enter the Lot, reconstruct the intended flow pattern and then Individually Assess the Owner for the expense.

18.1.6    If Association ceases to exist, all Owners shall be jointly and severally responsible for operation and maintenance of the Surface Water Management System in accordance with the requirements of the Permit, unless and until an alternate entity assumes responsibility.

18.2    Association Easements.  Without limiting any provision of this Declaration, Association, and its agents, employees, and managers, shall be deemed to have easements of ingress and egress in, over, and across the Common Areas for all reasonable purposes including, without limitation, such easements required for maintenance of the lakes and canal banks and slopes for Bridgewater, if any, and the entry and boundary signs.

19.    Owners Liability.

19.1    Loop System Irrigation.  Some or all Homes and Common Areas may receive irrigation pursuant to a loop system.  If an Owner desires to make any alterations or improvements to a Home that in any way affect the loop irrigation system, then the Owner shall be responsible for taking measures to "cap off" the main line of the loop irrigation system that leads to the Home.  In addition, the Owner shall be obligated to obtain the prior written approval of Association before taking any action that may adversely affect the loop irrigation system.  Once the main line is "capped off," the Owner shall then be responsible for maintaining the irrigation system for his or her Home.  Any damages to the Home resulting from an Owner's failure to comply with the terms set forth herein shall be the sole responsibility of such Owner and Developer shall not be liable for the same.  Furthermore, each Owner understands that as provided in this Declaration, an Owner may be permitted to install, without limitation, a patio,

and/or screened enclosure ("**Improvement**") on the Home upon the prior written approval of the ACC as set forth in this Declaration and/or the Community Standards. If an Improvement is approved to be installed, then a five (5) foot gate must also be installed. Before the ACC approves the installation of an Improvement, the irrigation system that will be within the Improvement portion of that Home must be re-routed, if necessary, by a professional irrigation company. In order for the ACC to approve the Improvement installation, a letter or other evidence by a professional irrigation company must be given to the ACC at least ten (10) days before the Improvement installation stating that the effectiveness of Bridgewater drainage system will not be affected by the re-routing of the irrigation system. Should an Owner install the Improvement without providing the necessary letter or other evidence from a professional irrigation company in advance as required herein, then Association may conduct the necessary inspection, repair any necessary drainage facilities and charge the work as an Individual Assessment to such Owner, all as further provided in this Declaration and/or Community Standards.

19.2    <u>Right to Cure</u>. Should any Owner do any of the following:

19.2.1    Fail to perform its responsibilities as set forth herein or otherwise breach the provisions of the Declaration; or

19.2.2    Cause any damage to any improvement or Common Areas; or

19.2.3    Impede Developer, or Association from exercising its rights or performing its responsibilities hereunder; or

19.2.4    Undertake unauthorized improvements or modifications to a Home or the Common Areas; or

19.2.5    Impede Developer from proceeding with or completing the development of Bridgewater,

then Developer and/or Association, where applicable, after reasonable prior written notice, shall have the right, through its agents and employees, to cure the breach, including, but not limited to, the right to enter upon the Home and/or Homes and causing the default to be remedied and/or the required repairs or maintenance to be performed, or as the case may be, remove unauthorized improvements or modifications. The cost thereof, plus reasonable overhead costs and attorneys' fees and paraprofessional fees at all levels including appeals, collections and bankruptcy, incurred shall be assessed against the Owner as an Individual Assessment.

19.3    <u>Non-Monetary Defaults</u>. In the event of a violation by any Owner, other than the nonpayment of any Assessment or other monies, of any of the provisions of this Declaration, Developer or Association shall notify the Owner of the violation, by written notice. If such violation is not cured as soon as practicable and in any event within seven (7) days after such written notice, the party entitled to enforce same may, at its option:

19.3.1    Commence an action to enforce the performance on the part of the Owner or to enjoin the violation or breach or for equitable relief as may be necessary under the circumstances, including injunctive relief; and/or

19.3.2    Commence an action to recover damages; and/or

19.3.3    Take any and all action reasonably necessary to correct the violation or breach.

All expenses incurred in connection with the violation or breach, or the commencement of any action against any Owner, including reasonable attorneys' fees and paraprofessional fees at all levels including appeals, collections and bankruptcy, shall be assessed against the Owner, as an Individual Assessment, and shall be immediately due and payable without further notice.

19.4    <u>No Waiver</u>. The failure to enforce any right, provision, covenant or condition in this Declaration, shall not constitute a waiver of the right to enforce such right, provision, covenant or condition in the future.

MIA\98109.7

19.5    Rights Cumulative.  All rights, remedies, and privileges granted to Developer, Association and/or the ACC pursuant to any terms, provisions, covenants or conditions of this Declaration, or Community Standards, shall be deemed to be cumulative, and the exercise of any one or more shall neither be deemed to constitute an election of remedies, nor shall it preclude any of them from pursuing such additional remedies, rights or privileges as may be granted or as it might have by law.

19.6    Enforcement By or Against Other Persons.  In addition to the foregoing, this Declaration or Community Standards may be enforced by Developer, Association, and/or Owners, where applicable, by any procedure at law or in equity against any person violating or attempting to violate any provision herein, to restrain such violation, to require compliance with the provisions contained herein, to recover damages, or to enforce any lien created herein.  The expense of any litigation to enforce this Declaration or Community Standards shall be borne by the person against whom enforcement is sought, provided such proceeding results in a finding that such person was in violation of this Declaration or the Community Standards.

19.7    Fines.  Association may suspend, for reasonable periods of time, the rights of an Owner or an Owner's tenants, guests and invitees, or both, to use the Common Areas and may levy reasonable fines, not to exceed the maximum amounts permitted by Section 720.305(2) of the Florida Statutes, against an Owner, tenant, guest or invitee, for failure to comply with any provision of this Declaration including, without limitation, those provisions benefiting the SWFWMD.

19.7.1    A fine may be levied on the basis of each day of a continuing violation, with a single notice and opportunity for hearing.  Fines in the aggregate are not capped to any amount.

19.7.2    A fine or suspension may not be imposed without notice of at least fourteen (14) days to the person sought to be fined or suspended and an opportunity for a hearing before a committee of at least three (3) persons (the "**Violations Committee**") appointed by the Board who are not officers, directors or employees of Association, or the spouse, parent, child, brother, sister of an officer, director or employee.  If the Violations Committee does not by a majority vote approve a fine or suspension the same may not be imposed.  The written notice of violation shall be in writing to the Owner, tenant, guest or invitee and detail the infraction or infractions. Included in the notice shall be the date and time of the hearing of the Violations Committee.

19.7.3    The non-compliance shall be presented to the Violations Committee acting as a tribunal, after which the Violations Committee shall hear reasons why a fine should not be imposed.  The hearing shall be conducted in accordance with the procedures adopted by the Violations Committee from time to time.  A written decision of the Violations Committee shall be submitted to the Owner, tenant, guest or invitee, as applicable, by not later than twenty-one (21) days after the meeting of the Violations Committee.  The Owner, tenant, guest or invitee shall have a right to be represented by counsel and to cross-examine witnesses.

19.7.4    The Violations Committee may impose Individual Assessments against the Owner in the amount of $100 (or any greater amount permitted by law from time to time) for each violation.  Each day of non-compliance shall be treated as a separate violation and there is no cap on the aggregate amount the Violations Committee may fine an Owner, tenant, guest or invitee.  Individual Assessment fines shall be paid not later than five (5) days after notice of the imposition of the Individual Assessment.  All monies received from fines shall be allocated as directed by the Board of Directors.

20.    Additional Rights of Developer.

20.1    Sales Office and Administrative Offices.  For so long as Developer and its assigns owns any property in Bridgewater, is affected by this Declaration, or maintains a sales office or administrative office within Bridgewater, Developer shall have the right to take such action reasonably necessary to transact any business necessary to consummate the development of Bridgewater and sales and re-sales of Homes and/or other properties owned by Developer or others outside of Bridgewater.  This right shall include, but not be limited to, the right to maintain models, sales offices and parking associated therewith, have signs on any portion of Bridgewater, including Common Areas, employees in the models and offices, without the payment of rent or any other fee, maintain offices

in models, and use of the Common Areas to show Homes. The sales office, models, signs and all items pertaining to development and sales remain the property of Developer. Developer shall have all of the foregoing rights without charge or expense. Without limiting any other provision of this Declaration, Developer may assign its rights hereunder to each Builder. The rights reserved hereunder shall extend beyond the Community Completion Date.

20.2   Modification.   The development and marketing of Bridgewater will continue as deemed appropriate in Developer's sole discretion, and nothing in this Declaration or Community Standards, or otherwise, shall be construed to limit or restrict such development and marketing. It may be necessary or convenient for the development of Bridgewater to, as an example and not a limitation, amend a Plat and/or the Community Plan, modify the boundary lines of the Common Areas, grant easements, dedications, agreements, licenses, restrictions, reservations, covenants, rights-of-way, and to take such other actions which Developer, or its agents, affiliates, or assignees may deem necessary or appropriate. Association and Owners shall, at the request of Developer, execute and deliver any and all documents and instruments which Developer deems necessary or convenient, in its sole and absolute discretion, to accomplish the same.

20.3   Promotional Events.   Prior to the Community Completion Date, Developer, Builders and their assigns shall have the right, at any time, to hold marketing, special and/or promotional events within Bridgewater and/or on the Common Areas, without any charge for use. Developer, its agents, affiliates, or assignees shall have the right to market Bridgewater and Homes in advertisements and other media by making reference to Bridgewater, including, but not limited to, pictures or drawings of Bridgewater, Common Areas, and Homes constructed in Bridgewater. All logos, trademarks, and designs used in connection with Bridgewater are the property of Developer, and Association shall have no right to use the same after the Community Completion Date except with the express written permission of Developer. Without limiting any other provision of this Declaration, Developer may assign its rights to each Builder.

20.4   Use by Prospective Purchasers.   Prior to the Community Completion Date, Developer and each Builder shall have the right, without charge, to use the Common Areas for the purpose of entertaining prospective purchasers of Homes, or other properties owned by Developer outside of Bridgewater.

20.5   Franchises.   Developer may grant franchises or concessions to commercial concerns on all or part of the Common Areas and shall be entitled to all income derived therefrom.

20.6   Easements.   Until the Community Completion Date, Developer reserves the exclusive right to grant, in its sole discretion, easements, permits and/or licenses for ingress and egress, drainage, utilities service, maintenance, Telecommunications Services; and other purposes over, upon and across Bridgewater so long as any said easements do not materially and adversely interfere with the intended use of Homes previously conveyed to Owners. By way of example, and not of limitation, Developer may be required to take certain action, or make additions or modifications to the Common Areas in connection with an environmental program. All easements necessary for such purposes are reserved in favor of Developer, in perpetuity, for such purposes. Without limiting the foregoing, Developer may relocate any easement affecting a Home, or grant new easements over a Home, after conveyance to an Owner, without the joinder or consent of such Owner, so long as the grant of easement or relocation of easement does not materially and adversely affect the Owner's use of the Home as a residence. As an illustration, Developer may grant as easement for Telecommunications Systems, irrigation, drainage lines or electrical lines over any portion of Bridgewater so long as such easement is outside the footprint of the foundation of any residential improvement constructed on such portion of Bridgewater. Developer shall have the sole right to any fees of any nature associated therewith, including, but not limited to, license or similar fees on account thereof. Association and Owners will, without charge, if requested by Developer: (a) join in the creation of such easements, etc. and cooperate in the operation thereof; and (b) collect and remit fees associated therewith, if any, to the appropriate party. Association will not grant any easements, permits or licenses to any other entity providing the same services as those granted by Developer, nor will it grant any such easement, permit or license prior to the Community Completion Date without the prior written consent of Developer which may be granted or denied in its sole discretion.

20.7   Right to Enforce.   Developer has the right, but not the obligation, to enforce the provisions of this Declaration and the Community Standards and to recover all costs relating thereto, including attorneys' fees and

paraprofessional fees at all levels of proceeding, including appeals, collections and bankruptcy. Such right shall include the right to perform the obligations of Association and to recover all costs incurred in doing so.

20.8     Additional Development.   If Developer withdraws portions of Bridgewater from the operation of this Declaration, Developer may, but is not required to, subject to governmental approvals, create other forms of residential property ownership or other improvements of any nature on the property not subjected to or withdrawn from the operation of this Declaration. Developer shall not be liable or responsible to any person or entity on account of its decision to do so or to provide, or fail to provide, the amenities and/or facilities which were originally planned to be included in such areas. If so designated by Developer, owners or tenants of such other forms of housing or improvements upon their creation, may share in the use of all or some of the Common Areas and other facilities and/or roadways which remain subject to this Declaration. The expense of the operation of such facilities shall be allocated to the various users thereof, if at all, as determined by Developer.

20.9     Representations.   Developer makes no representations concerning development both within the boundaries of Bridgewater including, but not limited to, the number, design, boundaries, configuration and arrangements, prices of all Homes and buildings in all other proposed forms of ownership and/or other improvements on Bridgewater or in Bridgewater or adjacent or near Bridgewater, including, but not limited to, the size, location, configuration, elevations, design, building materials, height, view, airspace, number of homes, number of buildings, location of easements, parking and landscaped areas, services and amenities offered.

20.10   Non-Liability.   NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE ASSOCIATION DOCUMENTS, ASSOCIATION SHALL NOT BE LIABLE OR RESPONSIBLE FOR, OR IN ANY MANNER A GUARANTOR OR INSURER OF, THE HEALTH, SAFETY OR WELFARE OF ANY OWNER, OCCUPANT OR USER OF ANY PORTION OF BRIDGEWATER INCLUDING, WITHOUT LIMITATION, RESIDENTS AND THEIR FAMILIES, GUESTS, LESSEES, LICENSEES, INVITEES, AGENTS, SERVANTS, CONTRACTORS, AND/OR SUBCONTRACTORS OR FOR ANY PROPERTY OF ANY SUCH PERSONS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING:

20.10.1 IT IS THE EXPRESS INTENT OF THE ASSOCIATION DOCUMENTS THAT THE VARIOUS PROVISIONS THEREOF WHICH ARE ENFORCEABLE BY ASSOCIATION AND WHICH GOVERN OR REGULATE THE USES OF BRIDGEWATER HAVE BEEN WRITTEN, AND ARE TO BE INTERPRETED AND ENFORCED, FOR THE SOLE PURPOSE OF ENHANCING AND MAINTAINING THE ENJOYMENT OF BRIDGEWATER AND THE VALUE THEREOF; AND

20.10.2 ASSOCIATION IS NOT EMPOWERED, AND HAS NOT BEEN CREATED, TO ACT AS AN AGENCY WHICH ENFORCES OR ENSURES THE COMPLIANCE WITH THE LAWS OF THE STATE OF FLORIDA AND/OR PASCO COUNTY OR PREVENTS TORTIOUS ACTIVITIES; AND

20.10.3 THE PROVISIONS OF THE ASSOCIATION DOCUMENTS SETTING FORTH THE USES OF ASSESSMENTS WHICH RELATE TO HEALTH, SAFETY, AND WELFARE SHALL BE INTERPRETED AND APPLIED ONLY AS LIMITATIONS ON THE USES OF ASSESSMENT FUNDS AND NOT AS CREATING A DUTY OF ASSOCIATION TO PROTECT OR FURTHER THE HEALTH, SAFETY, OR WELFARE OF ANY PERSON(S), EVEN IF ASSESSMENT FUNDS ARE CHOSEN TO BE USED FOR ANY SUCH REASON.

EACH OWNER (BY VIRTUE OF HIS ACCEPTANCE OF TITLE TO A HOME) AND EACH OTHER PERSON HAVING AN INTEREST IN OR LIEN UPON, OR MAKING A USE OF, ANY PORTION OF BRIDGEWATER (BY VIRTUE OF ACCEPTING SUCH INTEREST OR LIEN OR MAKING SUCH USE) SHALL BE BOUND BY THIS SECTION AND SHALL BE DEEMED TO HAVE AUTOMATICALLY WAIVED ANY AND ALL RIGHTS, CLAIMS, DEMANDS AND CAUSES OF ACTION AGAINST ASSOCIATION ARISING FROM OR CONNECTED WITH ANY MATTER FOR WHICH THE LIABILITY OF ASSOCIATION HAS BEEN DISCLAIMED IN THIS SECTION OR OTHERWISE. AS USED IN THIS SECTION, "ASSOCIATION" SHALL INCLUDE WITHIN ITS MEANING ALL OF ASSOCIATION'S DIRECTORS, OFFICERS, COMMITTEE AND BOARD MEMBERS, EMPLOYEES, AGENTS, CONTRACTORS (INCLUDING MANAGEMENT COMPANIES, SUBCONTRACTORS, SUCCESSORS AND ASSIGNS).

20.11   Resolution of Disputes.  BY ACCEPTANCE OF A DEED, EACH OWNER AGREES THAT THE ASSOCIATION DOCUMENTS ARE VERY COMPLEX; THEREFORE, ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION, WITH RESPECT TO ANY ACTION, PROCEEDING, CLAIM, COUNTERCLAIM, OR CROSS CLAIM, WHETHER IN CONTRACT AND/OR IN TORT (REGARDLESS IF THE TORT ACTION IS PRESENTLY RECOGNIZED OR NOT), BASED ON, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED TO THE ASSOCIATION DOCUMENTS, INCLUDING ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT, VALIDATION, PROTECTION, ENFORCEMENT ACTION OR OMISSION OF ANY PARTY SHOULD BE HEARD IN A COURT PROCEEDING BY A JUDGE AND NOT A JURY IN ORDER TO BEST SERVE JUSTICE.  DEVELOPER HEREBY SUGGESTS THAT EACH OWNER UNDERSTAND THE LEGAL CONSEQUENCES OF ACCEPTING A DEED TO A HOME.

20.12   Venue.  EACH OWNER ACKNOWLEDGES REGARDLESS OF WHERE SUCH OWNER (i) EXECUTED A PURCHASE AND SALE AGREEMENT, (ii) RESIDES, (iii) OBTAINS FINANCING OR (iv) CLOSED ON A HOME, THIS DECLARATION LEGALLY AND FACTUALLY WAS EXECUTED IN PASCO COUNTY, FLORIDA.  DEVELOPER HAS AN OFFICE IN PASCO COUNTY, FLORIDA AND EACH HOME IS LOCATED IN PASCO COUNTY, FLORIDA.  ACCORDINGLY, AN IRREBUTTABLE PRESUMPTION EXISTS THAT THE ONLY APPROPRIATE VENUE FOR THE RESOLUTION OF ANY DISPUTE LIES IN PASCO COUNTY, FLORIDA.  IN ADDITION TO THE FOREGOING, EACH OWNER AND DEVELOPER AGREE THAT THE VENUE FOR RESOLUTION OF ANY DISPUTE LIES IN PASCO COUNTY, FLORIDA.

20.13   Reliance.  BEFORE ACCEPTING A DEED TO A HOME, EACH OWNER HAS AN OBLIGATION TO RETAIN AN ATTORNEY IN ORDER TO CONFIRM THE VALIDITY OF THIS DECLARATION.  BY ACCEPTANCE OF A DEED TO A HOME, EACH OWNER ACKNOWLEDGES THAT HE HAS SOUGHT AND RECEIVED SUCH AN OPINION OR HAS MADE AN AFFIRMATIVE DECISION NOT TO SEEK SUCH AN OPINION.  DEVELOPER IS RELYING ON EACH OWNER CONFIRMING IN ADVANCE OF ACQUIRING A HOME THAT THIS DECLARATION IS VALID, FAIR AND ENFORCEABLE.  SUCH RELIANCE IS DETRIMENTAL TO DEVELOPER.  ACCORDINGLY, AN ESTOPPEL AND WAIVER EXISTS PROHIBITING EACH OWNER FROM TAKING THE POSITION THAT ANY PROVISION OF THIS DECLARATION IS INVALID IN ANY RESPECT.  AS A FURTHER MATERIAL INDUCEMENT FOR DEVELOPER TO SUBJECT BRIDGEWATER TO THIS DECLARATION, EACH OWNER DOES HEREBY RELEASE, WAIVE, DISCHARGE, COVENANT NOT TO SUE, ACQUIT, SATISFY AND FOREVER DISCHARGE DEVELOPER, ITS OFFICERS, DIRECTORS, EMPLOYEES, AND AGENTS AND ITS AFFILIATES AND ASSIGNS FROM ANY AND ALL LIABILITY, CLAIMS, COUNTERCLAIMS, DEFENSES, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, AGREEMENTS, PROMISES AND DEMANDS WHATSOEVER IN LAW OR IN EQUITY WHICH AN OWNER MAY HAVE IN THE FUTURE, OR WHICH ANY PERSONAL REPRESENTATIVE, SUCCESSOR, HEIR OR ASSIGN OF OWNER HEREAFTER CAN, SHALL OR MAY HAVE AGAINST DEVELOPER, ITS OFFICERS, DIRECTORS, EMPLOYEES, AND AGENTS, AND ITS AFFILIATES AND ASSIGNS, FOR, UPON OR BY REASON OF ANY MATTER, CAUSE OR THING WHATSOEVER RESPECTING THIS DECLARATION, OR THE EXHIBITS HERETO.  THIS RELEASE AND WAIVER IS INTENDED TO BE AS BROAD AND INCLUSIVE AS PERMITTED BY THE LAWS OF THE STATE OF FLORIDA.

20.14   Duration of Rights.  The rights of Developer set forth in this Declaration shall, unless specifically provided to the contrary herein, extend for a period of time ending upon the earlier of:  (i) the Community Completion Date; or (ii) a relinquishment by Developer in an amendment to the Declaration placed in the Public Records.

20.15   Monitoring System.  In addition to any Monitoring System maintained and/or operated by Association, if any, the following provisions shall govern any Monitoring System which exclusively serves Bridgewater.

20.15.1   Right to Install.  Association shall have the right, but not the obligation, to contract for the installation of a Monitoring System for Bridgewater and/or each Home within Bridgewater.  Prior to the Community Completion Date, all contracts for Monitoring Systems shall be subject to the prior written approval of

Developer. Developer or its nominees, successors, assigns, affiliates, and licensees may install such a Monitoring System. Developer reserves the right, at any time and in its sole discretion, to discontinue or terminate any Monitoring System prior to the Community Completion Date. In addition, all Owners specifically acknowledge that Bridgewater may have a perimeter access control system, such as fences, walls, hedges, or the like on certain perimeter areas. ASSOCIATION AND DEVELOPER SHALL NOT BE HELD LIABLE FOR ANY LOSS OR DAMAGE BY REASON OR FAILURE TO PROVIDE ADEQUATE ACCESS CONTROL OR INEFFECTIVENESS OF ACCESS CONTROL MEASURES UNDERTAKEN.

      20.15.2 <u>Components</u>. The Monitoring System, if installed, may include one or more manned gatehouses, one or more electronic gates, and roving attendants using vehicles. It is anticipated that the gatehouse, if applicable, will not be manned until after the Community Completion Date, at which time Association may elect to man the gatehouse. Association and Developer do not warrant or guaranty in any manner that the system will include these items, but reserve the right to install or provide the foregoing items, or any other items they deem appropriate in their sole and absolute discretion. After the Community Completion Date, Association may expand the Monitoring System by a vote of the majority of the Board, without the joinder or consent of the Owners or any third parties. Without limiting the foregoing, Developer and Association reserve the right to, at any time, increase, decrease, eliminate, or add manned or unmanned gates houses, information booths, sensors, gates and other access monitoring measures as they deem appropriate in their sole and absolute discretion; provided, however, no changes shall be made prior to the Community Completion Date without the prior written consent of Developer.

      20.15.3 <u>Part of Operating Costs</u>. If furnished and installed within any Home, the cost of operating and monitoring any Monitoring System may be included in Operating Costs of Association and shall be payable as a portion of the Assessments against Owners. The purpose of the Monitoring System will be to control access to Bridgewater.

      20.15.4 <u>Owners' Responsibility</u>. All Owners and occupants of any Home, and the tenants, guests and invitees of any Owner, as applicable, acknowledge that Association, its Board and officers, Developer, their nominees or assigns, or any successor Developer, and the ACC and its members, do not represent or warrant that (a) any Monitoring System, designated by or installed according to guidelines established, will not be compromised or circumvented, (b) any Monitoring System will prevent loss by fire, smoke, burglary, theft, hold-up, or otherwise, and/or the Monitoring System will in all cases provide the detection for which the system is designed or intended. In the event that Developer elects to provide a Monitoring System, Developer shall not be liable to the Owners or Association with respect to such Monitoring System, and the Owners and Association shall not make any claim against Developer for any loss that an Owner or Association may incur by reason of break-ins, burglaries, acts of vandalism, personal injury or death, which are not detected or prevented by the Monitoring System. Each Owner and Association are responsible for protecting and insuring themselves in connection with such acts or incidents. The provision of a Monitoring System (including any type of gatehouse) shall in no manner constitute a warranty or representation as to the provision of or level of security within Bridgewater or any residential subdivision contained therein. Developer and Association do not guarantee or warrant, expressly or by implication, the merchantability of fitness for use of any community Monitoring System, or that any such system (or any of its components or related services) will prevent intrusions, fires, or other occurrences, regardless of whether or not the Monitoring Service is designed to monitor the same. Each and every Owner and the occupant of each Home acknowledges that Developer and Association, their employees, agents, managers, directors, and officers, are not insurers of Owners or Homes, or the personal property located within Homes. Developer and Association will not be responsible or liable for losses, injuries, or deaths resulting from any such events.

21.    <u>Telecommunications Services</u>.

      21.1    <u>Right to Contract for Telecommunications Services</u>. Association shall have the right, but not the obligation, to enter into one or more contracts for the provision of one or more Telecommunications Services for all or any part of Bridgewater. Prior to the Community Completion Date, all contracts between a Telecommunications Provider and Association shall be subject to the prior written approval of Developer.

      21.2    <u>Easements</u>. Developer (i) reserves unto itself and its nominees, successors, assigns, affiliates, and licensees, and (ii) grants to each Telecommunications Provider providing Telecommunications Services to all or a

part of Bridgewater pursuant to an agreement between Association and such Telecommunications Provider, a perpetual right, privilege, easement and right-of-way across, over, under and upon Bridgewater for the installation, construction and maintenance of Telecommunications Systems together with a perpetual right, privilege and easement of ingress and egress, access, over and upon Bridgewater for installing, constructing, inspecting, maintaining, altering, moving, improving and replacing facilities and equipment constituting such systems. If, and to the extent, Telecommunications Services provided by such Telecommunications Systems are to serve all of Bridgewater, then the cost of the Telecommunications Services may be Operating Costs of Association and shall be assessed as a part of the Assessments.

21.3   Restoration.  Upon the completion of any installation, upgrade, maintenance, repair, or removal of the Telecommunications Systems or any part thereof, each Telecommunications Provider shall restore the relevant portion of the Common Areas and/or any Home to as good a condition as that which existed prior to such installation, maintenance, repair or removal. Failure by Telecommunications Provider to complete such restoration within ten (10) days after receiving written notice from Association of such failure shall vest in Association the right (but not the obligation) to restore or cause to be restored such portion of the Common Areas and/or Home disturbed by such work, all at such Telecommunications Provider's sole cost and expense, except for in emergency situations whereby Association may restore or cause to be restored such disturbed portion of the Common Areas and/or Home immediately. In the event that Association exercises the right of self-help, each Telecommunications Provider agrees in advance that Association shall have the sole right to (i) select the contractors to perform such work and (ii) determine the extent of required restoration. This remedy of self-help is in addition to all other remedies of Association hereunder. All reasonable expenses incurred by Association in connection with such restoration shall be paid by Telecommunications Provider within ten (10) days of delivery to Telecommunications Provider of Association's invoice therefor. Any expenses not so paid when due shall bear interest from the due date at the lesser of (i) the publicly announced prime rate (or similar successor reference rate) of Wachovia National Bank or its successor on the date of such invoice, or (ii) the maximum rate of interest allowed by the law of the State of Florida for such obligations, or as may be provided in a contract between Association and a Telecommunications Provider.

21.4   Operating Costs.  Each Owner understands that the expense of any Telecommunications Service may not be charged on a bulk basis, but may be charged at the rate equal to any rate paid by individual home owners that are not subject to a homeowners association in Pasco County, Florida. Each Owner acknowledges that Developer may receive lump sum or monthly compensation from any Telecommunications Provider in connection with the supply of Telecommunications Services. Such compensation may be paid on a per Home or other basis. All such compensation shall be the sole property of Developer, who shall have no duty to account for or disclose the amount of such compensation.

22.   Refund of Taxes and Other Charges.  Unless otherwise provided herein, Association agrees that any taxes, fees or other charges paid by Developer to any governmental authority, utility company or any other entity which at a later date are refunded in whole or in part, shall be returned to Developer in the event such refund is received by Association.

23.   Assignment of Powers.  All or any part of the rights, exemptions and powers and reservations of Developer herein contained may be conveyed or assigned in whole or part to other persons or entities by an instrument in writing duly executed, acknowledged, and at Developer's option, recorded in the Public Records.

24.   General Provisions.

24.1   Authority of Board.  Except when a vote of the membership of Association is specifically required, all decisions, duties, and obligations of Association hereunder may be made by the Board. Association and Owners shall be bound thereby.

24.2   Severability.  Invalidation of any of the provisions of this Declaration by judgment or court order shall in no way affect any other provision, and the remainder of this Declaration shall remain in full force and effect.

24.3    Construction Activities. ALL OWNERS, OCCUPANTS AND USERS OF BRIDGEWATER ARE HEREBY PLACED ON NOTICE THAT (1) DEVELOPER AND/OR ITS AGENTS, CONTRACTORS, SUBCONTRACTORS, LICENSEES AND OTHER DESIGNEES AND/OR (2) ANY OTHER PARTIES MAY BE, FROM TIME TO TIME, CONDUCTING BLASTING, EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR IN PROXIMITY TO BRIDGEWATER. BY THE ACCEPTANCE OF THEIR DEED OR OTHER CONVEYANCE OR MORTGAGE, LEASEHOLD, LICENSE OR OTHER INTEREST, AND BY USING ANY PORTION OF BRIDGEWATER, EACH SUCH OWNER, OCCUPANT AND USER AUTOMATICALLY ACKNOWLEDGES, STIPULATES AND AGREES (i) THAT NONE OF THE AFORESAID ACTIVITIES SHALL BE DEEMED NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, HEREUNDER OR AT LAW GENERALLY, (ii) NOT TO ENTER UPON, OR ALLOW THEIR CHILDREN OR OTHER PERSONS UNDER THEIR CONTROL OR DIRECTION TO ENTER UPON (REGARDLESS OF WHETHER SUCH ENTRY IS A TRESPASS OR OTHERWISE) ANY PROPERTY WITHIN OR IN PROXIMITY TO BRIDGEWATER WHERE SUCH ACTIVITY IS BEING CONDUCTED (EVEN IF NOT BEING ACTIVELY CONDUCTED AT THE TIME OF ENTRY, SUCH AS AT NIGHT OR OTHERWISE DURING NON-WORKING HOURS), (iii) DEVELOPER AND THE OTHER AFORESAID RELATED PARTIES SHALL NOT BE LIABLE FOR ANY AND ALL LOSSES, DAMAGES (COMPENSATORY, CONSEQUENTIAL, PUNITIVE OR OTHERWISE), INJURIES OR DEATHS ARISING FROM OR RELATING TO THE AFORESAID ACTIVITIES, EXCEPT RESULTING DIRECTLY FROM DEVELOPER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, AND (iv) ANY PURCHASE OR USE OF ANY PORTION OF BRIDGEWATER HAS BEEN AND WILL BE MADE WITH FULL KNOWLEDGE OF THE FOREGOING.

24.4    Affirmative Obligation of Association. In the event that Association believes that Developer has failed in any respect to meet Developer's obligations under this Declaration or has failed to comply with any of Developer's obligations under law or the Common Areas are defective in any respect, Association shall give written notice to Developer detailing the alleged failure or defect. Association agrees that once Association has given written notice to Developer pursuant to this Section, Association shall be obligated to permit Developer and its agents to perform inspections of the Common Areas and to perform all tests and make all repairs/replacements deemed necessary by Developer to respond to such notice at all reasonable times. Association agrees that any inspection, test and/or repair/replacement scheduled on a business day between 9 a.m. and 5 p.m. shall be deemed scheduled at a reasonable time. The rights reserved in this Section include the right of Developer to repair or address, in Developer's sole option and expense, any aspect of the Common Areas deemed defective by Developer during its inspections of the Common Areas. Association's failure to give the notice and/or otherwise comply with the provisions of this Section will damage Developer. At this time, it is impossible to determine the actual damages Developer might suffer. Accordingly, if Association fails to comply with its obligations under this Section in any respect, Association shall pay to Developer liquidated damages in the amount of $250,000.00 which Association and Developer agree is a fair and reasonable remedy.

24.5    Execution of Documents. Developer's plan of development for Bridgewater (including, without limitation, the creation of one (1) or more special taxing districts) may necessitate from time to time the execution of certain documents as required by governmental agencies. To the extent that said documents require the joinder of Owners other than Developer, Developer, by its duly authorized officers, may, as the agent or the attorney-in-fact for the Owners, execute, acknowledge and deliver such documents (including, without limitation, any consents or other documents required by any governmental agencies in connection with the creation of any special taxing district); and the Owners, by virtue of their acceptance of deeds, irrevocably nominate, constitute and appoint Developer, through its duly authorized officers, as their proper and legal attorneys-in-fact, for such purpose. Said appointment is coupled with an interest and is therefore irrevocable. Any such documents executed pursuant to this Section may recite that it is made pursuant to this Section. Notwithstanding the foregoing, each Owner agrees, by its acceptance of a deed to a Home or any other portion of Bridgewater, to execute or otherwise join in any petition and/or other documents required in connection with the creation of a special taxing district relating to Bridgewater or any portion(s) thereof.

24.6    Notices. Any notice required to be sent to any person, firm, or entity under the provisions of this Declaration shall be deemed to have been properly sent when mailed, postpaid, to the last known address at the time of such mailing.

OR BK **5574** PG **985**
52 of 102

24.7    Florida Statutes.  Whenever this Declaration refers to the Florida Statutes, it shall be deemed to refer to the Florida Statutes as they exist on the date this Declaration is recorded except to the extent provided otherwise as to any particular provision of the Florida Statutes.

24.8    Title Documents.  Each Owner by acceptance of a deed to a Home acknowledges that such Home is subject to certain land use and title documents and all amendments thereto, recorded in the Public Records of Pasco County, Florida (collectively, the **"Title Documents"**).  Developer's plan of development for Bridgewater may necessitate from time to time the further amendment, modification and/or termination of the Title Documents.  DEVELOPER RESERVES THE UNCONDITIONAL RIGHT TO SEEK AMENDMENTS AND MODIFICATIONS OF THE TITLE DOCUMENTS.  It is possible that a governmental subdivision or agency may require the execution of one or more documents in connection with an amendment, modification, and/or termination of the Title Documents.  To the extent that such documents require the joinder of Owners other than Developer, Developer, by any one of its duly authorized officers, may, as the agent and/or the attorney-in-fact for the Owners, execute, acknowledge and deliver any documents required by applicable governmental subdivision or agency; and the Owners, by virtue of their acceptance of deeds, irrevocably nominate, constitute and appoint Developer, through any one of its duly authorized officers, as their proper and legal attorney-in-fact for such purpose.  This appointment is coupled with an interest and is therefore irrevocable.  Any such documents executed pursuant to this Section may recite that it is made pursuant to this Section.  Notwithstanding the foregoing, each Owner agrees, by its acceptance of a deed to a Home: (i) to execute or otherwise join in any documents required in connection with the amendment, modification, or termination of the Title Documents; and (ii) that such Owner has waived its right to object to or comment the form or substance of any amendment, modification, or termination of the Title Documents.  Without limiting the foregoing, upon the Community Completion Date Association shall assume all of the obligations of Developer under the Title Documents unless otherwise provided by Developer by amendment to this Declaration recorded by Developer in the Public Records, from time to time, and in the sole and absolute discretion of Developer.

**(SIGNATURE AND NOTARY ON NEXT PAGE)**

OR BK **5574**  PG  **986**
53  of  102

IN WITNESS WHEREOF, the undersigned, being Developer hereunder, has hereunto set its hand and seal this ___7th___ day of ___October___, 2003.

WITNESSES:

Print Name: _ERIN L. CISSEL_

Print Name: _Linda Penny_

LENNAR HOMES, INC., a Florida corporation

By: _____
Name: _Doyle D. Dudley_
Title: _Vice President_

{SEAL}

STATE OF FLORIDA            )
                            ) SS.:
COUNTY OF _Hillsborough_    )

The foregoing instrument was acknowledged before me this ___7th___ day of ___October___, 2003 by _Doyle D. Dudley_, as Vice President of Lennar Homes, Inc., a Florida corporation, who is personally known to me or who has produced _____ as identification, on behalf of the corporation.

My commission expires:

NOTARY PUBLIC, State of Florida at Large

Print Name: _Erin L. Cissel_

ERIN L. CISSEL
MY COMMISSION # DD 027985
EXPIRES: May 22, 2005
Bonded Thru Notary Public Underwriters

Bridgewater
Declaration
48
10/6/03

MIA\98109.7

OR BK **5574** PG **987**
54 of 102

## JOINDER

### BRIDGEWATER COMMUNITY ASSOCIATION, INC.

BRIDGEWATER COMMUNITY ASSOCIATION, INC. ("**Association**") does hereby join in the Declaration for Bridgewater ("**Declaration**"), to which this Joinder is attached, and the terms thereof are and shall be binding upon the undersigned and its successors in title. Association agrees that this joinder is for convenience only and not to the effectiveness of this Declaration as Association has no right to approve this Declaration.

IN WITNESS WHEREOF, the undersigned has executed this Joinder on this 7th day of October, 2003.

WITNESSES:

Print Name: Erin L. Cissel

Print Name: Linda Penny

BRIDGEWATER COMMUNITY ASSOCIATION, INC., a Florida not-for-profit corporation

By: _____
Name: BETTY D. VALENTI
Title: President

{SEAL}

STATE OF FLORIDA )
) SS.:
COUNTY OF Hillsborough )

The foregoing instrument was acknowledged before me this 7th day of October, 2003 by Betty D. Valenti as President of BRIDGEWATER COMMUNITY ASSOCIATION, INC., a Florida not-for-profit corporation, who is personally known to me or who produced _____ as identification, on behalf of the corporation.

My commission expires:

NOTARY PUBLIC, State of Florida at Large
Print name: Erin L. Cissel

ERIN L. CISSEL
MY COMMISSION # DD 027985
EXPIRES: May 22, 2006
Bonded Thru Notary Public Underwriters

Bridgewater
Declaration
49
10/6/03

MIA\98109.7